IN THE SUPREME COURT OF PENNSYLVANIA
EASTERN DISTRICT
TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, Appellee | : | No. 792 CAP |
| | : | |
| | : | Appeal from the Order entered on |
| | : | March 31, 2021 in the Court of |
| v. | : | Common Pleas, York County, |
| | : | Criminal Division, at No. CP-67-CR- |
| | : | 0004854-2008. |
| HARVE LAMAR JOHNSON, | : | |
| | : | SUBMITTED: May 16, 2022 |
| Appellant | : | |

## OPINION

**JUSTICE DOUGHERTY**                                  **DECIDED: February 22, 2023**

In this capital case, Harve Lamar Johnson (appellant) appeals from the order of the York County Court of Common Pleas denying his first, timely petition for post-conviction relief pursuant to the Post Conviction Relief Act (PCRA).[1] Appellant raises twenty-two claims. For the reasons set forth below, we affirm.

## I. BACKGROUND

This case arises from the April 2008 murder of D.B., a two-year-old child living with her mother and appellant, mother's boyfriend. We previously recounted the facts underlying appellant's conviction in our opinion affirming his sentence of death on direct appeal:

> On April 6, 2008, police were called to [appellant and appellant's girlfriend's] residence, where they found appellant outside. Victim was on the kitchen floor, unresponsive, and had both old and new bruises all over her body. Police attempted to revive victim, and paramedics transported her to York

---

[1] 42 Pa.C.S. §§9541-9546. This Court has exclusive jurisdiction over appeals from the denial of post-conviction relief in death penalty cases. *See* 42 Pa.C.S. §9546(d).

Hospital. Victim was then transferred to Hershey Medical Center, where she died the next day.

Mother[, Neida Baez,] initially told police her daughter fell into the bathtub; she later told police she fell down a flight of stairs. At trial, mother testified otherwise. Before April 6, 2008, victim had bruises on her fingers and legs and bald spots on her head. On that morning, victim upset appellant by coming into mother and appellant's bedroom. Appellant hit victim and told her to stand in the corner. At about 12:20 p.m., mother heard appellant yelling and victim crying, and saw appellant spanking the child at the top of the stairs. The spanking caused the child's diaper to explode, which angered appellant further; he began beating her again and threatened to beat mother. Mother, who was in a separate room during most of this incident, indicated appellant beat victim for 20 to 30 minutes, although she repeatedly asked him to stop. Eventually, mother could no longer hear victim scream or appellant yell. She then heard water running in the bathtub for approximately 10 minutes. Appellant returned, carrying victim's limp body. Appellant and mother attempted to resuscitate victim and, on mother's prodding, appellant called 911.

At trial, Police Sergeant Roy Kohler testified that when he responded to the 911 call, he noticed appellant near the residence, breathing rapidly and appearing distraught. Kohler asked appellant if he was okay; appellant replied, "No, I don't feel well." N.T. Trial, 11/9/09, at 111. Kohler asked appellant to come to his police cruiser to be medically examined, and appellant agreed. While they were walking to the cruiser, appellant said, "I know I'm in trouble because of all the bruises all over her body. I beat her yesterday pretty bad with a belt." *Id.*, at 113.

Emergency Medical Technician (EMT) Supervisor Donald Sanders testified he medically examined appellant in the back of the cruiser. During the examination, appellant asked how victim was doing. Sanders said they were doing everything possible for the child, and asked what happened to her. Appellant replied, "I've been beating her." *Id.*, at 148. Sanders inquired, "What do you mean?," and appellant stated, "I'm sorry, I did it." *Id.* Sanders asked again, "What do you mean you did it?" *Id.* Appellant elaborated, "I have been hitting the child for the last two or three days." *Id.* Sanders then asked, "Well, what did you use on the child?" Appellant responded, "A belt." *Id.*, at 149. Kohler subsequently drove appellant to the York City Police Department. During the drive, appellant said, "That girl and her mother bruise when I touch them at all. If I bite her mother or hit [victim] at all, they bruise right up." *Id.*, at 117.

At the police department, appellant admitted to detectives that, on multiple prior occasions, he beat victim as a form of discipline. He said victim came into his bedroom between 5:30 a.m. and 6:00 a.m. the day before her death, waking him up. He told victim to stay in a corner of the bedroom until he and mother awoke. He later woke up, left the residence, and returned to

find mother upset. He assumed mother was upset because of victim, so between 12:30 p.m. and 1:00 p.m. he struck victim on her arms and buttocks approximately seven times with the cord from an Xbox controller. He noted these blows could have injured victim's chest and back because the cord wrapped around her body. Victim then moved her bowels, so he took her to a running bathtub of hot water. Appellant claimed he left the child in the bathtub to bring her clean clothes and, when he returned, he found her drowning and noticed a lump on her head. Appellant summoned mother, argued with her about what happened, and sought to revive victim. He admitted he did not call 911 immediately because victim was breathing and he did not want police to see the injuries on her arms.

The Commonwealth also introduced evidence showing blood spatter on a bedroom wall matched victim's DNA. Blood found on the top of the Xbox controller, a child's boot, appellant's clothes, and hairs found in a bedroom also matched victim's DNA. Blood and blood spatter, consistent with impact spatter and matching victim's DNA, were found on victim's clothes.

While victim was being treated at York Hospital, a nurse trained in forensic examination documented and photographed victim's injuries. Eighteen of those photographs were admitted at trial, and the nurse explained the injuries she photographed.

The morning after victim died, a forensic pathologist[, Dr. Wayne Ross,] conducted an autopsy on victim's body and determined she died of multiple traumatic injuries. [Dr. Ross] found approximately 220 external injuries on victim, 150 of which were "fresh," meaning they had occurred within 24 hours of victim's admission to the hospital. He noted victim's right ear had fresh trauma, and the center of her right ear had an abrasion consistent with someone scraping a fingernail in her ear. Victim's hair on the right side of her head was pulled out by its roots. Injuries on her left shoulder were caused by the cord of the Xbox controller, and her entire left arm was swollen. [Dr. Ross] determined bruises on the back of victim's forearm and contusions, bruises, and abrasions to her feet and lower legs were caused by blunt force trauma. [Dr. Ross] discovered numerous fresh internal injuries to victim's head, including swelling and bleeding in her brain, as well as retinal hemorrhages and damage to her spinal cord. He noted victim suffered trauma to her heart, right lung, liver, pancreas, and right adrenal gland, which were caused by multiple high-velocity impacts to the chest and belly. There were also hemorrhages to her neck caused by compression or strangulation. He opined victim was repeatedly struck at a speed of approximately 20 miles per hour. He concluded, at the rate of an injury every 20 seconds, it would take 45 to 60 minutes to inflict all of victim's fresh injuries.

*Commonwealth v. Johnson*, 42 A.3d 1017, 1023-24 (Pa. 2012), *cert. denied*, 569 U.S. 922 (2013) (internal citations and footnotes omitted).

## II. PROCEDURAL HISTORY

Appellant was tried in the York County Court of Common Pleas. *Voir dire* was conducted on November 2-6, 2009, and trial began on November 9, 2009. At trial, appellant was represented by Richard Robinson, Esq., and Ari Weitzman, Esq. On November 13, 2009, the jury convicted appellant of first-degree murder. The penalty phase was held on November 16, 2009, and the jury found two aggravating factors: (1) the offense was committed by means of torture; and (2) the victim was younger than twelve years old. *See* 42 Pa.C.S. §§9711(d)(8) and (16). The jury found one mitigating circumstance — that, as stipulated by the parties, appellant had no significant history of prior criminal convictions, *id.* at §9711(e)(1) — but determined the two aggravating circumstances outweighed it and sentenced appellant to death pursuant to 42 Pa.C.S. §9711(c)(1)(iv).

On February 3, 2010, appellant filed a *nunc pro tunc* direct appeal in this Court. We affirmed his judgment of sentence on April 26, 2012,[2] and the United States Supreme Court denied *certiorari* on April 15, 2013. *Johnson v. Pennsylvania*, 569 U.S. 922 (2013).

Appellant filed a timely first *pro se* PCRA petition and emergency motion for stay of execution on July 23, 2013. His petition was assigned to the trial judge, the Honorable Michael E. Bortner, who granted the stay of execution on August 15, 2013. Counsel was

---

[2] Relevant to the issues raised in the present post-conviction appeal, on direct appeal we rejected appellant's substantive claims alleging the trial court erred in: admitting prior bad act evidence regarding the victim's injuries prior to the incident, appellant's statements to Sergeant Kohler, EMT Supervisor Sanders, and police en route to and at the police department, and photographs of the victim's injuries; failing to instruct the jury on voluntary manslaughter; allowing Dr. Ross to testify at the penalty phase; limiting the direct examination of appellant's mother; allowing the jurors to use their guilt phase notes during the penalty phase; and limiting appellant's description of life in prison during his penalty phase argument. *See Johnson*, 42 A.3d at 1026-38.

appointed and, following a series of extensions, filed an amended petition on December 11, 2014. The Commonwealth filed its answer on July 14, 2015 and, on June 1, 2016, appellant filed a second amended petition. On August 16, 2016, the PCRA court granted the Commonwealth's request for appellant to undergo a psychiatric evaluation. The Commonwealth subsequently filed an answer to appellant's second amended petition on September 9, 2016. Following extensions to accommodate witness scheduling, Judge Bortner conducted evidentiary hearings on February 27, 2017, March 31, 2017, April 26, 2017, June 4-6, 2018, July 30, 2018, August 20-22, 2018, and February 8, 2019.[3]

The PCRA court reserved decision and set a post-hearing briefing schedule. The parties filed briefs, which included proposed findings of fact and conclusions of law, but due to the Covid-19 pandemic, court operations were delayed for over a year. On January 4, 2021, Judge Bortner retired before issuing an opinion and the case was reassigned to President Judge Maria Musti-Cook. Judge Musti-Cook issued a 105-page opinion and order denying relief on March 31, 2021. Appellant timely filed a notice of appeal and concise statement of errors complained of on appeal. In his Pa.R.A.P. 1925(b) statement, appellant raised each claim he presented to the PCRA court, as well as an additional claim challenging the disposition of his petition by a substitute judge. The PCRA court filed its Pa.R.A.P. 1925(a) opinion on June 16, 2021, wherein it adopted its March 31, 2021 order and opinion denying PCRA relief and also addressed appellant's additional

---

[3] Witnesses who testified at the hearings included appellant's trial counsel, Attorneys Robinson and Weitzman, as well as the following individuals listed alphabetically: Dr. Neil Hoffman, Dr. Joette James, Dr. Victoria Reynolds, Dr. Kevin Riley, Dr. Wayne Ross, Dr. Lawrence Rotenberg, Dr. Stanley Schneider, Mr. Robert Tressel, Dr. Chris Van Ee, and Dr. Charles Wetli. In addition, the PCRA court received stipulated testimony from fifteen layperson witnesses in connection with appellant's mitigation claims.

claim. The issues raised in appellant's brief to this Court correspond with the claims he

raised in his Pa.R.A.P. 1925(b) statement of matters complained of on appeal.[4]

## III. STANDARDS OF REVIEW

[4] Appellant's issues on appeal are ordered as follows: (1) the PCRA court erred, abused its discretion, and violated due process when it issued a dispositive order and opinion in this case when it did not hear the evidence, judge credibility, or obtain the consent of the parties; (2) trial and appellate counsel were ineffective for failing to raise and preserve a violation of appellant's rights under Pa.R.Crim.P. 600, state and federal constitutional speedy trial rights, and the right to due process of law; (3) trial counsel were ineffective for failing to develop and present evidence supporting the chosen guilt phase defenses and failing to dispute the prosecution's case; (4) the jury improperly considered appellant's involuntary statements to the police in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments; (5) trial counsel were ineffective for failing to request instructions on voluntary manslaughter and third-degree murder; (6) trial and appellate counsel were ineffective for failing to object to or otherwise litigate the court's opening instructions which erroneously assumed the case would advance to the penalty stage; (7) appellant was denied his rights under the Sixth, Eighth, and Fourteenth Amendments when the court conducted numerous unrecorded portions of the trial proceedings; (8) appellant's rights under the Sixth, Eighth, and Fourteenth Amendments were violated during the guilt phase due to prosecutorial misconduct, court error, and ineffective assistance of counsel; (9) trial counsel were ineffective for failing to investigate, develop, and present mitigating evidence as required by the Sixth, Eighth, and Fourteenth Amendments; (10) the jury found the torture aggravating factor in violation of the Sixth, Eighth, and Fourteenth Amendments as a result of counsel's ineffectiveness; (11) the penalty phase jury instructions violated the Sixth, Eighth, and Fourteenth Amendments in multiple respects; (12) trial counsel were ineffective for failing to present evidence in support of the "age" mitigation factor; (13) trial counsel were ineffective for failing to object to jury instructions related to the possibility of release if appellant were sentenced to life imprisonment; (14) the jury was prevented from considering mitigating evidence as a result of prosecutorial misconduct, court error, and ineffective assistance; (15) appellant was denied his right to an impartial jury; (16) prosecutorial misconduct, ineffective assistance of counsel, and court error caused the jury to consider non-statutory aggravating circumstances and evidence in violation of the Sixth, Eighth, and Fourteenth Amendments; (17) appellant was denied due process when the trial court permitted the jury to consider cumulative and inflammatory photographs and counsel ineffectively failed to prevent such considerations; (18) pervasive prosecutorial misconduct during the penalty phase violated appellant's rights under the Sixth, Eighth, and Fourteenth Amendments; (19) appellant was tried while incompetent; (20) trial counsel were ineffective for failing to request a change of venue in violation of the Sixth, Eighth, and Fourteenth Amendments; (21) appellant's rights under the Sixth, Eighth, and Fourteenth Amendments were violated because Justices Eakin and McCaffery participated in his direct appeal, and were each party to religiously, racially, and sexually offensive emails, which created the appearance of bias, or actual bias; and (22) cumulative prejudice.

We review the denial of PCRA relief by examining whether the PCRA court's conclusions are supported by the record and free from legal error. *See Commonwealth v. Housman*, 226 A.3d 1249, 1260 (Pa. 2020). In so doing, we defer to the factual findings of the post-conviction court, which is tasked with hearing the evidence and assessing credibility. *See id.* Our standard of review over a PCRA court's legal conclusions is *de novo*. *See Commonwealth v. Blakeney*, 108 A.3d 739, 749 (Pa. 2014).

To be entitled to PCRA relief, a petitioner must establish, by a preponderance of the evidence, that the conviction or sentence resulted from one or more of the enumerated errors set forth in 42 Pa.C.S. §9543(a)(2). These include, *inter alia*, a constitutional violation or ineffective assistance of counsel, which "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. §9543(a)(2)(i)-(ii). A petitioner must also show the claim has not been previously litigated or waived, and that "the failure to litigate the issue prior to or during trial, . . . or on direct appeal could not have been the result of any rational, strategic[,] or tactical decision by counsel." 42 Pa.C.S. §9543(a)(3), (a)(4). An issue is previously litigated if "the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue[.]" 42 Pa.C.S. §9544(a)(2). An issue is waived if the petitioner "could have raised it but failed to do so before trial, at trial[,] . . . on appeal[,] or in a prior state postconviction proceeding." 42 Pa.C.S. §9544(b).

Here, the bulk of appellant's claims predominantly allege his trial counsel were ineffective. When analyzing such claims, we begin, as we must, with the presumption that counsel acted effectively. *See, e.g.*, *Commonwealth v. Robinson*, 82 A.3d 998, 1005 (Pa. 2013). To prove otherwise, a petitioner must satisfy the performance and prejudice standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), by a preponderance of the evidence. This Court has applied the *Strickland* test by requiring a petitioner to

establish three elements: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's action or failure to act; and (3) the petitioner suffered prejudice because of counsel's error, with prejudice measured by whether there is a reasonable probability the result of the proceeding would have been different absent the error. *See Commonwealth v. Pierce*, 527 A.2d 973, 975 (Pa. 1987).

With respect to the reasonable basis prong, we have explained that courts should not inquire as to whether there were other, more logical courses of action counsel could have pursued; rather, the appropriate question is whether counsel's decision had any reasonable basis. *See, e.g.*, *Commonwealth v. Howard*, 719 A.2d 233, 237 (Pa. 1998) ("[W]here matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests."); *see also Commonwealth v. Reed*, 42 A.3d 314, 324 (Pa. Super. 2012) ("If a reasonable basis exists for the particular course, the inquiry ends and counsel's performance is deemed constitutionally effective."). Indeed, a claim of ineffectiveness ordinarily will not "succeed through comparing, by hindsight, the trial strategy employed with alternatives not pursued." *Id*.

If a petitioner's claim fails under any required element of the *Strickland* test, the claim may be dismissed on that basis. *Housman*, 226 A.3d at 1260-61. A court is not required to analyze the elements of an ineffectiveness claim in any order of priority; if a claim fails under any necessary element, the court may proceed to that element first. *See Robinson*, 82 A.3d at 1005; *see also Commonwealth v. Albrecht*, 720 A.2d 693, 701 (Pa. 1998). In addition, for purposes of efficiency, we may begin by assessing the merits of a defaulted underlying claim because, if we deem the underlying claim meritless, neither trial nor appellate counsel could be found ineffective.

**IV. ANALYSIS**

With these standards in mind, we turn to appellant's claims. As noted, he presents twenty-two issues for our consideration. Following a comprehensive review, we conclude none entitle him to relief.

### A. Substitute Jurist

Appellant begins by arguing Judge Musti-Cook erred in deciding his petition as a substitute jurist following Judge Bortner's retirement without alerting counsel she would do so, and by supposedly making credibility determinations based on a cold record. In support, appellant relies on *Commonwealth ex rel. Davis v. Davis*, 408 A.2d 849 (Pa. Super. 1979), wherein the Superior Court held a judge who did not preside over a custody hearing should not have rendered a decision in the case since the "facts and inferences that can be drawn from" witness testimony "can only be determined by the judge before whom the[ ] witnesses appear[ed]." *Davis*, 408 A.2d at 849-50. Appellant explains the intermediate appellate courts have held that, absent the consent of the parties, a court may not substitute a new judge to render an opinion where the original judge earlier heard testimony. *See* Appellant's Brief at 6-7, *citing, e.g. Hyman v. Borock*, 235 A.2d 621 (Pa. Super. 1967). Although appellant acknowledges this Court has not "pass[ed] on the propriety" of whether a substitute judge may render an opinion, he notes we have emphasized the importance of the hearing judge making credibility determinations. *Id.* at 7, *citing Commonwealth v. Small*, 189 A.3d 961, 978 (Pa. 2018) and *Commonwealth v. D'Amato*, 856 A.2d 806, 825-26 (Pa. 2004).

Appellant believes Judge Musti-Cook made at least four fact-based assessments. They include her: (1) agreement with the Commonwealth that appellant's "experts did not 'disprove Dr. Ross's conclusions' with respect to biomechanics[,]" Appellant's Reply Brief at 2, *citing* PCRA Court Op. at 16; (2) crediting the Commonwealth's trial expert over appellant's expert "with respect [to] the impact of CPR as [a] potential cause of death[,]"

*id.*, *citing* PCRA Court Op. at 22-24; (3) crediting the Commonwealth's trial expert over "a number of postconviction defense experts related to [the] cause of [the victim's] head injury," *id.*, *citing* PCRA Court Op. at 24-28; and (4) dismissal of appellant's claims alleging counsel were ineffective for "failing to contest [the] torture aggravating circumstance because testimony of postconviction experts were not credible[,]" *id.*, *citing* PCRA Court Op. at 75-76. Appellant argues this Court's "duty to search for constitutional error with painstaking care is never more exacting than it is in a capital case," and his case should be remanded with direction for the PCRA court to conduct a hearing on "issues requir[ing] live testimony for resolution." *Id.* at 2-3, *quoting Kyles v. Whitely*, 514 U.S. 419, 422 (1995).

The Commonwealth advances several arguments in response. First, it notes a court may dispose of a PCRA petition without conducting an evidentiary hearing pursuant to Pa.R.Crim.P. 909(B)(1) and 909(B)(2), while here, extensive hearings were held. Second, the Commonwealth explains that before issuing her opinion, Judge Musti-Cook reviewed thousands of pages of pleadings, transcripts, exhibits, and briefing. Third, the Commonwealth asserts appellant failed to demonstrate Judge Musti-Cook actually made any credibility findings, rendering his reliance on *Davis* and similar cases irrelevant. On this point, the Commonwealth explains those cases apply only where a court "**must** make determinations of credibility regarding conflicting testifying witnesses[,]" as a court may not do so on a cold record. Commonwealth's Brief at 38-39 (emphasis in original). In contrast here, the Commonwealth argues, no credibility determinations were necessary because appellant presented nearly all of his lay witnesses by written stipulation and did not take the stand to contradict his counsel's testimony. As for appellant's experts' testimony, the Commonwealth argues those witnesses "did not contest the Commonwealth experts' credibility, but rather merely presented evidence that an

alternative strategy of argument was available for trial counsel based on alternative interpretations of the data." *Id.* at 39. Accordingly, the Commonwealth asserts appellant's witnesses' testimony was essentially uncontradicted and no credibility determinations were required.

Moreover, Judge Musti-Cook filed a supplemental opinion in which she explains how she thoroughly reviewed the extensive record and did not make credibility findings. In her view, it was unnecessary "to delay the very protracted PCRA proceedings to re-litigate that which was already of record." Supplemental PCRA Court Op. at 3.

After a complete review of the record, the PCRA court's opinions, and the parties' briefs, we find no error. We disagree with appellant that Judge Musti-Cook made credibility determinations in the instances he identifies, or in resolving any of his claims. Rather, our review reveals the PCRA court merely examined, without making assessments as to veracity, the testimony of appellant's experts to evaluate its potential impact when viewed in relation to the evidence of record. Through this examination the PCRA court found, for the reasons explored more fully in connection with appellant's corresponding claims below, that his experts' testimony — even if accepted as true — failed to counter or disprove the Commonwealth's evidence and, in some cases, undermined his defense. Thus, we hold Judge Musti-Cook did not err in disposing of appellant's PCRA petition after the original PCRA jurist retired.

## B. Ineffective Assistance for Failure to File a Rule 600 Motion

Appellant next contends trial counsel were ineffective for failing to file a Rule 600 motion to protect his right to a speedy trial. Rule 600 provides, in relevant part, that "[t]rial in a court case in which a written complaint is filed against the defendant shall commence within 365 days from the date on which the complaint is filed." Pa.R.Crim.P. 600(A)(2)(a). To determine whether Rule 600 has been violated, a "court must first calculate the

'mechanical run date,' which is 365 days after the complaint was filed," and then must "account for any 'excludable time' and 'excusable delay.'" *Commonwealth v. Goldman*, 70 A.3d 874, 879 (Pa. Super. 2013). "For purposes of paragraph (A), periods of delay at any stage of the proceedings caused by the Commonwealth when the Commonwealth has failed to exercise due diligence shall be included in the computation of the time within which trial must commence. Any other periods of delay shall be excluded from the computation." Pa.R.Crim.P. 600(C)(1).

To this end, Rule 600 establishes two requirements that must be met for delay to count toward the 365-day deadline: (1) the delay must be caused by the Commonwealth; and (2) the Commonwealth must have failed to exercise due diligence. Otherwise, the delay is excluded from the calculation of the run date. Put differently, where delay is not caused by the Commonwealth or delay caused by the Commonwealth is not the result of lack of diligence, it must be excluded from the computation of the Rule 600 deadline. "Due diligence is fact specific, to be determined case-by-case; it does not require perfect vigilance and punctilious care, but merely a showing the Commonwealth has put forth a reasonable effort." *Commonwealth v. Selenski*, 994 A.2d 1083, 1089 (Pa. 2010). Moreover, judicial delay is delay caused by the court, rather than the Commonwealth, and is likewise excludable if the Commonwealth exercised diligence during that time. *See Commonwealth v. Harth*, 252 A.3d 600, 603 (Pa. 2021) ("[A] trial court may invoke 'judicial delay' in order to deny a defendant's Rule 600 motion to dismiss only after the Commonwealth has demonstrated that it complied with the due diligence requirements of Rule 600 at all relevant periods throughout the life of the case.").

Appellant argues the Commonwealth violated Rule 600 by bringing him to trial 210 days after the run date of April 6, 2009 and the Commonwealth would have been unable to demonstrate those days were either excludable or excusable. Appellant contends he

suffered prejudice because, had a Rule 600 motion been filed by counsel, it would have been granted and the charges dismissed.

At bottom, appellant quarrels with the PCRA court's calculation of the applicable periods of excludable time. More specifically, he argues the court attributed several continuance delays to him that should have been charged to the Commonwealth. For instance, appellant notes the PCRA court attributed to him seventy-six days between April 9, 2008, and June 24, 2008, because he allegedly requested a continuance to obtain counsel, as well as 270 days between when he filed his Omnibus Pretrial Motion on January 30, 2009, and the court resolved that motion on October 27, 2009. Appellant contends the former period is inapplicable to him because the Commonwealth did not have its pathology report and could not have proceeded to the preliminary hearing. Similarly, he asserts the excludable time clock should not have started at the time he filed his pretrial motion since the Commonwealth did not pass complete discovery until March 27, 2009; appellant believes the matter would have been delayed until that date irrespective of his filing. In this regard, appellant argues the PCRA court misinterpreted our decision in *Commonwealth v. Hill*, 736 A.2d 578 (Pa. 1999), because even though the filing of a pretrial motion "may" stop the clock for speedy trial purposes, it does not do so automatically and should not have done so here, where discovery was incomplete and the Commonwealth could not establish appellant's motion alone delayed trial.

The Commonwealth counters that appellant's trial counsel were not ineffective, arguing a Rule 600 motion would have been dismissed for lack of merit because appellant significantly contributed to the delay. For example, the Commonwealth notes appellant sought a continuance: of his preliminary hearing to obtain counsel; following his August 22, 2008, arraignment to file a pretrial motion; and in October of 2008 and January of 2009 to file pretrial motions. It also observes that, following the motion hearings on March

27 and April 2, 2009, the parties filed memoranda in support and, on June 2, 2009, the court scheduled trial for November 2, 2009, so it could resolve the motions in advance. The court ruled on appellant's motions on October 27, 2009, and *voir dire* commenced November 2, 2009.

According to the Commonwealth, between the time appellant filed his motion on January 30, 2009, and the court resolved it on October 27, 2009, the Commonwealth could not bring appellant to trial because his motion rendered him unavailable. The Commonwealth further maintains it did not request a continuance during that period and exercised due diligence by litigating and responding to appellant's motion. As such, in the Commonwealth's view, the 270-day period between the filing and resolution of appellant's motion is excludable time, meaning the proper adjusted run date should be March 17, 2010.

The PCRA court concluded appellant failed to demonstrate his claim has arguable merit, stating "there was **no** chance of a Rule 600 challenge succeeding." PCRA Court Op. at 10 (emphasis in original). In support, the court found the following time attributable to appellant: seventy-six days, accounting for the period from April 8, 2008, until June 24, 2008, because he requested a continuance to obtain counsel; and the 270 days between the filing of appellant's pretrial motion and the trial court's resolution of the same. The court determined the Commonwealth was diligent at each stage, noting it did not request continuances and actively litigated the motions. The court then conducted a second calculation, in which it assumed the period attributable to appellant's pretrial motion started March 27, 2009 — the date the Commonwealth passed complete discovery. It found that, even under that calculation, the Commonwealth still brought appellant to trial within the Rule 600 period. Thus, the court concluded appellant's claim lacked arguable merit and there was "not a **substantially** greater chance of success" or a reasonable

probability of a different outcome had the motion been filed. *Id.* at 10 (emphasis in original).

Upon review, we find no error. Even assuming appellant is correct that the delay from April 8 until June 24, 2008, is attributable to the Commonwealth,[5] the Commonwealth still brought him to trial within 365 days. In particular, we agree with the Commonwealth and the PCRA court that during the period between the filing and resolution of appellant's motion, he was unavailable such that the delay is not attributable to the Commonwealth, so long as the Commonwealth exercised due diligence. Assuming once more that appellant is correct, and that the Commonwealth failed to exercise diligence between January 30 and March 27, 2009, the date it provided complete discovery, there remains a period of 214 days between that date and October 27, 2009, when the motion was resolved. We find the Commonwealth was diligent during this period, as it did not request continuances and actively litigated appellant's motion. *See Selenski*, 994 A.2d at 1089. Therefore, Rule 600 was not violated because, although the Commonwealth brought appellant to trial 575 days after April 6, 2008, at least 214 days were attributable to appellant, such that he was brought to trial 361 days from the filing of the complaint. *See Hill*, 736 A.2d at 587. Because a Rule 600 motion would have failed, appellant cannot demonstrate his trial counsel were ineffective for not filing one. *See Commonwealth v. Treiber*, 121 A.3d 435, 445 (Pa. 2015).

### C. Ineffectiveness For Failing to Develop and Present Evidence Supporting Appellant's Defenses

---

[5] As noted, the Commonwealth asserts (and the PCRA court agreed) that appellant requested a continuance to obtain counsel on April 8, 2008. Appellant is correct the docket does not reflect this request, and it is unclear whether the Commonwealth makes this representation from its own notes, file markings, or other material. However, it is unnecessary to address these arguments as we conclude the Commonwealth tried appellant within the required period even if that time were attributable to it.

Appellant asserts trial counsel were ineffective for failing to develop and present evidence to challenge the Commonwealth's theory he had specific intent to kill the minor victim. He claims his counsel should have presented: (1) expert testimony to refute the findings of Dr. Ross, a Commonwealth expert who opined as to the number and type of injuries the victim suffered, the velocity of the blows that caused her injuries, and the amount of time it would have taken for the injuries to be inflicted; and (2) mental health evidence that would have served to lessen his degree of guilt. Appellant contends these failures impacted both the guilt and penalty phases and that, contrary to the PCRA court's findings, relief in the form of a new trial is warranted.

After a thorough review of the record, we conclude the PCRA court did not err in dismissing appellant's claims, as he failed to demonstrate his counsel were ineffective in their development and presentation of his defenses. We address appellant's arguments with respect to each of his subclaims separately below.

1. Counsel's Failure to Challenge Dr. Ross's Expert Opinions

Dr. Ross, the forensic pathologist who performed an autopsy on the victim, testified for the Commonwealth and presented several opinions. As is relevant to the instant claim, Dr. Ross opined: the victim had 220 identifiable injuries, 150 of which were fresh injuries, *i.e.*, inflicted in the twenty-four hours preceding her hospital admission; the victim also suffered numerous fresh internal injuries to her head, including swelling and bleeding in her brain, as well as retinal hemorrhages and damage to her spinal cord; the victim also suffered trauma to her heart, right lung, liver, pancreas, and right adrenal gland, which were caused by high-velocity impacts to her chest and belly, likely resulting from being struck at a speed of approximately twenty miles per hour; the victim's internal injuries were not caused by improperly administered CPR or by attempts to resuscitate her by shaking; abrasions to her vaginal area were caused by pinching, as evidenced by

fingernail imprints; and it would have taken appellant approximately forty-five minutes to beat the victim, based on the assumption he inflicted an injury every twenty seconds.

Appellant argues his counsel erred in failing to present experts to rebut Dr. Ross's findings and challenge the Commonwealth's first-degree murder theory. He alleges this failure amounted to ineffective assistance because his primary defense was to advance a "heat of passion" theory to obtain a third-degree verdict and, as demonstrated by the witnesses he presented during the post-conviction hearings, experts were available to challenge Dr. Ross's findings at trial. Appellant claims his experts would have established that Dr. Ross's opinions were "speculative, unreliable, and without scientific basis[.]" Appellant's Brief at 17. Appellant highlights the hearing testimony of his four witnesses: forensic pathologists, Dr. Neil Hoffman and Dr. Charles Wetli; mechanical engineer and biomedical engineering Ph.D., Chris Van Ee; and former police officer and medico-legal death investigations expert, Robert Tressel.

Dr. Hoffman is a forensic pathologist his counsel retained approximately six weeks in advance of trial, who reviewed Dr. Ross's reports and drew several conclusions based on those materials and his review of other evidence. Dr. Hoffman ultimately disagreed with several of Dr. Ross's conclusions and advanced his own opinions, including that: the duration of the beating was likely ten minutes; the injuries to the victim's vaginal area were likely the result of the whipping motion of the controller cord or the actions of medical personnel treating her; the victim had "considerably less" injury than Dr. Ross opined, because Dr. Ross conflated blows/strikes with injuries even though multiple injuries could be caused by one blow/strike and some injuries attributed to the fatal beating were actually "days-and-perhaps-longer old[,]" N.T. 6/4/18 at 47-48; Dr. Ross's biomechanics-related opinions were unreliable, as he lacked formal training in that area, and his velocity-related opinions were flawed because he did not explain whether he was referring to the

victim's body moving at twenty miles per hour and suddenly halting, or another phenomenon such as the victim impacting another object, *see id.* at 51; the injuries to the victim's mouth and head evidenced significant healing, indicating she suffered a blow about one week prior, *see id.* at 54; one cannot determine to a reasonable degree of medical certainty that, absent prior head trauma, the new injuries would have resulted in death, *see id.* at 34-37; the internal organ injuries were consistent with improperly administered CPR, *see id.* at 65, 126-27; and there was no evidence of strangulation, *see id.* at 37, 142-43.

Significantly, appellant's trial counsel disagreed about whether to call Dr. Hoffman to refute Dr. Ross's findings. While Attorney Weitzman believed Dr. Hoffman's opinions would have accomplished this task and was adamant about calling him, *see* N.T. 8/21/18 at 141, Attorney Robinson did not think it would benefit appellant, *see* N.T. 8/22/18 at 228-29. In fact, Mr. Robinson testified that once the trial court allowed evidence about the pinching of the victim's vaginal area, it was bad for appellant and he was concerned presenting Dr. Hoffman could result in a lengthy cross-examination about the vaginal injuries and introduction of the vaginal photographs they had successfully precluded from trial. *See* N.T. 8/22/18 at 271-273. Still, Attorney Robinson asserted Dr. Hoffman's explanation of those injuries would have been better for the jury to hear than appellant sexually assaulted the victim. *See id.* at 237-40, 271.

Appellant also offered the testimony of Dr. Wetli, who concluded: there was no scientific basis for Dr. Ross's findings as to the duration of the beating, or for his injury count, which did not reflect the fact multiple injuries could have resulted from each swing of the controller cord, *see* N.T. 6/5/18 at 20, 61; Dr. Ross's use of biomechanics in equating the victim's injuries to those sustained in a twenty-mile-per-hour crash "d[id]n't make any sense[,]" *id.* at 20-21; Dr. Ross's findings with respect to the victim's vaginal

injuries were unreliable, as he did not reference the abrasions in the autopsy report, medical personnel at two hospitals did not mention them, and, in any event, these injuries could have resulted from the insertion of a Foley catheter by medical personnel, *see id.* at 24-28*,* 66; there was no evidence of strangulation, *see id.* at 37-38; and the injuries to the victim's internal organs were likely caused by improper CPR, *see id.* at 41, 65.

Appellant further relied on the hearing testimony of Dr. Van Ee, who testified: Dr. Ross's opinion on biomechanics and the number and velocity of strikes/blows was unreliable because, to make such determinations, Dr. Ross would have had to delineate whether the 150 injuries resulted from 150 impacts yet he failed to do so, *see* N.T. 7/30/18 at 20-22; he only observed fifty separate strikes based on the victim's injuries and it "[s]eemed like [Dr. Ross] was just pulling numbers out that . . . did not make sense[,]" *id.* at 22; Dr. Ross did not identify any basis for his presumption twenty to thirty seconds elapsed between strikes and, as a biomechanical engineer himself, did not know of any literature supporting that conclusion, *see id.* at 23, 25; to provide an accurate duration estimate, one would have to conduct testing, which would be difficult as numerous factors would affect the complexity of the experiment, such as the angle of the blows, whether the victim was moving, and whether there were multiple mechanisms of injury, *see id.* at 40-42; Dr. Ross's velocity opinion was "technical gibberish" from a biomechanics standpoint, *id*. at 28; and a fall from 3.5 feet could result in a skull fracture, *see id.* at 29-30. Appellant observes Attorney Robinson conceded a biomechanics expert could have proved helpful in refuting Dr. Ross's opinion related to the duration of the incident and amount of force used, as well as his opinion that the victim's injuries did not result from falling in the bathtub as appellant told police. *See* N.T. 8/21/18 at 149-50; N.T. 8/22/18 at 243, 245.

Finally, appellant offered the testimony of Robert Tressel, who testified about the importance of presenting a medico-legal death investigations expert at trial. Mr. Tressel portrayed such investigators as the "eyes and ears of the medical examiner on the crime scene[,]" Appellant's Brief at 28, *quoting* N.T. 3/31/17 at 36, and asserted they are relied upon to "document and identify what could have created injuries, the distribution and patterns of injuries, and [ ] assist the medical examiner in determining the cause and manner of death[.]" *Id*. Mr. Tressel also testified that Dr. Ross's estimates regarding duration and injury number were exaggerated as incidents such as this typically do not take forty-five minutes, *see* N.T. 3/31/17 at 54, and "wraparound injuries" inflicted by a cord could cause the appearance of more than one injury from a single strike, *id.* at 48-49. To assess duration, Mr. Tressel conducted his own experiment by striking a bed with a belt and found he could inflict ten blows in seven seconds. *See id.* at 56. He also testified medical examiners typically do not opine as to duration, *see id.* at 111-13, and the fact the abuse here took place over several days is not uncommon and supports a lack of intent, as violence was used as a form of discipline, *see id.* at 61, 70-71, 114.

Generally stated, appellant argues his counsel were ineffective for failing to call Dr. Hoffman, already retained for trial, or the other experts above who testified at the post-conviction hearings. He argues their testimony undermined Dr. Ross's conclusions even if they did not provide a succinct countervailing opinion, whether individually or combined. Believing such testimony could have refuted the Commonwealth's first-degree murder theory, appellant asserts his claim has arguable merit, counsel lacked a reasonable basis, and he suffered prejudice.

In response, the Commonwealth argues appellant has not demonstrated his trial counsel were ineffective. Rather, the Commonwealth asserts appellant's trial counsel, having understood the overwhelming evidence against him and the heinous nature of his

crime, sought to avoid the death penalty through a strategy of "minimizing and not drawing attention to the terrible aspects of the crime and [appellant]'s culpability, leveraging the cross-examination of the co-defendant to sow doubt, and to give the jury the impression that this was a one-time event in [appellant]'s life brought about by a life of trauma." Commonwealth's Brief at 43-44. Contrary to appellant's representation of his experts' testimony, the Commonwealth maintains the four witnesses he presented largely agreed with Dr. Ross's conclusions, contradicted aspects of each other's opinions and appellant's version of events, and would have opened the door to lengthy cross-examination on the disturbing aspects of the crime, including testimony about and photographic evidence of the victim's vaginal injuries. The Commonwealth submits the testimony of appellant's counsel confirmed this and demonstrated they had a reasonable basis for deliberately deciding not to call their retained expert or present other expert testimony.

In the interest of clarity, we evaluate appellant's arguments with respect to each of Dr. Ross's conclusions separately below.[6]

### a. *Dr. Ross's Calculation of Duration*

Appellant contests counsel's effectiveness for not calling Dr. Hoffman or another expert to dispute Dr. Ross's conclusion it took at least forty-five minutes for appellant to inflict the victim's injuries. In support, he points to the testimony of each of his four experts, who, as detailed above, opined Dr. Ross's calculation was exaggerated and unreliable. *See*, *e.g.*, N.T. 6/4/18 at 66, 151. Thus, he asserts his claim has arguable merit and counsel lacked a reasonable basis for not calling such experts.

The Commonwealth responds that the opinions of his four experts were not scientifically supported. The Commonwealth explains that Dr. Hoffman's ten-minute

---

[6] In litigating his claims before the PCRA court, appellant raised an additional subclaim related to blood spatter evidence that he has abandoned before this Court. Accordingly, we do not discuss it.

estimate was based solely on his experience as a forensic pathologist and was not supported by scientific study, comparison of scientific literature, or experimentation. In addition, while Dr. Hoffman would estimate the beating lasted ten minutes, he conceded it could have lasted as long as forty-five minutes. *Id.* at 33. The Commonwealth further notes Dr. Wetli's conclusion the beating lasted twenty minutes was based solely on Neida Baez's testimony about how long the victim cried. Like Dr. Hoffman, Dr. Wetli admitted he did not undertake any scientific review or independently attempt to determine the duration. The Commonwealth also notes Dr. Van Ee did not provide a duration estimate, conduct any experiments or studies assessing duration, or render a conclusion due to the issue's complexity. While Dr. Van Ee did propose a "methodology as to how additional information could be discovered to better determine the length of time," he did not employ that methodology and could not identify what methodology Dr. Hoffman used to arrive at a ten-minute estimate. Commonwealth's Brief at 48, *citing* N.T. 7/30/18 at 40-41. Finally, the Commonwealth observes Mr. Tressel did not opine on duration but did conduct his own "experiment" of hitting a bed with a belt, although he admitted he did not use the same instrument as appellant and recognized weight, length, and speed of the instrument would impact duration. *Id.* at 49.

Based on this testimony, the Commonwealth asserts appellant's counsel were not ineffective for failing to call experts on this issue because, while the experts disagreed with Dr. Ross, they also disagreed with each other, did not support their conclusions, and conceded the assault could have lasted forty-five minutes. In fact, the Commonwealth notes Dr. Hoffman's ten-minute estimate conflicted with appellant's own statements that, while he did strike the victim approximately seven times with the controller cord on April 6, 2008, his abuse of her occurred in the days preceding the offense. On this point, the Commonwealth reiterates Attorney Robinson's belief that he did not think Dr. Hoffman's

testimony would assist the defense because it conflicted with appellant's statements and did not preclude the forty-five-minute estimate. *See* N.T. 8/22/18 at 272-73. Given this, the Commonwealth argues appellant's claim lacks merit and counsel acted reasonably.

The PCRA court ultimately agreed with the Commonwealth, finding appellant's experts did "not disprove Dr. Ross's conclusions; but, rather, merely dispute[d] them with little to no appeal to science to back their assertions" which is exactly what "they accused Dr. Ross of doing." PCRA Court Op. at 16.

We find the PCRA court did not err in dismissing appellant's claim on this ground. Dr. Ross provided a duration calculation supported by thirty-four citations from which he derived his opinion. *See* N.T. 3/31/17 at 106. Conversely, appellant's experts' estimates, to the extent they were provided, were not scientifically based and, instead, simply challenged Dr. Ross's estimate as exaggerated or generally unreliable. Only Dr. Hoffman provided a precise estimate, but even it was not based on scientific review or experimentation and, in fact, conflicted with appellant's version of events. Thus, even if appellant's claim had arguable merit, we find he has not established his counsel lacked a reasonable basis for not calling Dr. Hoffman or a similar expert, as it was entirely reasonable for Attorney Robinson to conclude "there was a risk of the jury realizing Dr. Hoffman's testimony did not jibe with that of [appellant]" and that realization could detrimentally impact his case. PCRA Court Op. at 17. The PCRA court's decision was supported by the record and it did not err in finding appellant failed to prove the reasonable basis prong. *See*, *e.g.*, *Commonwealth v. Colavita*, 993 A.2d 884, 887 (Pa. 2010).

### b. Dr. Ross's Calculation of the Number and Age of the Victim's Injuries

Appellant claims counsel were ineffective for failing to call an expert to counter Dr. Ross's conclusion as to the number of the victim's injuries. The Commonwealth, on the other hand, argues this subclaim fails because appellant's experts did not meaningfully

challenge Dr. Ross's opinion on this issue or present a countervailing conclusion. Like the PCRA court, we agree with the Commonwealth.

Although Dr. Hoffman testified generally that Dr. Ross's calculation of the victim's injuries was high because he "conflated blows/strikes with injuries" and some of the "fresh" injuries were "actually 'days-and-perhaps-longer old[,]'" N.T. 6/4/18 at 47-48, the Commonwealth correctly observes Dr. Hoffman indicated he was unable to distinguish the total number of external injuries, did not attempt to distinguish new injuries from old injuries, and did not identify which injuries were attributable to strikes from the controller cord and would constitute several injuries from a single strike. *See id*. at 148-50. Moreover, while Dr. Wetli testified he did not think there were 150 fresh injuries, he could not say so definitively and did not personally count the injuries or attempt to distinguish old versus new, or how many strikes would be required to cause the victim's observable injuries. *See* N.T. 6/5/18 at 34-38, 45-46. Finally, Mr. Tressel concluded one could not determine the number of blows because many created multiple injuries, *see* N.T. 3/31/17, at 49, and Dr. Van Ee deferred to forensic pathologist experts to assess the accuracy of Dr. Ross's count but believed there were approximately fifty injuries. *See* N.T. 7/30/18 at 19-22.

Upon reviewing the record, we agree appellant did not demonstrate he suffered prejudice as a result of his trial counsel's failure to call witnesses to challenge the number of injuries, because his experts "fail[ed] to produce a convincing counter that is based upon the very science they claim Dr. Ross's opinions lacked." PCRA Court Op. at 18. Indeed, none of appellant's experts rendered an opinion as to the number and age of the injuries and Dr. Van Ee expressly deferred to forensic pathologists — of which Dr. Ross is one — to make those determinations.

Moreover, considering this subclaim with the preceding one related to the duration of the beating, we likewise agree appellant did not establish prejudice because, "[e]ven if one divines a coherent narrative from the defense experts that the beating occurred over some ten minutes, rather than forty-five or more, and, per Dr. Van Ee, some fifty injuries occurred, the result is unlikely to have been different." *Id.* at 19. In this regard, the PCRA court found a jury would "likely still infer a specific intent to kill in this utter mismatch of force to cause death in such a vulnerable victim." *Id.* Considering the record before us, we agree and are unpersuaded by appellant's argument he was prejudiced by counsel's decision to not introduce his proffered experts.

c. *Dr. Ross's Conclusion on Strike Velocity*

Appellant claims trial counsel were ineffective for failing to call experts to challenge Dr. Ross's testimony that the injuries to the victim's liver were caused by strikes with a twenty miles per hour velocity. Appellant avers that, if his counsel had called Dr. Hoffman at trial, he would have testified Dr. Ross's opinion was incorrect and confusing, as Dr. Ross did not clarify "what" was moving at a velocity of twenty miles per hour. Appellant highlights Dr. Hoffman's testimony from the post-conviction hearings:

> There's no essentially scientific information. . . . [H]e's talking about what it takes to injure the body. Well, it takes at least 20 miles per hour . . . . It takes a certain velocity to produce an injury pattern to this liver, parentheses, over 20 miles per hour. Well, is that velocity of a feather? Is it the body traveling at 20 miles per hour coming to a sudden halt? He's misusing the injury as coming from the force generated by the velocity and by the energy that is imparted to the victim or that the victim applies to itself as it hits something.

N.T. 6/4/18 at 51. In reply, the Commonwealth asserts Dr. Hoffman's testimony on this issue failed to rebut Dr. Ross's conclusion. The Commonwealth notes appellant did not offer additional testimony regarding the victim's liver injury and that, because appellant alone has the burden to plead and prove his claims, this subclaim must fail.

The PCRA court agreed, stating that, while appellant may have "raise[d] the prospect that Dr. Ross's testimony [wa]s scientifically invalid concerning the specific point[,]" he did not offer a countervailing opinion or demonstrate a "substantially greater chance of success" if this testimony were introduced. PCRA Court Op. at 18-19. It further concluded appellant could not prove prejudice because "there [wa]s no question amongst the experts that the victim's liver was injured, and quibbling over the exact velocity and the object achieving it to impart force does not raise a reasonable probability of a different outcome save for trial counsel's supposed error." *Id.*

The PCRA court's conclusions are supported by the record.[7] Notably, appellant's experts did not dispute the victim suffered injury to her liver. *See* N.T. 3/31/17 at 97; N.T. 6/4/18 at 120; N.T. 6/5/18 at 9-10, 40. Although Dr. Hoffman's testimony may have raised doubt over the velocity of the strike required to injure the victim's liver and/or whether that velocity came in the form of a blow imposed upon her or from her striking another object, we reject appellant's position this testimony would have likely resulted in a more favorable outcome. On the contrary, the testimony presumably would have brought even more attention to the fact that, regardless of the actual velocity, the two-year-old victim suffered a blow sufficient to cause internal injury to her liver. The PCRA court did not err in finding

[7] With regard to appellant's assertion the PCRA court assessed credibility in "agreeing with the Commonwealth that [his] experts did not 'disprove Dr. Ross'[s] conclusions with respect to biomechanics[,]" we conclude the lower court made no such finding. Appellant's Reply at 2, *citing* PCRA Court Op. at 16. To the contrary, the PCRA court, in examining the merit of appellant's claim, found "the experts proffered by [appellant] do not disprove Dr. Ross'[s] conclusions; but, rather, merely dispute them with little to no appeal to science to back their assertions; the very thing they accused Dr. Ross of doing." PCRA Court Op. at 16. The PCRA court made no findings with respect to the credibility of any witness. Instead, it simply concluded the opinions appellant's experts advanced were, by the witnesses' own admissions, based on their individual experience rather than on scientific studies or literature comparisons, and were offered to question Dr. Ross's conclusions rather than provide countervailing opinions. *See id.* at 14-16, *citing* N.T. 6/4/18 at 151; N.T. 6/6/18 at 35. The PCRA court found appellant's claim failed because, even if the testimony of his witnesses were believed, it did not disprove Dr. Ross's opinions. We agree with this assessment.

this testimony would not have weighed so significantly in appellant's favor as to create a reasonable probability of a different result.

### d. *Dr. Ross's Conclusions on the Victim's Internal Injuries*

Appellant claims his experts would have undermined Dr. Ross's conclusions that the victim's internal injuries were the result of strikes/blows inflicted by appellant, by opining the injuries were the result of efforts to resuscitate the victim via improperly administered CPR and shaking. He maintains his experts' post-conviction hearing testimony established improperly performed CPR caused or could have caused the injuries to the victim's internal organs and, per Dr. Hoffman, shaking the victim was equally likely to have caused her death as blunt force trauma. Appellant therefore contends his counsel were ineffective for failing to call such experts because they would have demonstrated he lacked specific intent to kill.

The Commonwealth disagrees. It argues appellant's experts did not establish the victim's injuries were caused by resuscitation efforts and, in any event, trial counsel were reasonable in not calling such experts. Regarding appellant's claim the victim's injuries were caused by CPR attempts, the Commonwealth notes: although Dr. Wetli testified the injuries to the victim's internal organs were not related to cause of death and were consistent with incorrect CPR, he conceded he did not know if CPR was performed and the same injuries could be caused by striking, *see* N.T. 6/5/18 at 10, 41-42; Dr. Hoffman testified improperly administered CPR could cause injury, but he did not know if CPR was improperly performed and, further, abdominal injuries are common in child abuse cases; and Dr. Hoffman did not offer an opinion about improperly performed CPR, despite being requested to do so. The Commonwealth posits it was objectively reasonable for counsel not to call experts, as they would have testified it was equally possible the victim's injuries

were caused by intentional blows, and because Dr. Hoffman failed to offer a CPR opinion previously.

Moreover, with respect to appellant's assertion the victim's head injuries were caused by shaking, the Commonwealth argues appellant's experts did not affirmatively support this theory. It notes Dr. Van Ee stated "there's strong reason to be skeptical that shaking alone can give angular acceleration sufficient to rip bridging veins, which could give rise to things like subdural hemorrhage[,]" and, while "[t]hat doesn't mean it can't happen" the "current data calls into question whether it's possible[.]" N.T. 7/30/18 at 36-38. Mr. Tressel agreed with Dr. Ross's cause of death determination, *see* N.T. 3/31/17 at 97-98, and Dr. Hoffman conceded the victim's head injuries, including evidence of diffuse brain injuries, retinal, optic nerve, and subarachnoid hemorrhage, could also have been caused by blunt force trauma, *see* N.T. 6/4/18 at 100-03, 106-07. Finally, Dr. Wetli disagreed with Dr. Hoffman as to the victim's cause of death, opining anoxic brain injury was not the primary cause. *See* N.T. 6/5/18 at 39. In sum, the Commonwealth maintains appellant's experts did not establish the victim's head injuries resulted from shaking and the experts' testimony, at least in part, actually corroborated Dr. Ross's testimony.

The Commonwealth also points to trial counsels' testimony as evidence they had a reasonable basis for not calling experts to testify on this issue. Attorney Robinson testified he and Attorney Weitzman had a conference call with Dr. Hoffman during which they discussed the victim's head injuries. Attorney Weitzman's contemporaneous notes demonstrated they discussed blunt force impact to the victim's head, torso, chest, and extremities, as well as a potential bite mark on her left calf, and that Dr. Hoffman believed the sole of a boot caused the pattern of injuries under the victim's eye and there was evidence of blunt force trauma to her head. *See* N.T. 8/21/18 at 199-201; N.T. 8/22/18 at 269-70. Attorney Robinson testified he decided not to call Dr. Hoffman precisely

because he was concerned Dr. Hoffman would corroborate Dr. Ross's testimony, which could prove detrimental to appellant. *See id.* at 290.

The PCRA court agreed with the Commonwealth on both issues. With regard to the theory of improperly administered CPR, the court found it lacked merit because the experts could not say whether or how CPR was performed and conceded the victim's injuries were also consistent with forceful grabbing or strikes. Moreover, the jury would have heard from Dr. Hoffman that he was asked to opine on CPR in his 2009 expert report but did not do so. For the same reasons, the PCRA court concluded appellant additionally failed to demonstrate the reasonable basis and prejudice prongs.

As for appellant's shaking theory, the PCRA court similarly determined appellant's experts did not support it. Rather, the court explained, Dr. Van Ee was "skeptical" shaking alone would cause the injuries the victim sustained, Mr. Tressel did not disagree with Dr. Ross's death determination, Dr. Hoffman admitted the victim's injuries could also be attributed to blunt force trauma or a combination of that and shaking, and Dr. Wetli testified anoxic brain injury was not the cause of death but agreed with Dr. Hoffman's conclusions. PCRA Court Op. at 26. The PCRA court also concluded appellant failed to prove the reasonable basis prong because, as noted, his counsel retained Dr. Hoffman prior to trial and specifically discussed this issue with him but ultimately decided his testimony would corroborate several of Dr. Ross's conclusions to appellant's detriment. Finally, the PCRA court explained appellant did not prove prejudice since his experts contradicted each other's testimony and proved confusing. *See id.* at 28.

Based on the foregoing, we agree with the PCRA court and reject appellant's ineffectiveness claims related to his resuscitation theories.[8] As the PCRA court detailed

---

[8] As stated, appellant argues the PCRA court made credibility findings in rejecting his subclaims regarding trial counsel's alleged ineffectiveness for failing to call experts to opine that the victim's internal injuries were caused by improperly performed CPR and (continued…)

in its opinion, even though appellant's witnesses testified the victim's injuries could have resulted from these alternative causes, it was equally if not more possible they were caused by blows to her head, chest, and torso inflicted by appellant. As this expert testimony did not definitively support appellant's theory, we conclude trial counsel had a reasonable basis for not calling experts who may well have corroborated Dr. Ross and, in the case of Dr. Van Ee's testimony, undermined appellant's shaking argument by stating it should be viewed skeptically. This conclusion is further supported by the fact appellant's counsel retained Dr. Hoffman and discussed his potential testimony before deciding whether to call him as a witness. Where a reasonable basis exists for a particular course of action, counsel's performance is constitutionally effective. *See, e.g.*, *Colavita*, 993 A.2d at 887.

### e. *Dr. Ross's Conclusion Regarding the Victim's Vaginal Injuries*

In his next subclaim, appellant argues trial counsel erred in failing to present expert testimony opining the injuries to the victim's vaginal area were not caused by pinching but were instead caused by blunt force trauma or stretching. Appellant notes trial counsel retained Dr. Hoffman to address this issue and, in his initial expert report, he determined the injuries were caused by manual stretching, perhaps by medical personnel. Appellant also points to Dr. Wetli's testimony reflecting he did not observe any evidence of pinching and the abrasions could have resulted from medical personnel inserting a Foley catheter.

---

her head injuries resulted from shaking. *See* Appellant's Reply Brief at 1-2. But, contrary to appellant's assertions, and as detailed more fully above, the PCRA court simply found that, even accepting appellant's experts' conclusions as true: (1) the victim's internal injuries could have been caused by improperly administered CPR or by blunt force trauma, but none of appellant's experts were aware whether or how CPR was performed; and (2) the victim's head injuries could have been caused by blunt force trauma, shaking, or a combination of both, and attributing the head injuries to shaking alone should be viewed skeptically. Significantly, the PCRA court made no conclusions as to witness veracity. Instead, it found appellant's experts' conclusions either supported Dr. Ross's opinions or did not contradict them. There is nothing improper about these conclusions.

*See* N.T. 6/5/18 at 24-25, 66. Appellant argues trial counsel lacked a reasonable basis for not calling these experts because, by failing to offer alternative explanations, the jury could only conclude he sexually assaulted the victim.

Noting appellant's experts did not provide an alternative explanation for the victim's vaginal injuries, the Commonwealth argues appellant's counsel's decision not to offer expert testimony on this issue was entirely reasonable. The Commonwealth notes Dr. Hoffman seemingly changed his opinion about the cause of the vaginal injuries after completing his expert report. According to Attorney Weitzman's November 14, 2009, memo drafted during trial, Dr. Hoffman informed counsel he could not say for certain that medical personnel caused the injuries, and that the injuries likely resulted from blunt force trauma. *See* N.T. 8/21/18 at 147-48. Regarding blunt force trauma, Dr. Hoffman testified at the post-conviction hearing that the thin, curved linear abrasions in the victim's vaginal area — identified by Dr. Ross as fingernail impressions based on their size and shape — were oriented toward the front and back of the body, but were also oriented crossways and occasionally crossed other lines. Dr. Hoffman opined the abrasions resulted from a forceful blow with a blunt object that caused labial contusion, pre-anal laceration, and pre-anal laceration by stretch mechanism. *See* N.T. 6/4/18 at 80-88, 90. Yet, his 2016 report did not address his original opinion that the abrasions were caused by medical personnel.

The Commonwealth also underscores the testimony of Dr. Wetli, who opined there were no abrasions and the curved markings were too irregular to be attributable to fingernail pinching. *See* N.T. 6/5/18 at 25. Dr. Wetli found the abrasions were due to "post-mortem settling of blood and a mottled pattern of lividity." *Id.* at 25-26. When the Commonwealth explained during cross-examination that the victim was alive when the photographs were taken, Dr. Wetli then stated the photographs showed reddish mottling below the vulva that would not have been caused by blunt force trauma. *See id.* at 58-

59. In light of this testimony, the Commonwealth asserts appellant's claim lacks arguable merit, as Dr. Hoffman's explanation for the abrasions also involved causing the victim pain, and Dr. Wetli's opinion contradicted Dr. Hoffman and was patently not credible.

The PCRA court determined appellant's claim lacked merit because Dr. Hoffman's explanation for the abrasions was they "could" have been caused by blunt force trauma, but he "could not state with a reasonable degree of medical certainty what the mechanism of injury was[,]" and Dr. Wetli disputed his conclusion. PCRA Court Op. at 30. The court further found appellant failed to demonstrate counsel lacked a reasonable basis because Attorney Robinson testified he sought to avoid cross-examination on the victim's vaginal injuries and, had he introduced expert testimony, it would have been necessary to introduce photographs of the vaginal injuries, thereby "undermin[ing his] strategy to exclude such inflammatory materials." *Id.* Finally, the PCRA court concluded appellant failed to demonstrate prejudice because "the outcome would not have improved for [him] where his experts would have contradicted one another, caused the introduction of inflammatory pictures, and been subjected to cross-examination that might well have undermined the credibility of the defense." *Id.*

The PCRA court's disposition of this issue is amply supported by the record. Despite appellant's assertions to the contrary, the record makes clear his experts did not affirmatively refute Dr. Ross's conclusions; Dr. Hoffman offered an explanation that also involved appellant harming the victim and was not supported by a reasonable degree of medical certainty, and Dr. Wetli's opinion was scientifically impossible. For this reason, the claim lacks arguable merit.[9] Even assuming the claim were arguably meritorious, we

---

[9] To the extent appellant asserts his trial counsel were ineffective for failing to introduce expert testimony that someone other than appellant caused the victim's vaginal injuries, we find this claim lacks merit. While Dr. Wetli testified the abrasions could have been caused by medical personnel inserting a catheter and Dr. Hoffman originally concluded the abrasions were caused by stretching by medical personnel, neither could point to any specific evidence to support their conclusions.

would conclude appellant has not established his counsel lacked a reasonable basis for their actions. To the contrary, Attorney Robinson testified he and Attorney Weitzman discussed at length whether to call Dr. Hoffman but ultimately determined doing so would prove detrimental insofar as it would likely increase focus on the victim's vaginal injuries, open the door to cross-examination on the issue, and possibly result in the introduction of the vaginal injury photographs counsel successfully had excluded. N.T. 8/22/18 at 240-43. Considering this strategic assessment, trial counsel's actions were eminently reasonable. *See Howard*, 719 A.2d at 237.

f. *Trial Counsel's Cross-Examination of Baez*

Finally, appellant claims trial counsel were ineffective for failing to effectively cross-examine Baez about the injuries she inflicted on the victim in the days prior to her death. Appellant believes that, had counsel elicited such testimony, it would have demonstrated Baez inflicted injuries that "contributed to, or may have been the primary cause of [the victim's] death" such that there is a reasonable probability he would have been convicted only of third-degree murder. Appellant's Brief at 35.

The Commonwealth says appellant's claim fails for several reasons. Initially, it contends appellant did not establish the reasonable basis prong because he did not ask trial counsel any questions related to their examination of Baez during the post-conviction hearings. Since "[c]laims of ineffectiveness assistance of counsel are not self-proving," *Commonwealth v. Wharton*, 811 A.2d 978, 986 (Pa. 2002), the Commonwealth asserts his subclaim fails on this ground alone. However, even assuming appellant demonstrated this prong, the Commonwealth maintains he has not established prejudice, as Baez: testified on direct examination she hit the victim, once leading to unconsciousness, and used excessive force as discipline; pled guilty to third-degree murder and was awaiting sentencing, hoping to receive a five to ten year sentence following her testimony in

appellant's case; and was cross-examined about inconsistencies in her statements to police, her motivation to testify against appellant, and her plea agreement with the Commonwealth.  N.T. 11/10/09 at 504, 618-19, 623-24, 626.

The PCRA court ultimately agreed with the Commonwealth, finding appellant failed to establish the reasonable basis prong by not addressing this issue with counsel; it also found he did not demonstrate he suffered prejudice as a result of counsel's actions.  On this latter point, the PCRA court concluded that, even if counsel presented Dr. Hoffman to testify prior injuries could have contributed to the victim's death, his testimony would not have changed the outcome as appellant "inflicted too many fresh injuries and the jury saw an abundance of evidence to support this fact."  PCRA Court Op. at 69.  Indeed, the court noted the victim suffered "as 'few' as fifty whipping injuries" and, had the jury heard that "older brain bleeds, perhaps inflicted by Ms. Baez[,]" contributed to her death, it "still would have found guilt . . . in light of the overwhelming amount of injuries that the record supports [appellant] inflicted." *Id.*

The record supports the PCRA court's conclusions.  Appellant's counsel did cross-examine Baez extensively as to her abuse of the victim, inconsistencies in her police statements, and her plea agreement with the Commonwealth.  Although counsel did not present Dr. Hoffman to opine that previously inflicted injuries could have contributed to the victim's death, we have already found counsel had a reasonable basis for not introducing Dr. Hoffman.  Regarding prejudice, we agree with the PCRA court there was significant evidence establishing appellant beat the two-year-old victim — including by appellant's own experts' accounts — for at least ten minutes and inflicted at least fifty injuries.  On this record, we reject appellant's position that additional cross-examination of Baez or the introduction of Dr. Hoffman's contributing injury testimony, would have so

undermined the Commonwealth's specific intent evidence as to create a reasonable probability the result would have been different.

### 2. Counsel's Failure to Present Mental Health Evidence to Support the Defense

Appellant next claims trial counsel were ineffective for failing to present mental health experts to prove he lacked specific intent to kill the victim and, accordingly, was guilty of a lesser degree of homicide. He notes Attorneys Robinson and Weitzman both testified they pursued a lesser-degree conviction and the guilt-phase strategy was to present a "heat of passion" defense. N.T. 8/21/18 at 172; N.T. 8/22/18 at 228-29. Appellant further emphasizes the fact Attorney Robinson, who primarily handled the guilt phase, testified if they had an opinion at the time of trial indicating appellant did not have the mental capability to form specific intent, they would have used it. N.T. 8/22/18 at 230. Appellant maintains such expert witnesses were available and, in support, relies on the testimony of four experts he presented during the post-conviction hearings — Dr. Stanley Schneider, Dr. Joette James, Dr. Richard Dudley, and Dr. Victoria Reynolds.

Concerning Dr. Schneider, appellant explains he evaluated appellant in January and October of 2009. During his post-conviction testimony, Dr. Schneider stated he had limited communication with trial counsel in advance of trial, including a ten-minute call with Attorney Weitzman following the January 2009 evaluation, a second ten-minute phone conversation three weeks later, and then no communication for the next eight months (aside from receiving records to review). N.T. 6/6/18 at 14-17. Appellant notes Attorney Weitzman's billing records reflect this limited interaction and the fact Attorney Weitzman had no in-person discussions with Dr. Schneider, spent just over one hour communicating with him during the time he was retained, and failed to ask for an expert report until just before trial. *Id.* at 25; N.T. 8/21/18 at 118-19, 121-23.

Appellant contends Dr. Schneider's hearing testimony demonstrates his counsel were ineffective in failing to call this expert as a trial witness, as he would have opined appellant did not have the specific intent to kill the victim and, instead, reacted due to "cumulative stressors on the day of the offense, including the [victim]'s behavior[,] the explosion of the feces-filled diaper[,] having to pay child support for his three children but not being able to see them[,] caring for his younger brother[,] and disbelief about Neida Baez's pregnancy and the added responsibilities associated with that." Appellant's Brief at 38-39, *citing* N.T. 6/6/18 at 96-97. Appellant states this testimony would have undermined the Commonwealth's case for first-degree murder and would have proved useful during the penalty phase in supporting the statutory mental health mitigators.

Appellant also presented the testimony of Dr. James, who conducted a neuropsychological evaluation of appellant in 2013. In appellant's view, trial counsel erred in failing to have him submit to another neuropsychological evaluation at the time of trial, because, based on Dr. James's earlier conclusions, it would have supported a lesser degree of guilt. Specifically, Dr. James testified appellant: had deficits in executive functioning, which impacted efficient learning and planning, controlling emotions and behavior, modulating reactions, being able to quickly adapt to changes, and make sound judgments; exhibited weaknesses in deductive reasoning and information processing, which made sound decision-making difficult in stressful situations; and, when combined, such deficits impeded his daily activities lending to easy frustration. Appellant's Brief at 39-40.

A third expert, Dr. Dudley, evaluated appellant and the findings of his other experts. Based on that review he concluded: appellant's cognitive deficits, as described by Dr. James, combined with the stressors in his life at the time of the incident, exacerbated his "underlying psychiatric problems, rendering him unable to form specific intent to kill[,]" *id.*

at 40, *citing* N.T. Evidentiary Hearing, 2/27/17 at 49-51; *see also* N.T. 2/27/17 at 55-57; and appellant's parenting of the victim resulted from his "reflexive response" of being abused as a child, Appellant's Brief at 40, *citing* N.T. 2/27/17 at 55-56.

Finally, appellant relies on the testimony of Dr. Reynolds, his fourth expert, who specializes in trauma and its effects on development. Dr. Reynolds explained appellant's behavior, including his use of physical violence, was "modeled" off the abusive and neglectful environment he experienced or witnessed as a child. N.T. Evidentiary Hearing, 4/26/17 at 65. Dr. Reynolds likewise agreed with Dr. Schneider that appellant exhibited impulse-control and anger issues. *Id.*

Appellant claims trial counsel were ineffective in failing to introduce the mental health evidence elucidated above at trial, because the presentation would have informed the jury of his psychological, cognitive, and emotional deficits; the stressors in his life at the time of the incident; and how his impairments combined with stress prevented him from forming the specific intent to kill the victim. Appellant asserts counsel had no reasonable basis for neglecting to present such testimony, particularly when it directly supported the guilt phase objective of obtaining a lesser-degree homicide conviction.

The Commonwealth responds by arguing appellant's subclaim is expressly waived because his PCRA counsel specifically stated, in an objection during Dr. James's cross-examination, that Dr. James and his other experts were not being offered to prove appellant's mental state as to causation or intent and, instead, were introduced to opine regarding general mitigation. Commonwealth's Brief at 70, *citing* N.T. 8/20/18 at 65-66. Even if this subclaim is not waived, the Commonwealth further argues appellant cannot establish ineffective assistance since his counsel had a reasonable basis for not calling mental health experts. The Commonwealth directs us to the testimony of Attorneys Robinson and Weitzman, who both stated they decided not to call Dr. Schneider or

present similar experts because doing so would have opened the door to testimony from the Commonwealth's expert, Dr. Rotenberg, who evaluated appellant in November of 2009 and would have introduced evidence unfavorable to him. Dr. Rotenberg, in the Commonwealth's telling, would have testified to appellant's juvenile record and his history of torturing animals and participating in dog fighting. From the Commonwealth's point of view, counsel's strategy was thus objectively reasonable.

The PCRA court agreed with the Commonwealth. It concluded appellant expressly waived this subclaim because he "took the tact, during PCRA proceedings, that the experts submitted were done so in order to address mitigation and not the guilt-phase of his trial, which waives this claim." PCRA Court Op. at 46. In any event, the court explained, appellant's claim also fails on the reasonable basis prong because trial counsel testified they "feared pitting Dr. Schneider against Dr. Rotenberg and, as such, made calculated decisions about keeping Dr. Schneider off of the stand in order to keep the Commonwealth's expert off of the stand." *Id.* at 47. Given this reasoning, the PCRA court concluded it could not find a "**substantially** greater chance of success where [it] agree[d] with trial counsel that calling Dr. Schneider, who could not even recall his own reasoning for failing to administer his **usual** battery of tests[,] . . . was a risk in light of opening the door to Dr. Rotenberg and his blistering assessment of [appellant]." *Id.* (emphasis in original). Indeed, the court continued, if Dr. Rotenberg introduced testimony related to appellant's criminal history and animal abuse, he was "unlikely to have achieved a **substantially** greater chance of success[.]" *Id.* (emphasis in original).

As a threshold matter, we respectfully disagree with the PCRA court's finding this subclaim was expressly waived by PCRA counsel during the evidentiary hearing when he stated these experts were not being asked to draw a nexus between appellant's actions on April 6, 2008 and his impairments. N.T. 8/20/18 at 65-66. Having reviewed

the record and the substance of PCRA counsel's objection, we conclude appellant did not limit his experts' testimony to mitigation findings. PCRA counsel stated, as a part of his objection, "it's a temporal question or order on the day of the offense did he suffer from these impairments[,] and would they have impaired his ability to form intent and to appreciate the criminality of his conduct?" *Id.* at 66. Moreover, PCRA counsel asked each expert whether appellant's impairments impacted his capacity to form specific intent, and each provided findings. *See, e.g.*, *id.* at 46; N.T. 2/27/17 at 49-51; N.T. 2/6/18 at 45. Thus, we find this subclaim is not waived.

But we agree with the PCRA court's substantive conclusion appellant's claim fails because he did not demonstrate his counsel lacked a reasonable basis for not calling mental health experts. Trial counsel testified they decided against calling Dr. Schneider during the guilt phase (as well as during the penalty phase), because if they presented such testimony it would have opened the door to Dr. Rotenberg's testimony, who would have detailed appellant's juvenile criminal record and information related to his history of torturing animals and engaging in a dog fighting business. His report noted appellant killed at least ten dogs via electrocution and spoke of breaking pigeons' wings before throwing them off of buildings and setting his grandmother's cat on fire before beating it to death. *See* N.T. Evidentiary Hearing, 2/8/19 at 23-24, 26; *see also* N.T. 8/20/18 at 88-89. Despite all this, Dr. Rotenberg testified appellant exhibited no neurological disorder, extreme mental or emotional disturbance, or substantial neurological impairments in 2009. N.T. 2/8/19 at 41-43.

We conclude it was reasonable for trial counsel here to determine the presentation of mental health experts might have opened the door to even more damaging evidence. In fact, counsel made this determination after retaining Dr. Schneider in advance of trial, permitting him to evaluate appellant on two occasions, and reviewing his report and

assessment. The record supports the PCRA court's finding that trial counsels' decision not to call mental health experts had a "reasonable basis designed to effectuate [their] client's interests." *See Colavita*, 993 A.2d at 887. We agree appellant has not demonstrated trial counsel's ineffectiveness in this regard.

### D. Admissibility of Appellant's Statements

For his next claim, appellant contends trial counsel were ineffective in litigating the admissibility of his statements to Sergeant Kohler and EMT Supervisor Sanders, wherein he acknowledged "beat[ing]" the victim over "the last two to three days" and stated he "did it." N.T. Jury Trial, 11/9/09 at 113, 148. He argues counsel "failed to investigate or develop any witnesses or evidence to present in support" of his motion to suppress, erred in not consulting with Dr. Schneider "regarding the voluntariness of [his] statements[,]" and did not "develop[] or attempt[] to develop any other facts which could support suppression[.]" Appellant's Brief at 44. Appellant suggests these instances of pretrial ineffectiveness were compounded by counsel's failure to investigate, develop, or present evidence that would undermine the prosecution's use of the statements at trial.

The Commonwealth challenges appellant's claim on multiple grounds. First, it argues his claim is directed toward the admissibility of his statements, which was previously litigated on direct appeal and deemed meritless. The Commonwealth further contends that, to the extent appellant is attempting to again raise this substantive issue as an ineffectiveness claim, this Court made clear in *Commonwealth v. Reyes*, 870 A.2d 888 (Pa. 2005), that "a petitioner cannot obtain post-conviction review of claims that were previously litigated on appeal by alleging ineffective assistance of prior counsel and presenting new theories of relief." *Reyes*, 870 A.2d at 895-96.

Second, with respect to appellant's assertion counsel were ineffective for failing to investigate and develop evidence demonstrating appellant's waiver of his *Miranda* rights

and his statements were involuntary, the Commonwealth stresses this Court has held "[t]here is no *per se* rule that there can be no voluntary waiver when a person is mentally ill." Commonwealth's Brief at 74, *quoting Commonwealth v. Mitchell,* 105 A.3d 1257, 1268 (Pa. 2014). Rather, the Commonwealth explains, *Miranda*'s voluntariness standard asks whether a waiver of rights is "an intentional choice made without any undue governmental pressure" and "with a full comprehension of both the nature of the right being abandoned and the consequences of that choice." *Id.*, *quoting Mitchell*, 105 A.3d at 1268. The Commonwealth submits appellant's statements were not involuntary, as he was reminded of his *Miranda* rights three times, expressed he understood those rights, and indicated he wanted to speak with detectives. *See Johnson*, 42 A.3d at 1029.

Third, the Commonwealth argues counsel were not ineffective for failing to raise questions as to the voluntariness of appellant's *Miranda* waiver and/or statements once they were admitted. It observes counsel were aware of appellant's mental state before and throughout trial, retained and consulted with Dr. Schneider following his evaluations of appellant, and made the reasonable decision to not call Dr. Schneider where doing so would open the door to rebuttal testimony from Dr. Rotenberg.

In assessing this claim, the PCRA court found appellant failed to demonstrate each prong of the *Strickland* analysis. Regarding arguable merit, the court concluded that, with respect to appellant's argument his counsel ineffectively litigated the motion to suppress, this issue was previously litigated on appeal and found meritless at that stage. Thus, it held "there can be no **substantially** greater chance of success or prejudice where the Supreme Court has already ruled upon the matter." PCRA Court Op. at 48 (emphasis in original).

As for appellant's claim trial counsel failed to challenge the voluntariness of his statements, the PCRA court found it also lacked merit. The court explained "mental

illness, even where present, does not automatically vitiate voluntary waiver[,]" and, here, the jury heard testimony that appellant "voluntarily waived his *Miranda* warnings" and had "calmed down and was no longer in the 'hyperventilated state'" when he made his statements. *Id.* at 48-49. Counsel also consulted with Dr. Schneider but were disappointed with his "performance," as he failed to "produce anything useful at the time of trial[.]" *Id.* at 49. The PCRA court further found appellant failed to show counsel lacked a reasonable basis for their decisions; in fact, appellant did not address this claim with counsel during the post-conviction hearings. Finally, the court found no prejudice where the jury heard appellant's demeanor had calmed by the time of the *Miranda* warnings. *See id.*

The record supports the PCRA court's conclusions. First, to the extent appellant argues counsel were ineffective in litigating the motion to suppress, this Court addressed the merits of the substantive claim on direct appeal and found it lacked merit. Thus, that issue was previously litigated and is not cognizable on postconviction review. *See* 42 Pa.C.S. §9544(a)(2) ("an issue has been previously litigated if . . . the highest appellate court in which the petitioner could have had review as a matter of right has ruled on the merits of the issue"). Second, with respect to appellant's argument trial counsel were ineffective because they did not investigate, develop, or challenge the voluntariness of his *Miranda* waiver and statements, he has likewise failed to demonstrate arguable merit by the required standard. Although he declares counsel should have taken such actions, appellant does not point to any specific evidence counsel could have introduced in support. Such a broad assertion cannot satisfy the arguable merit prong.

Even if appellant had demonstrated arguable merit, his claim still fails on the reasonable basis prong. While the PCRA court is correct appellant's questioning of trial counsel in connection with this claim was sparse, counsel nevertheless testified that they

did not call Dr. Schneider to address appellant's mental health because he failed to provide useful information and presenting his testimony would enable the Commonwealth to call Dr. Rotenberg in rebuttal. *See* N.T. 8/21/18 at 210-11. It is certainly reasonable for counsel to make the informed decision to decline to call a retained witness whose report proved unhelpful and who would open the door to damaging rebuttal. Because appellant's claim lacks arguable merit and he has failed to demonstrate counsel lacked a reasonable basis for their action, it is not necessary to address the prejudice prong, as the PCRA court did not err in dismissing this claim.

### E. Appellant's Entitlement to a Voluntary Manslaughter Instruction

Appellant contends counsel were ineffective for failing to present evidence to support a voluntary manslaughter instruction.[10] He asserts counsel should have introduced evidence demonstrating how the "stressors in [his] life at the time of the incident, combined with his psychological, cognitive, and emotional deficits and the other provocative factors that day, including the rupturing of [the victim]'s feces-filled diaper, combined with his own horrific past caused [him] to become so impassioned and provoked that he lost control and began hitting the [victim]." Appellant's Brief at 45-46. Appellant argues that due to the "wealth of available evidence[,]" including information his counsel learned about his upbringing from his mother and sister, as well as testimony related to his "distraught and emotional" state immediately after the incident, counsel could not have a reasonable basis for failing to introduce evidence in support of a voluntary manslaughter instruction. *Id.* at 47.

The Commonwealth responds this claim was previously litigated on direct appeal, where this Court, after fully considering the facts of the case, determined "there [was] no

---

[10] Trial counsel requested a voluntary manslaughter instruction but the trial court denied the request, finding no evidence in the record to support the charge. *See Johnson*, 42 A.3d at 1036.

evidence showing appellant was still acting under a serious and intense passion" at the time of the assault. *Johnson*, 42 A.3d at 1036. The PCRA court agreed:

> None of the expert testimony provided by [appellant] during his PCRA proceedings seems to have touched upon the attenuated timeline of the supposed complex situation of a dirty diaper and an assault some seven hours later. There is simply no evidence upon which this [c]ourt can conclude that [appellant] was still acting under a serious and intense passion some seven hours afterwards. Any thrust made towards an argument that this ignores the totality of stressors in [his] life is parried by the conclusions of [appellant]'s own experts. . . . [who] did not provide evidence upon which this [c]ourt can find counsel to have been ineffective.

PCRA Court Op. at 50-51. Indeed, the PCRA court found that, while appellant presented experts who opined he was under stress and "lacked the ability to appropriately respond to complex situations," there "was a temporal break" between the early morning wake up, the diaper issue, and when the assault occurred. *Id.* at 50.

The PCRA court did not err in dismissing this claim. As we noted on appellant's direct appeal, a voluntary manslaughter instruction is warranted where "the evidence would . . . demonstrate that, at the time of the killing, [a]ppellant acted under a sudden and intense passion resulting from serious provocation by the victim." *Johnson*, 42 A.3d at 1036, *quoting Commonwealth v. Montalvo*, 986 A.2d 84, 100 (Pa. 2009). Whether the alleged provocation is "sufficient" to warrant a manslaughter instruction is assessed objectively and, "if there be provocation without passion, or passion without a sufficient cause of provocation, or there be time to cool, and reason has resumed its sway," the instruction is not appropriate and "the killing will be murder." *Commonwealth v. Hutchinson*, 25 A.3d 277, 315 (Pa. 2011), *quoting Commonwealth v. Miller*, 987 A.2d. 638, 651 (Pa. 2009).

After reviewing the record, the parties' arguments, and the relevant law, we conclude appellant has failed to demonstrate arguable merit because the substantive claim was previously litigated and his own experts failed to present evidence warranting

a voluntary manslaughter instruction. Even accepting as true that appellant suffered from stressors and lacked the capacity to properly respond to complex situations, viewing the facts objectively, as required, we reiterate again that "[w]hile an early wake-up and dirty diaper may be unpleasant," there is "no evidence [the] victim sufficiently provoked appellant to create a sudden and intense passion in him, or that any such provocation caused him to kill [the] victim."[11] *Johnson*, 42 A.3d at 1036. Because appellant's claim lacks arguable merit, his counsel were not ineffective. *See Commonwealth v. Pursell*, 724 A.2d 293, 304 (Pa. 1999). Further, to the extent appellant argues counsel should have introduced mitigating mental health experts in connection with this claim, we again find it was not objectively unreasonable to decide against calling Dr. Schneider to avoid the introduction of damaging rebuttal evidence from Dr. Rotenberg. The PCRA court did not err in dismissing this claim.

## F. The Trial Court's Instruction Regarding the Penalty Phase

Appellant argues trial counsel were ineffective for not objecting to the trial court's opening instruction to the jury, during which it stated: "Once the closing arguments are presented by counsel, and we're talking, again I remind [you], about the guilt phase, I will

---

[11] In reaching this conclusion we note the PCRA court, in its recitation of the facts and application of those facts to this claim, stated the situation with the victim's diaper coincided with the 5:00 a.m. wakeup, such that seven hours elapsed between the alleged "provocation" and appellant's brutal assault. PCRA Court Op. at 50-51. The court's recitation parallels our discussion of the facts and the voluntary manslaughter instruction on direct appeal, where we stated "[t]he alleged provocation occurred at 5:30 a.m., but appellant assaulted [the] victim around 12:30 p.m.; there is no evidence showing appellant was still acting under a serious and intense passion at this time." *Johnson*, 42 A.3d at 1036. However, based on the record presently before us, it appears the victim woke appellant between 5:00 a.m. and 6:00 a.m. but appellant did not start to strike her until around 12:30 p.m., at which time her diaper "exploded," and his assault continued. While we note this distinction to clarify the record, it does not change our analysis of this claim. Even if the diaper incident occurred when he was hitting the victim at approximately 12:30 p.m., this "unpleasant" event, whether by itself or combined with the early morning wake up, does not rise to the level of objective provocation that would warrant a voluntary manslaughter instruction. *Id*.

then instruct you on the law that you will apply and you will then retire to engage your deliberations regarding the penalty phase of the case." N.T. Jury Trial, 11/9/09 at 16-17. Appellant asserts the court's reference to the "penalty phase" on the first day of trial violated the presumption of innocence guaranteed by the Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and that counsel did not have a reasonable basis for failing to object to it. *See* Appellant's Brief at 48-49. In support, appellant cites our decision in *Commonwealth v. Montalvo*, 244 A.3d 359 (Pa. 2021), wherein we held a trial judge's incorrect instruction on reasonable doubt warranted a new trial. Appellant also points to counsel's evidentiary hearing testimony stating he did not have a tactical or strategic reason for not objecting to the error. *See* N.T. 8/22/18 at 248. Finally, appellant challenges the PCRA court's characterization of the trial court's error as "innocuous" or simple "misspeaking"; in his view, the error "implicat[ed] a bedrock principle" regarding the presumption of innocence. Appellant's Brief at 49, *quoting* PCRA Court Op. at 54.

The Commonwealth contends the PCRA court did not err in dismissing appellant's claim because, when the "entire instruction is viewed *in toto*, it is clear that [he] did not suffer prejudice from the instruction or from trial counsel's failure to object." Commonwealth's Brief at 77. The Commonwealth argues the entirety of the instruction did not direct the jury to find appellant guilty of first-degree murder or imply he should be convicted, because the "single word 'penalty' did not affect the jury's understanding of the Commonwealth's burden or impermissibly indicate [appellant]'s guilt." *Id.* at 79.

The PCRA court reasoned appellant failed to prove his ineffectiveness claim on the basis that this case is distinguishable from *Montalvo.* Whereas the instruction in *Montalvo* read like a directed verdict —*i.e.,* "if the Commonwealth has not sustained it's [sic] burden to that level, the burden of proving the Defendant guilty beyond a reasonable

doubt, then your verdict must be guilty" — here, the trial court's reference to the penalty phase was "innocuous[,]" "less-akin to the excerpt from *Montalvo*," and is best construed as the trial judge "misspeaking momentarily[.]" PCRA Court Op. at 53-54, *quoting Montalvo*, 244 A.3d at 369.

It is well established that, in reviewing a challenge to jury instructions, an appellate court must consider the charge in its entirety, rather than discrete portions of the instruction. *See*, *e.g.*, *Commonwealth v. Frein*, 206 A.3d 1049, 1077 (Pa. 2019). In conducting this examination, we do "not rigidly inspect a jury charge, finding reversible error for every technical inaccuracy, but rather evaluate whether the charge sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision." *Commonwealth v. Prosdocimo*, 578 A.2d 1273, 1276 (Pa. 1990). Moreover, a court may use its own expressions of the law, so long as the concepts at issue are accurately presented. *See Frein*, 206 A.3d at 1077.

Here, we agree with appellant that the trial court erred in referring to the penalty phase in its opening instructions, in that the statement seemingly implied the jury would find appellant guilty. However, as noted, jury instructions are not to be read in isolation. Having considered the trial court's instruction on this point in conjunction with the other instructions the jury received, we find the court's brief misstatement did not sufficiently taint the charge as a whole, because the jury was repeatedly instructed the finding of guilt was exclusively within its province and appellant was presumed innocent. Notably, the trial court instructed the jury as follows:

> [T]he mere fact that the [d]efendant has been charged and accused of this crime carries no suggestion of guilt or evidentiary value. Rather, under our system a person accused of a crime is presumed to be innocent, is cloaked with the presumption of innocence, and that remains with him throughout the trial and unless and until during your deliberation phase you should conclude that the Commonwealth has indeed carried its burden of convincing you unanimously of his guilt beyond a reasonable doubt.

N.T. Jury Trial, 11/9/09 at 10.  The trial court further instructed:

> It's not the [c]ourt's duty to decide guilt or innocence or the facts of the case.
> I have no opinions in those regards and leave those matters exclusively to
> you.
>
> . . . .
>
> Now, a fundamental principle in our system of criminal law is that the
> Defendant is presumed to be innocent.  The mere fact that he was arrested
> and accused of a crime is not to be considered as evidence against him.
> Furthermore, the Defendant is presumed innocent throughout the trial and
> unless and until you conclude based on your careful and impartial
> consideration of the evidence that the Commonwealth has proven him guilty
> beyond a reasonable doubt.
>
> It is not the Defendant's burden to prove that he is not guilty.  Rather, it is
> the Commonwealth that always has the burden of proving each and every
> element of the crime charged[,] and that the Defendant is guilty of that crime
> beyond a reasonable doubt.

N.T. Jury Trial, 11/13/09 at 734-35.

In light of these additional instructions, we disagree with appellant that our decision in *Montalvo* dictates a different result.  In *Montalvo*, the trial court twice instructed the jury it should find the defendant **guilty** if the Commonwealth **failed** to meet its burden of proof. Montalvo's trial counsel did not object to the trial court's first misstatement of the law because he "did not recognize the mistake[,]" but he did object to the second.  *Montalvo*, 244 A.3d at 369, 371.  In response to counsel's correction, the court "immediately" commented, "[n]ow that was a Freudian slip."  *Id*. at 372 (citation omitted).  In concluding Montalvo met his burden of demonstrating prejudice, we held "the trial court's second misstatement of the law, and [the judge's] reference to a 'Freudian slip'" — a term "commonly understood to mean an unintended statement that reveals the true feelings of the speaker" — "fully support[ed]" the PCRA court's grant of relief.  *Id*. at 373.  This was so, we explained, because the "judge's characterization of her misstatement of the law as a 'Freudian slip' unmistakably constituted an expression of her opinion on [defendant]'s guilt" and "**undermined** the correction, as it made light of her two prior misstatements of

the law, and implied that the prior misstatements were not simply innocent slips of the tongue that the jury should disregard." *Id.* (emphasis in original).

We find appellant's case distinguishable. Although in *Montalvo* the trial court's two misstatements of the law were compounded by the judge's choice of words in attempting to correct the error, here the trial court's single reference to the penalty phase was clarified by the remaining instructions. The remaining instructions, as quoted above, made clear the jury needed to assess the evidence to determine if appellant was guilty of the offenses charged beyond a reasonable doubt and further directed the guilt determination was exclusively its responsibility. Thus, while the court's initial statement, viewed in isolation, could be read to convey a presumption the jury would find appellant guilty, the lengthy instructions that followed clearly clarified and assigned the jury's role. Because we find the court's instruction "sufficiently and accurately apprise[d]" the jury of the law, we conclude appellant has failed to demonstrate his claim has arguable merit or that he was prejudiced by counsels' failure to object to the instruction. *Prosdocimo*, 578 A.2d at 1276. This claim was properly dismissed.

**G. Failure to Ensure a Full Trial Record**

Appellant next contends counsel were ineffective for failing to ensure a complete record of the *voir dire*, jury trial, and penalty phase proceedings. According to appellant, there were five unrecorded, off-the-record sidebar discussions during the four-day *voir dire*, ten off-the-record discussions during trial, and six such discussions during the penalty phase. He asserts this was constitutionally deficient, particularly in a capital case since, absent a full transcript, he cannot "evaluate whether significant violations of the United States and/or Pennsylvania Constitutions have occurred." Appellant's Brief at 52. Appellant urges this Court to grant relief in the form of a new trial so that, in his words, he

may obtain meaningful appellate review and protection under the Eighth Amendment and Article I, Section 13 of the Pennsylvania Constitution.

In response, the Commonwealth argues that, to the extent appellant claims the trial court erred in failing to ensure the entire record was transcribed, he waived his claim by not raising it on direct appeal. *See, e.g., Commonwealth v. Marshall*, 812 A.2d 539, 551 n.14 (Pa. 2002), *citing* 42 Pa.C.S. §9544(b), *overruled on other grounds by Commonwealth v. Tharp*, 101 A.3d 736 (Pa. 2014). Alternatively, to the extent appellant is alleging counsel were ineffective for failing to request transcriptions of the off-the-record discussions, the Commonwealth contends his claim lacks arguable merit. It notes this Court addressed this issue in *Commonwealth v. Sepulveda*, 55 A.3d 1108 (Pa. 2012), where we held that "to 'establish entitlement to relief based on the incompleteness of the trial record, [an appellant] must first make some potentially meritorious challenge which cannot be adequately reviewed due to the deficiency in the transcript.'" Commonwealth's Brief at 80-81, *quoting Sepulveda*, 55 A.3d at 1149. This challenge, the Commonwealth explains, "goes too far" when appellant "extrapolates that a 'full and accurate' record includes all sidebars, regardless of their substance." *Id*. at 81, *quoting Sepulveda*, 55 A.3d at 1150. The Commonwealth maintains that, because appellant has not raised a claim that "cannot be adequately reviewed due to the lack of transcription of sidebar conferences[,]" he has failed to demonstrate this claim has arguable merit. *Id.*

The PCRA court agreed, finding appellant's claim "wholly without merit[.]" PCRA Court Op. at 54. It explained appellant's claim of trial court error was waived because he did not raise it on direct appeal; and, in any event, he also failed to demonstrate the ineffectiveness prongs. Regarding the latter, the court noted Attorney Robinson testified he "presumed anything that was not informal, such as discussing lunch breaks, was transcribed[,]" and the record, which includes numerous transcribed sidebar discussions

on meaningful issues, supports this presumption. *Id.* at 54-55 (citations omitted). Moreover, the court found appellant failed to plead or prove prejudice as he did not meaningfully allege any "potentially meritorious claim evading review" or that the outcome would have been different if the remaining sidebars had been transcribed. *Id.* at 55

Again, we do not discern any reversible error. As the PCRA court recognized, the transcript in this case includes multiple sidebars on meaningful issues, *see, e.g.*, N.T. Jury Trial, 11/9/09-11/10/09 at 40-41, 168, 319-27, 395-398, and appellant does not allege there were viable issues discussed during the other non-transcribed sidebars. Trial counsel's recollection of the sidebars supports this conclusion and appellant did not testify to the contrary. We restate what we said in *Sepulveda*: a "full and accurate" transcript does not necessarily include "all sidebars, regardless of their substance[,]" nor are courts required to transcribe all sidebar conferences and "needlessly waste money to transcribe the inconsequential." *Sepulveda*, 55 A.3d at 1150. Because appellant has not identified any potentially meritorious claim that cannot be reviewed or developed due to the lack of sidebar transcription, he has not demonstrated his claim has arguable merit or that he was prejudiced by counsel's failure to object.

## H. Prosecutorial Misconduct During Guilt Phase

Appellant next claims trial counsel were ineffective for failing to object to "repeated forms of [prosecutorial] misconduct, including injecting improper victim impact argument in [the Commonwealth's] opening statement and introducing constitutionally improper and inadmissible testimony through prosecution witnesses." Appellant's Brief at 54. Appellant specifically raises the following alleged misconduct: (1) the prosecutor's improper victim impact argument in his opening, where he stated the victim's "second birthday was not filled with balloons and party animals. . . . [W]hat her second birthday got to be filled with was a brutal vicious beating the day after she turned 2[,]" *id.* at 54-55, *quoting* N.T. Jury

Trial, 11/9/09 at 22; (2) eliciting Dr. Ross's testimony about the victim's older injuries, which was "completely irrelevant[,]" "did not tend towards proving any relevant fact[,]" and left the jury "with the misleading and unfounded impression" appellant caused the earlier injuries, *id.* at 55; (3) allowing Officer Andy Baez to offer his personal opinion about the victim's injuries when he responded to the scene, including that he "yelled profanities" upon observing her condition, *id.,* quoting N.T. Jury Trial, 11/9/09 at 80; and (4) allowing the victim's mother to testify regarding "purported prior incidents where [a]ppellant assaulted the [victim,]" which led the jury to have a "misleading picture" of him as a "serial child abuser," *id.* at 56. As appellant sees it, counsel should have objected and/or requested limiting instructions with respect to each of these incidents, and their failure to do so compromised the integrity of the verdict. We address each of appellant's subclaims in turn.

### 1. Use of Victim Impact Argument in Commonwealth's Opening

First, with respect to appellant's allegation the prosecutor injected victim impact argument in his opening, the Commonwealth notes appellant's counsel did object, thus preserving the issue, and the trial court overruled the objection. The court's resolution of the objection was proper, the Commonwealth explains, because the challenged portion "was a fair recitation of . . . the evidence" since the victim's birthday was the day before her assault and two days before she died as a result of that severe beating. Commonwealth's Brief at 83. The Commonwealth argues appellant's claim is meritless because "[a] prosecutor's remarks are fair if they are supported by evidence or contain inferences reasonably derived from that evidence[,]" and the jury is instructed the statements of counsel are not evidence. *Id., quoting Montalvo*, 986 A.2d at 93, *quoting Commonwealth v. Robinson*, 877 A.2d 433, 441 (Pa. 2005). In addition, the

Commonwealth asserts appellant failed to prove the reasonable basis prong because he did not ask counsel questions related to this claim during the hearing.

The PCRA court agreed with the Commonwealth, finding the trial court properly overruled counsel's objection given that the prosecutor's statements were supported by the evidence. Indeed, the PCRA court observed the victim's injuries indicate she was "beaten in a manner that most would consider brutal and vicious with little or no hint of hyperbole[,]" and appellant admitted to beating the victim over a period of days. PCRA Court Op. at 56. The court determined it was clear the victim suffered severe beatings in the days around her birthday, and found that, even if this claim had arguable merit, which it concluded it did not, "the requisite facts that the Commonwealth **had** to impart to the jury, regarding the victim being beaten and medical experts['] opinions, utterly overshadow any intemperance in the challenged [birthday] remark." *Id.* at 57 (emphasis in original).

We agree. As the PCRA court correctly explains, a prosecutor's remarks are fair if they are supported by or can be reasonably inferred from the evidence. *Montalvo*, 986 A.2d at 93. In this vein, we have directed that a prosecutor's statement will not rise to the level of misconduct unless the "unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict." *Id., quoting Robinson*, 877 A.2d at 441. We do not find the prosecutor's remarks here rise to the level of creating a "fixed bias" or "hostility" toward appellant. To the contrary, the opening statement remark was grounded in the evidence, in that it recited the accurate timing of the victim's birthday in reference to the date of the beating that led to her death. Even if the jury formed a "hostility" in their mind directed at appellant, he has not demonstrated such feeling would have resulted from the prosecutor's remark,

particularly where the Commonwealth was, as the PCRA court observed, required to present evidence of the beating and resulting injuries that led to the victim's death. Appellant has not meaningfully asserted he was prejudiced by this one comment and, as a result, we conclude his claim fails.

## 2. Dr. Ross's Allegedly Improper Testimony

Appellant advances several arguments challenging Dr. Ross's testimony as improper and alleging trial counsel should have objected to it. As a threshold matter, the Commonwealth again notes appellant failed to ask his counsel any questions related to this subclaim during the post-conviction proceedings. On this basis alone, *i.e.*, because appellant has not demonstrated counsel lacked a reasonable basis for their actions, the Commonwealth urges us to affirm.[12] The Commonwealth further contends that, even assuming appellant demonstrated no reasonable basis, his subclaim fails for lack of arguable merit and prejudice.

Regarding appellant's claim Dr. Ross's description of the number of the victim's injuries was improper because he used the term "overwhelming," the Commonwealth disagrees, noting Dr. Ross used that term to describe how he counted the victim's injuries, not to editorialize about them. As discussed, Dr. Ross observed over 220 injuries, 150 of which showed evidence of having been inflicted in the prior twenty-four hours. However, because there were a significant number of injuries in one location on the victim's body, Dr. Ross had to combine some injuries together. In explaining his counting method for the jury, Dr. Ross described those areas with multiple injuries in one location as having an overwhelming number. The Commonwealth asserts that, because the term was used

---

[12] In litigating his claims before the PCRA court, appellant raised five additional subclaims relating to Dr. Ross that he no longer pursues before this Court. As previously noted, we do not address any claims appellant has abandoned. *See supra* note 6.

in the context of explaining his medical documentation of injuries, rather than to express an inflammatory personal opinion about them, it was properly admitted.

Moreover, with respect to appellant's assertion Dr. Ross should not have been permitted to testify about injuries that occurred prior to April 6, 2008, the Commonwealth responds by observing this Court reviewed the admissibility of this prior injury testimony on direct appeal and concluded it was admissible under Pa.R.Crim.P. 404(b): it was "probative to show the . . . relationship between appellant and [the] victim," and appellant told Sergeant Kohler "he hit [the] victim with a belt the day before" her death and "disciplined [the] victim by beating her." *Johnson*, 42 A.3d at 1027. Based on this finding, the Commonwealth takes the position appellant did not demonstrate arguable merit.

The PCRA court agreed with the Commonwealth and concluded appellant failed to plead and prove his claims by the required standard. As for Dr. Ross's use of the term "overwhelming," the court found appellant "misconstrued the doctor's words[,]" as it was clear he "was simply explaining . . . he grouped some injuries together" when there were so many because "it was overwhelming to count them individually." PCRA Court Op. at 58, *citing* N.T. Jury Trial, 11/10/09 at 349. Because Dr. Ross's testimony was not directed at expressing a personal opinion about the injuries, the PCRA court concluded the claim lacked arguable merit. It further found appellant's subclaim waived, as he failed to ask counsel at the hearings about their reason(s) for not objecting to Dr. Ross's testimony. Regarding the Commonwealth's eliciting testimony from Dr. Ross about the victim's pre-incident injuries, the PCRA court noted this Court already assessed the admissibility of that evidence on direct appeal and found it admissible under Rule 404(b), and that its probative value outweighed its potential prejudice. *See Johnson*, 42 A.3d at 1027. Thus, the PCRA court concluded appellant could not raise the claim again on postconviction review.

We agree with the PCRA court's resolution of both issues and find its conclusions are supported by the record. On the issue of Dr. Ross's use of the term "overwhelming," the record makes clear he used that term to explain how he counted the victim's injuries. Contrary to appellant's characterization, he did not use it to convey his personal thoughts. In addition, appellant does not meaningfully allege the outcome of his proceeding would have been different had his counsel objected to Dr. Ross's use of the term. As such, he has not demonstrated prejudice. Moreover, the PCRA court properly recognized this Court assessed appellant's claim related to Dr. Ross's testimony about the victim's previous injuries on direct appeal. Because we already evaluated appellant's claim, it is previously litigated and the PCRA court properly dismissed it. *See* 42 Pa.C.S. §9544(a)(2).

### 3. Officer Andy Baez's Testimony

The Commonwealth argues appellant's subclaim related to Officer Baez's testimony is similarly without merit. In the Commonwealth's view, appellant fails to provide the full context surrounding Officer Baez's challenged statements or properly acknowledge that trial counsel successfully objected to both. Specifically, Officer Baez testified that, when he responded to the scene, the victim's mother was kneeling over her. He then stated that when he "got to the little child, I looked at her and I — I yelled profanities. I couldn't understand what . . ." N.T. Jury Trial, 11/9/09 at 80. At that point, trial counsel objected, the court sustained it, and Officer Baez was precluded from explaining what he did not understand. *See id.* Similarly, when Officer Baez testified, "I just remember grabbing [the victim] and holding her up on my chest so no one would see her because, if anything, what this child went through . . .[,]" *id.* at 86, counsel objected and the objection was sustained. With this context in mind, the Commonwealth argues it

is clear appellant has not established prejudice, because he has not, and cannot, demonstrate the isolated statements prejudiced the verdicts.

In resolving this claim, the PCRA court determined it was not necessary for the trial court to provide the jury with a limiting instruction based on Officer Baez's statements, because the jury "did not hear complete thoughts from the officer regarding any personal reactions he might have had" and the court "admonished the officer to stick to what he observed only." PCRA Court Op. at 61, *citing* N.T. Jury Trial, 11/9/09 at 80, 86. Additionally, even assuming the claim had arguable merit, the PCRA court concluded the claim was likely waived, as appellant failed to question trial counsel in connection with this claim during the evidentiary hearings; nor did appellant demonstrate a reasonable likelihood the result of his trial would have been different if they requested a limiting instruction for the jury to "disregard the already objected-to comments." *Id.*

We conclude appellant has not sufficiently established this subclaim. Indeed, while appellant urges us to find the trial court should have provided the jury with an instruction to disregard Officer Baez's comments, and that counsel was ineffective for failing to request one, he does not explain how he was prejudiced by the absence of an instruction and fails to meaningfully address the reality that Officer Baez did not finish either statement and the trial court admonished him to refrain from editorial comments. Having considered the entire record, we conclude appellant has not demonstrated a reasonable probability the result would have been different if counsel requested a limiting instruction and the court provided it to the jury.

### 4. Neida Baez's Prior Acts Testimony

Finally, the Commonwealth argues appellant's counsel were not ineffective for failing to challenge Neida Baez's prior bad acts testimony indicating appellant "previously whipped [the victim] with a belt to the point of unconsciousness, bit [her], and caused

marks, bruises, injuries[,] and missing hair/bald spots in the months prior to her death." PCRA Court Op. at 62 (internal quotations omitted). The Commonwealth notes this Court found the prior bad acts evidence admissible in assessing Dr. Ross's testimony on direct appeal, and the same conclusion applies here, where the evidence was admissible to show the absence of mistake or accident. *See* Commonwealth's Brief at 94. The Commonwealth further argues appellant has not demonstrated a "**substantially** greater chance of success if trial counsel had made a *motion in limine*" because the evidence was admissible, and, consistent with *Commonwealth v. Billa*, 555 A.2d 835, 841-42 (Pa. 1989), the trial court gave the jury a limiting instruction during the general charge. *Id.* at 94-95 (emphasis in original). In short, the Commonwealth believes appellant cannot demonstrate his claim has arguable merit, counsel lacked a reasonable basis for their actions, and/or he suffered prejudice.

The PCRA court determined appellant's subclaim failed on multiple fronts. Initially, it noted this Court already addressed appellant's prior acts on direct appeal as they related to Dr. Ross's testimony and found such evidence admissible. *Johnson*, 42 A.3d at 1026-27. Thus, the PCRA court likewise held such prior bad acts evidence in Naida Baez's testimony "was admissible to establish, *inter alia*[,] an absence of mistake or accident and that its probative value outweighed its prejudicial effect." PCRA Court Op. at 62-63. Nevertheless, the PCRA court continued its analysis and alternatively held that appellant failed to establish his counsel lacked a reasonable basis for their actions because there was no "**substantially** greater chance of success if trial counsel had made a *motion in limine* as the evidence was admissible." *Id.* at 63 (emphasis in original). Finally, the court concluded appellant could not demonstrate prejudice because, as the Commonwealth highlighted, the trial court gave a limiting instruction during the general

charge. *See id.* at 63-64; *see also Commonwealth v. Chmiel*, 30 A.3d 1111, 1184 (Pa. 2011) ("The law presumes that the jury will follow the instructions of the court.").

The "admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion." *Commonwealth v. Sherwood*, 982 A.2d 483, 495 (Pa. 2009). Abuse of discretion is not found "merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Id.* (citation omitted). Moreover, it is well established that evidence of prior bad acts can be admissible to show ill-will, motive, malice, or the nature of the relationship between the defendant and the decedent. *See id.* at 497. Of course, a trial court assessing whether evidence of a prior bad act is admissible must nevertheless balance the probative value of the evidence in question against its prejudicial impact. *Id.*

Here, we conclude Neida Baez's testimony about appellant's prior bad acts — more precisely, his alleged abuse of the victim before April 6, 2008 — was relevant evidence admissible under Rule 404(b) to demonstrate motive and/or absence of mistake, as well as to show the relationship between appellant and the victim. The fact the challenged evidence was presented by the victim's mother, rather than Dr. Ross (about whose testimony appellant made a similar unsuccessful argument), does not alter our analysis. In fact, although Dr. Ross's testimony informed the jury the victim suffered injuries prior to April 6, 2008, Baez's testimony was relevant in providing motive and relationship evidence that was highly probative because it related directly to appellant. Accordingly, since we conclude Baez's testimony was admissible, appellant's claim necessarily lacks arguable merit and counsel had a reasonable basis for not challenging it. In any event, appellant would be unable to demonstrate prejudice given that the trial

court provided the jury with a limiting instruction. A jury is presumed to follow instructions the trial court provides and, as such, the jury presumably understood appellant was on trial for the crimes he was alleged to have committed on April 6, 2008, not anything that happened before then. For this reason also, we find the PCRA court did not err in dismissing appellant's claim.

## I.  Failure to Present Mitigation Evidence at the Penalty Phase

Appellant claims trial counsel were ineffective for failing to investigate and present mitigation evidence at the penalty phase. Specifically, he faults counsel because they "failed to hire a mitigation specialist[.]" Appellant's Brief at 63. In addition, he asserts counsel "performed a perfunctory 'investigation' . . . consist[ing] of one trip to New York City to visit [his] mother and two sisters." *Id.* Appellant further argues counsel "failed to have [him] assessed by a neuropsychologist." *Id.* at 64. Also, he maintains counsel's "interaction" with the defense mental health expert, Dr. Schneider, was "shockingly brief[.]" *Id*. Appellant substantially relies on *Wiggins v. Smith*, 539 U.S. 510 (2003). *See id.* at 63, 65. He also contends his "case is analogous to *Abdul-Salaam v. Secretary*, 895 F.3d 254 (3d Cir. [2018]), where prejudice was found . . . under strikingly similar circumstances, in a far more aggravated case." Appellant's Brief at 66. Appellant insists evidence of "his history and organic brain damage" would have supported the mitigating factors under 42 Pa.C.S. §9711(e)(2) ("The defendant was under the influence of extreme mental or emotional disturbance."), and 42 Pa.C.S. §9711(e)(3) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired."), *id.* at 61, and would have created a reasonable probability of a different sentencing verdict, *see id.* at 65-67.

The Commonwealth responds that many of the proposed lay witnesses appellant faults counsel for not presenting — specifically, Heath Lloyd, Myra Hutchinson, Joshua

Zeigler, Patina Zeigler, Monica Jenkins, and Gerri Stewart — would have offered cumulative evidence of appellant's life history. It contends these witnesses would have "provide[d] no new relevant information, as both Cassandra and Heather Lloyd [appellant's mother and sister] testified [in the penalty phase] about the crime ridden-nature of [appellant]'s upbringing, including [appellant]'s exposure to crime, drugs, murder and mayhem[.]" Commonwealth's Brief at 98. The Commonwealth additionally asserts putative witnesses Penelope Barlow-Wright, Abdul Fulton, Khalif Watkins, and John Hormovitis would have undermined the stipulated mitigating circumstance of no significant history of prior criminal convictions under 42 Pa.C.S. §9711(e)(1). The Commonwealth notes these witnesses would have revealed his past involvement in drug dealing and dog fighting, and stays at juvenile delinquency facilities. Similarly, the Commonwealth claims proposed witnesses Davone Duncan[13] and Elizabeth DeJesus would have weakened appellant's claim to the catch-all mitigator under 42 Pa.C.S. §9711(e)(8), which was predicated on his supposed inability to cope with the stress of the victim's diaper exploding. On the contrary, the Commonwealth alleges, these witnesses would have "show[n appellant]'s non-violent history in dealing with stressful situations while raising children[.]" *Id.* at 102.

The Commonwealth argues employing a mitigation specialist "would not have aided the defense as all of the stipulated witnesses presented either cumulative testimony or undermined the defense strategy." *Id.* at 103. It also emphasizes counsel hired an investigator who researched appellant's background and aided counsel in determining who should be interviewed and used as witnesses at trial. The Commonwealth likewise contends counsel performed effectively in not presenting the testimony of Dr. Schneider. According to the Commonwealth, Dr. Schneider's testimony would have undermined the

---

[13] Duncan and appellant had two children together, and he was a stepfather to Duncan's third child by another man. *See* Affidavit of Davone Duncan at 1-2.

stipulated mitigator of a lack of significant criminal history, subverted the defense contention the murder resulted from appellant being unable to control himself while under stress, and opened the door to damaging rebuttal testimony from Dr. Rotenberg, the Commonwealth's mental health expert. Lastly, the Commonwealth maintains counsel were not ineffective for not introducing evidence of appellant's lack of executive functioning when confronted with a novel situation due to past trauma in his life. In the Commonwealth's view, "[i]ntroducing devastatingly negative information about [appellant] in the hopes that the jury would overlook [appellant]'s animal abuse and drug trafficking in the pursuit of a catch-all mitigator is patently ineffective." *Id.* at 117.

The PCRA court rejected this claim. It agreed with the Commonwealth that counsel were not deficient for not presenting the testimony of Heath Lloyd, Hutchinson, the Zeiglers, Jenkins, the Stewarts, and Knight, because this evidence "would have been duplicative[,]" and thus appellant "suffered no prejudice[.]" PCRA Court Op. at 65. The lower court likewise concurred counsel were not ineffective for not presenting Wright, Fulton, Watkins, and Hormovitis, as these witnesses would have "gutted" the defense arguments in mitigation that appellant did not have a criminal history and had not served time in a structured environment such as a prison. *Id.* at 66-67. The PCRA court also agreed with the Commonwealth that foregoing the testimony of Duncan and DeJesus was reasonable because this evidence would have undermined the defense arguments appellant lacked the ability to handle complex situations. As for counsel's failure to use a mitigation expert, the PCRA court ruled the expert would have provided cumulative testimony or testimony that undermined appellant's case, and hence appellant did not suffer prejudice.

Moreover, the PCRA court held counsel were not ineffective for not introducing the testimony of Dr. Schneider. The court determined counsel had reasonable grounds for

omitting this testimony. Namely, the court noted, it would have opened the door to the introduction of information in Dr. Schneider's report concerning evidence of appellant's past drug dealing, involvement in dog fighting, cruelty to animals, and domestic violence, which would have been contrary to his claim to the no significant criminal history mitigator. In addition, the court explained Dr. Schneider's testimony would have opened the door to damaging rebuttal testimony from Dr. Rotenberg. The PCRA court rejected the alternate strategy proposed by appellant of engaging with other experts to rebut the likely testimony of Dr. Rotenberg, arguing that "[e]ngaging other experts would not have changed the report of Dr. Schneider, nor Dr. Rotenberg[,] and the information provided by [appellant] therein; information which trial counsel successfully kept from the knowledge of the jury." *Id.* at 71. In the alternative, the PCRA court opined appellant was not prejudiced by the absence of expert mental health testimony. In particular, the court reasoned evidence of appellant's traumatic childhood was introduced to the jury via his mother and sister; there was evidence he was a good parent to his children from a previous relationship; "the Commonwealth's expert would have presented dramatically different testimony[;]" and mental health evidence would have "rendered meaningless" the lack of prior criminal history mitigating circumstance. *Id.* at 74. Finally, the PCRA court ruled counsel were not ineffective for not presenting evidence of defects in his executive functioning. The court concluded the expert opinions did not align on this issue, and appellant failed to satisfy the second and third prongs of the ineffectiveness standard.

Like the PCRA court, we hold appellant is not entitled to relief. We reject appellant's specific challenges to the adequacy of counsel's investigation for the penalty phase. Initially, counsel were not ineffective for not hiring a mitigation specialist. Attorney Weitzman, who was penalty phase counsel, testified in the PCRA court that as of the time of trial in 2009, a mitigation specialist was "not something that [he] had seen any attorney,

whether it was in [the Dauphin County Public Defender's Office where he was previously employed] or in private practice, utilize in a death penalty case or non-death penalty case." N.T. 8/21/18 at 125; *see also id.* ("[N]ot having actually seen it in practice or experienced it firsthand makes it a very nebulous concept to someone in my position."). "[C]ounsel's performance is to be evaluated in light of 'the professional norms prevailing when the representation took place.'" *Commonwealth v. Keaton*, 45 A.3d 1050, 1090 (Pa. 2012), *quoting Bobby v. Van Hook*, 558 U.S. 4, 16 (2009). Moreover, counsel employed a private investigator, George Morrison, who assisted in the investigation of mitigation evidence by finding addresses and phone numbers for counsel, locating witnesses, and conducting multiple witness interviews. *See* N.T. 8/21/18 at 131, 186-90. Also, as noted, counsel retained Dr. Schneider, who aided the mitigation investigation by reviewing records, performing psychological tests on appellant, interviewing appellant twice, conferring with counsel, and preparing a report. *See* N.T. 6/6/18 at 9-20, 26-35; N.T. 8/21/18 at 116. Under these circumstances, where it appears prevailing local norms did not involve the use of mitigation specialists, and counsel employed an investigator and mental health expert to supplement their investigative efforts, counsel were not constitutionally deficient for not also retaining a mitigation specialist. *See Commonwealth v. Eichinger*, 108 A.3d 821, 848 (Pa. 2014) ("[T]he Sixth Amendment guarantees the accused's right to effective assistance of counsel; it does not guarantee his right to a mitigation specialist."); *Commonwealth v. Baumhammers*, 92 A.3d 708, 724 (Pa. 2014) ("There is no *per se* requirement that, in all capital cases, counsel must employ a separate mitigation specialist regardless of the other mitigating evidence that is brought forth.").

Next, appellant's contention counsel's penalty phase investigation was limited to the in-person meeting with his mother and sisters is clearly false. In addition to this meeting, counsel's preparations for the penalty phase included the following: retaining

Dr. Schneider; numerous telephone calls with Dr. Schneider; attending Dr. Schneider's second evaluation of appellant; writing eight letters to Dr. Schneider; providing a substantial number of records to Dr. Schneider; conversations with Dr. Schneider regarding information he needed, issues to be developed, his report, and possible testimony; retaining Mr. Morrison; conferring with Mr. Morrison; a telephone conversation with appellant's grandmother; multiple conversations, including a face-to-face conversation, with Duncan; preparing appellant's mother and sister to testify at the penalty hearing; drafting a memorandum of the meeting with appellant's family and providing it to Dr. Schneider; reviewing Dr. Schneider's report; attending the evaluation of appellant by Dr. Rotenberg, the Commonwealth's mental health expert; reviewing the report of Dr. Rotenberg; retaining forensic pathologist Dr. Hoffman, whose opinions were pertinent not only to the guilt phase but also to the applicability of the torture aggravator at the penalty phase; coordinating the transfer of slides from Dr. Ross, the forensic pathologist who performed the autopsy of the victim, to Dr. Hoffman; a phone conference with Dr. Hoffman covering an extensive list of topics; requesting a report from Dr. Hoffman; drafting a memorandum regarding Dr. Hoffman's opinions; eight personal meetings with appellant in prison; and asking appellant whether there were individuals who should be consulted for mitigation evidence. *See* N.T. 8/21/18 at 116-20, 124, 131-36, 138-40, 142-45, 147, 170, 184-88, 192-93, 198. Counsel's investigation was far more than "perfunctory" and constitutionally reasonable.

Nor were counsel ineffective for not having appellant tested by a neuropsychologist. As Dr. Schneider testified, he never communicated to counsel that appellant should undergo neuropsychological testing. *See* N.T. 6/6/18 at 35-36. In the absence of a recommendation from Dr. Schneider, counsel may not be faulted for not unilaterally pursuing testing. Counsel were entitled to rely on the judgment of their

retained mental health expert. They were not constitutionally obliged to second-guess his expertise and identify on their own a need for testing that the doctor himself, at least as far as they were aware, did not. As this Court has repeatedly admonished, "courts must be careful not to conflate the roles and professional obligations of experts and lawyers." *Treiber*, 121 A.3d at 471, *quoting Commonwealth v. Lesko*, 15 A.3d 345, 382 (Pa. 2011); *accord Commonwealth v. Rivera*, 108 A.3d 779, 808 (Pa. 2014). We cannot demand that counsel, who are presumably unschooled in mental health matters, independently recognize the need for neuropsychological testing. Any fault in failing to pursue pretrial neuropsychological testing in this case lies with the expert, not counsel. *See Commonwealth v. Brown*, 196 A.3d 130, 151, 156 (Pa. 2018) (rejecting claim "that trial counsel was ineffective for failing to obtain neuropsychological testing that would have revealed brain damage" where defense mental health expert "did not recommend to trial counsel that a neuropsychologist be hired, and [] did not ask counsel to seek a continuance so that neuropsychological testing could be performed, more records could be reviewed, or further interviews could be performed to explore the possibility that [the defendant] had brain damage"); *Robinson*, 82 A.3d at 1015 ("Appellant's alternative argument that trial counsel was ineffective for failing to independently recognize possible mental health issues arising from the decrease in appellant's scores on the two IQ tests, as well as the competency evaluation by Dr. Gross also fails."); *Lesko*, 15 A.3d at 382-83 ("To the extent that the PCRA court specifically faulted trial counsel for failing to consult with a neuropsychologist, we caution that, in applying *Strickland*, courts must be careful not to conflate the roles and professional obligations of experts and lawyers. . . . [M]indful

of the deference to counsel that *Strickland* commands, we find that Lesko has failed to sustain his burden of proving the performance prong of *Strickland*.").[14]

Finally, counsel's interaction with Dr. Schneider was not inadequate. Again, among other things, counsel retained Dr. Schneider over a year before the commencement of trial, spoke with him numerous times over the telephone, attended his second evaluation of appellant, wrote him eight letters, provided him with numerous records, provided him a memorandum summarizing the interview with appellant's mother and sister, and had conversations with Dr. Schneider regarding information he needed, issues to be developed, his report, and possible testimony. *See* N.T. 8/21/18 at 116-20, 124, 134, 170, 192-93. Counsel's handling of Dr. Schneider was reasonable and not deficient, much less "shockingly" so. Appellant's Brief at 64.

This case is readily distinguishable from *Wiggins*. In that case, counsel's investigation of the defendant's life history was limited to two sources of information: a presentence investigation report and department of social services records. *See Wiggins*, 539 U.S. at 523-24. "[C]ounsel abandoned their investigation of [Wiggins'] background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Id.* at 524. Moreover, at the penalty phase, "counsel introduced no evidence of Wiggins' life history." *Id.* at 515. Here, by contrast, the mitigation investigation involved "extensive background information" and "a substantial number of records." Expert Report

---

[14] Attorney Weitzman testified in the PCRA court that, following Dr. Schneider's second evaluation of appellant on October 30, 2009, three days before the start of jury selection on November 2, 2009, Dr. Schneider "said something to [him] to the effect of I probably should have had you get him a neuropsychological evaluation." *See* N.T. 8/21/18 at 122. The doctor's off-hand, retrospective comment shortly before the commencement of trial regarding what more could have been done in hindsight was not a recommendation to pursue additional testing in the future. In any case, it was reasonable for counsel to conclude on the eve of trial that it was "too late" to complete neuropsychological testing, *id.* at 123, especially considering such testing is "very time consuming[.]" N.T. 6/6/18 at 38.

of Dr. Schneider, 10/30/09, at 1. Moreover, counsel supplemented the ample documentary sources by utilizing a private investigator and personally interviewing family members (appellant's grandmother, mother, and sister) and the mother of appellant's children. *See* N.T. 8/21/18 at 131-33. Further, unlike counsel in *Wiggins*, counsel here presented evidence of appellant's unfortunate life history at the penalty phase. Specifically, counsel introduced the testimony of appellant's mother, Cassandra Lloyd, who provided the following details of appellant's childhood: she used drugs when she was pregnant with appellant; she continued to use drugs after he was born; appellant's father was also a drug addict; the family was homeless for years and would live in abandoned buildings and hallways; she would put appellant out on the street when she used drugs; appellant witnessed her get robbed and began to vomit; he witnessed his father beat his mother "senseless"; he witnessed his brother Heath beat his mother's boyfriend and attempt to cut the boyfriend's throat; she beat appellant with race car tracks, belts, an iron, ironing cords, and a basketball; and she eventually threw him out of the house as a teenager. *See* N.T. Penalty Phase, 11/16/09 at 55-80, 83. Counsel also presented the testimony of appellant's sister, Heather Lloyd, who recounted: appellant and her were beaten a lot as children; they witnessed a lot of violence; and there was pervasive drug use and violence in their neighborhood. *See id.* at 87-96. *Wiggins* is altogether inapposite.

Appellant's reliance on *Abdul-Salaam* is likewise misplaced. This Third Circuit decision does not, of course, bind us. *See Commonwealth v. Bennett*, 57 A.3d 1185, 1203 (Pa. 2012) ("[W]e are not bound by the decisional law of the lower federal courts[.]"). Nor is it persuasive as *Abdul-Salaam* involved very different facts. In *Abdul-Salaam*, the Third Circuit held counsel was ineffective because he did not "pursue expert testimony about Abdul-Salaam's mental health," did not "obtain Abdul-Salaam's background

educational and juvenile records[,]" and did not interview any other family members beyond the individuals who testified at the penalty phase. 895 F.3d at 268. Here, however, counsel did all these things. Counsel retained Dr. Schneider to potentially testify as a mental health expert for the defense, *see* N.T. 8/21/18 at 116, and his report reflects counsel provided him with appellant's school and juvenile records, *see* Expert Report of Dr. Schneider, 10/30/09, at 2. Moreover, in addition to interviewing the family members who testified at the penalty hearing, appellant's mother and sister Heather Lloyd, counsel also interviewed appellant's grandmother and Duncan. *See* N.T. 8/21/18 at 132. In sum, appellant has not carried his burden to demonstrate counsel's investigation of mitigation evidence was constitutionally unreasonable.

Alternatively, even assuming counsel performed deficiently, appellant is not entitled to relief because he has failed to prove the prejudice prong of *Strickland*. *See Housman*, 226 A.3d at 1272, *quoting Brown*, 196 A.3d at 151 ("[E]ven if counsel's investigation is deemed unreasonable, the defendant is not entitled to relief unless the defendant demonstrates that prejudice resulted from counsel's conduct."). "*Strickland* prejudice in this instance requires the defendant to prove a reasonable probability that, but for counsel's alleged lapse, the result of the penalty proceeding would have been different — here, that appellant would have received a life sentence." *Robinson*, 82 A.3d at 1015. Thus, our "prejudice inquiry considers whether there is a reasonable probability that, had the PCRA evidence been adduced at the penalty phase at least one juror would have concluded that the mitigating circumstances collectively outweighed the aggravating ones." *Commonwealth v. Daniels*, 104 A.3d 267, 297 (Pa. 2014) (citation omitted).

Here, there was a very compelling case for the ultimate punishment. The facts of the murder were brutal and shocking. "Appellant repeatedly hit and whipped a two-year-old child, inflicting 150 injuries over approximately 45 to 60 minutes." *Johnson*, 42 A.3d

at 1026. The victim had "bruises all over [her] body, including vital parts of her body such as her head and chest." *Id.* She also "suffered substantial internal injuries[.]" *Id.* The young victim had abrasions to her vaginal area that looked like fingernail marks, which were caused by pinching. *See* N.T. 11/10/09 at 408-09. The horrifying details of appellant's torture-murder of a little girl "distinguished [him] from the majority of other first-degree murderers." *Lesko*, 15 A.3d at 384. Moreover, the record amply supported the two aggravating circumstances of torture and a child victim. The harrowing violence inflicted upon the victim over an extended period readily demonstrated the former, and appellant stipulated to the latter. *See* N.T. Penalty Phase, 11/16/09 at 104. It cannot be gainsaid that these aggravating circumstances were "patently grave" and weighty. *Commonwealth v. Bomar*, 104 A.3d 1179, 1204 (Pa. 2014). Indeed, the jury found the mitigating circumstance of no significant history of prior criminal convictions yet nonetheless concluded the two aggravators outweighed it. In short, there was overwhelming record support for the jury's sentence of death. *See Strickland*, 466 U.S. at 696 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support.").

Moreover, the evidence appellant faults counsel for failing to present would not have meaningfully helped his case for mitigation. The putative additional life history evidence would have been significantly redundant of the testimony of appellant's mother and sister at the penalty phase. And other background information that was not duplicative would have been **detrimental** to appellant. In particular, based on the parties' stipulation to the no significant history of criminal convictions mitigator, appellant argued at the penalty phase that while he "may have done horrible, horrible things on this particular occasion, . . . he has managed to remain crime-free for twenty-six years of his life." N.T. 11/16/09 at 120. His life history evidence, however, would have shown his

previous involvement in drug dealing and dog fighting, and placement in juvenile delinquency facilities, refuting the notion crime is aberrational for appellant. *See* Affidavit of Kalief Watkins at 2-3; Affidavit of Penelope Barlow-Wright at 1; Affidavit of John Hormovitis at 1. In addition, appellant's claim to the catch-all mitigator was predicated on his supposed inability to cope with the stress of parenting the victim. *See* N.T. 11/16/09 at 122 ("[H]e was clearly, clearly ill-equipped to deal with this young girl[.]"). Yet, his PCRA evidence included evidence he was a good parent to his children with Duncan. *See* Affidavit of Davone Duncan at 1-4.

In addition, any defense expert testimony as to brain damage would have been subject to cross-examination and rebuttal, which may have undermined or diminished the force of the mitigation. Dr. Rotenberg testified in the PCRA court appellant "showed . . . no evidence of brain damage[.]" N.T. 2/8/19 (afternoon) at 36; *see also id.* at 76. Indeed, he opined appellant was an "intelligent individual" who was "successful . . . in his own way." *Id.* at 39. Dr. Riley concurred appellant did not have brain damage. *See* N.T. 2/8/19 (morning) at 54; *see also Robinson*, 82 A.3d at 1016 ("Within this context [where expert testimony would have been subject to cross-examination and rebuttal], we see no error in the PCRA court's finding that there was not a reasonable probability that expert opinion evidence respecting appellant's brain damage would have resulted in a different weighing and a different penalty verdict."). Given the overwhelming record support for the death sentence, and relatively underwhelming evidence in mitigation, we conclude appellant was not prejudiced by any deficient performance by counsel, and for this independently sufficient reason, his mitigation-ineffectiveness claim fails.

## J. The Jury's Torture Aggravator Finding Was Unconstitutional

Appellant argues the jury's finding regarding the torture aggravating factor was due to counsel's ineffectiveness in failing to challenge the Commonwealth's penalty phase

introduction of Dr. Ross's testimony to show the "number and severity of [the] blows and the time it took to inflict the injuries to the [victim]." Appellant's Brief at 68. Appellant contends Dr. Ross's testimony should not have been introduced or, at the very least, should have been challenged as "unscientific, unreliable[,] and misleading[.]" *Id*. at 69. He claims its uncontested introduction violated due process and the Eighth Amendment, both of which apply at capital sentencing to ensure "accurate sentencing information[,]" *id*., *quoting Gregg v. Georgia*, 428 U.S. 153, 190 (1976), and prohibit long sentences "imposed under a material misapprehension of law or fact[,]" *id*., *citing Townsend v. Burke*, 334 U.S. 736, 741 (1948).

Appellant further alleges he is entitled to relief under the Sixth and Fourteenth Amendments because counsel in a capital case has a duty to thoroughly investigate and prepare for the guilt and penalty phases of trial, rather than rely on the Commonwealth's investigation and experts. He states his counsel failed to do so, rendering them "unable to effectively cross-examine or otherwise counter [Dr.] Ross'[s] damaging testimony and show it had no scientific basis and was utterly unreliable and misleading." *Id.* at 70-71. Appellant contends the experts he introduced at the post-conviction hearings would have undermined Dr. Ross's conclusions. As well, he asserts this claim was not previously litigated because, although this Court found the evidence sufficient to support the torture aggravator on direct appeal, his instant claim relates to counsel ineffectiveness. *See id.* at 71.

In reply, the Commonwealth first notes that, to the extent appellant is challenging the jury's finding of the torture aggravator, this Court considered that claim on direct appeal and concluded the evidence was sufficient. *See Johnson*, 42 A.3d at 1040. Second, the Commonwealth explains appellant's trial counsel did, in fact, object to the introduction of Dr. Ross's testimony during the penalty phase, the trial court allowed his

limited testimony to demonstrate the torture aggravator, and this Court found the introduction of that testimony proper. *See id.* at 1036-37. Therefore, the Commonwealth asserts these issues were previously litigated and cannot be raised here.

In addition, the Commonwealth contends that, to the extent appellant argues his counsel should have challenged the "speculative" nature of Dr. Ross's testimony, the argument is unfounded. The Commonwealth explains Dr. Ross relied upon and cited thirty-four references to support his conclusion that it took appellant forty-five minutes to one hour to beat the victim. Conversely, from the Commonwealth's point of view, appellant's witnesses provided speculative testimony unsupported by scientific study or literature comparison. As the Commonwealth describes: Dr. Hoffman "acknowledged he did not undertake any type of scientific study, did not do a comparison of the scientific literature, and provided no citations in support [of] his opinion[,]" Commonwealth's Brief at 118, *citing* N.T. 6/4/18 at 151; Dr. Wetli conceded he did not "undertake a scientific review" of how long it would take to cause the victim's injuries, did not independently attempt to determine the duration, and relied solely on his training and experience as a forensic pathologist, *id.* at 118-19, *citing* N.T. 6/5/18 at 67; Mr. Tressel acknowledged Dr. Ross supported his conclusion with thirty-four citations, did not include similar support for his own conclusions, and averred the number of blows the victim sustained was unknowable because there were so many, *see id.* at 119, *citing* N.T. 3/31/17 at 106-07, 109; and Dr. Van Ee suggested a "methodology as to how additional information could be discovered to better determine the length of time the injuries took to inflict," but did not conduct his own experiments due to the complexity of the issue, and did not review all of Dr. Ross's citations, *id.* at 119, *citing* N.T. 7/30/18 at 28, 40-41.

The Commonwealth asserts that because appellant's experts' disagreement with Dr. Ross was not scientifically based and did not provide an alternate estimate of duration

or the number of blows the victim sustained, appellant has not established counsel were ineffective for failing to call them. Further, it notes the experts' conclusions did not support appellant's own statements he had beaten the victim over a period of days, as Dr. Wetli, for instance, believed the beating lasted twenty minutes based on Neida Baez's testimony indicating the victim cried for that length of time, and Mr. Tressel acknowledged the victim suffered numerous injuries that would not, in and of themselves, cause death, but would cause pain. Finally, the Commonwealth avers there was sufficient evidence beyond Dr. Ross's testimony that established the torture aggravator.

The PCRA court determined trial counsel were not ineffective for failing to present appellant's post-conviction experts because, considering their inconsistent conclusions, it could not "find a **substantially** greater chance of success in presenting conflicting testimony" and thus appellant could not establish the reasonable basis or prejudice prongs. PCRA Court Op. at 76 (emphasis in original). The court found that appellant's experts were "too inconsistent and likely to undermine one another's testimony to form any real and cohesive counter to the Commonwealth's evidence regarding torture[,]" their conclusions as to the duration of the beating conflicted with appellant's own account, and this Court on direct appeal already determined there was sufficient evidence to establish torture, and the introduction of Dr. Ross's testimony was proper. *Id*. at 75-76.

The record supports the PCRA court's findings. To prove a murder was committed by torture, "the Commonwealth must show that the defendant 'intentionally inflicted . . . a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity.'" *Commonwealth v. Powell*, 956 A.2d 406, 425 (Pa. 2008), *quoting Commonwealth v. Karenbauer*, 715 A.2d 1086, 1099 (Pa. 1998). As we have previously made clear, the "intent to torture may be proven from the circumstances surrounding the killing" including such non-exhaustive factors as: "(1) the

manner in which the murder was accomplished, including the number and type of wounds inflicted; (2) whether the wounds were inflicted on a vital or non-vital area of the body; (3) whether the victim was conscious when the wounds were received; and (4) the duration of the episode." *Id.*, *citing Commonwealth v. Ockenhouse*, 756 A.2d 1130, 1137 (Pa. 2000).

Here, appellant's trial counsel objected to Dr. Ross's testimony during the penalty phase, arguing his opinions as to the number of injuries and the duration of the beating were already in evidence and incorporated into the penalty phase, and that an expert was not needed to establish the victim suffered pain, as her mother testified she was crying for approximately twenty to thirty minutes. *See* N.T. 11/16/09 at 13-15. The trial court, in a finding this Court upheld as proper on direct appeal, allowed Dr. Ross to testify for the limited purpose of establishing the level of pain the victim experienced during the beating. To the extent appellant asserts his trial counsel erred in not sufficiently objecting to the introduction of this testimony, his counsel did challenge its admission. Moreover, having reviewed the record, we reject appellant's assertion that Dr. Ross's testimony was "unscientific, unreliable[,] and misleading," such that it violated the Eighth Amendment or due process. Appellant's Brief at 69. To the contrary, Dr. Ross testified he relied on thirty-four articles and treatises in analyzing and drawing his conclusions as to the duration of the beating. *See* N.T. 11/16/09 at 53-54. Dr. Ross testified his expert report included the scientific methodology he used in generating his conclusions, which included literature comparison and application of his own prior experience as a forensic neuropathologist to the material he analyzed. *See id.* at 54. In light of this testimony, we conclude appellant has not demonstrated Dr. Ross's conclusions were unreliable or that

his conviction was based on false or misleading information.[15]  Appellant's disagreement with Dr. Ross's conclusions does not render them invalid.

We similarly reject appellant's argument he is entitled to relief under the Fifth and Sixth Amendments on the basis that his counsel were allegedly ineffective for failing to conduct their own investigation.  As explained *supra* in connection with our examination of appellant's third claim, his counsel did retain Dr. Hoffman as an expert to challenge Dr. Ross's conclusions.[16]  Trial counsel communicated with Dr. Hoffman, shared Dr. Ross's expert report and supplements with him, and ultimately asked Dr. Hoffman to generate his own expert report.  Counsel considered Dr. Hoffman's report and conclusions and, after discussing the benefits and pitfalls of presenting his testimony, made the strategic decision not to call him as an expert witness because introducing his testimony could result in a lengthy cross-examination regarding the victim's vaginal injuries.  *See* N.T. 8/22/18 at 240-43.  Trial counsel sought to avoid further discussion of the victim's vaginal injuries, particularly because Dr. Hoffman could not conclusively determine what caused them and counsel had successfully secured the exclusion of photographs of those injuries from trial.  *See id.*  As the foregoing makes clear, appellant's counsel did investigate his case and engage an expert witness, even though they ultimately decided against calling

---

[15] Appellant contends the PCRA court erred in deciding this claim at all since it supposedly required the court to make credibility determinations.  *See* Appellant's Reply Brief at 1-2. We do not agree.  As detailed in our analysis of this issue above, the PCRA court did not pass on credibility; it simply found appellant's experts' opinions, if accepted as true, were inconsistent with each other and/or with appellant's version of events such that they did not offer an alternate opinion sufficient to challenge the result.  Because the PCRA court did not assess whether these experts were credible or not, appellant's claim fails.

[16] We further observe appellant's counsel contacted additional experts before retaining Dr. Hoffman.  Specifically, counsel contacted a pathologist, Dr. Callery, who was not used because he would not have proved helpful to appellant's defense, and pathologist Dr. John Adams.  *See* N.T. 8/22/18 at 232, 260.

that witness for strategic reasons. Given these circumstances, we detect no Fifth or Sixth Amendment violation. *See Hinton v. Alabama*, 571 U.S. 263, 274-75 (2014).

With respect to appellant's argument his counsel were ineffective for not calling his post-conviction experts to challenge Dr. Ross's testimony at the penalty stage, we disagree. Dr. Ross's penalty phase testimony was limited to opining on whether and to what extent the victim experienced pain, and comprises just four pages of direct examination testimony. *See* N.T. Penalty Phase 11/16/09 at 38-41. The Commonwealth limited its examination consistent with the trial court's ruling that Dr. Ross's testimony could only be introduced for that purpose. Appellant does not allege, and our review of the record does not demonstrate, that his experts disputed that the victim suffered pain due to her injuries. Accordingly, appellant has not established his claim has arguable merit. Moreover, to the extent he claims trial counsel were ineffective for failing to call his post-conviction experts to challenge Dr. Ross's conclusions as to the number of injuries the victim sustained and the duration of the beating, we addressed that aspect of his claim in connection with his third issue above. *See supra* Section IV.C.

Finally, we agree with the Commonwealth that appellant has not proved prejudice. As we explained on direct appeal, the evidence of record supports the torture aggravator even absent Dr. Ross's testimony. Notably, the record demonstrates the victim sustained injuries over her entire body. Although her mother recognized some injuries on her fingers and legs were present before April 6, 2008, she testified the vast majority occurred on that date, the beating lasted at least twenty to thirty minutes, and the victim cried during that time. "[G]iven the size disparity between the victim and [a]ppellant, one can infer that it was [a]ppellant's intent to 'torture' the victim as he easily could have killed her with one quick blow.'" *Johnson*, 42 A.3d at 1040, *quoting Sherwood*, 982 A.2d at 506.

Consequently, we reject appellant's contention he proved prejudice by the required standard.

### K. Constitutionality of Penalty Phase Instructions

In his eleventh claim, appellant alleges the trial court instructed the jury in a "constitutionally defective and prejudicial manner during the penalty phase[,]" and his trial counsel were ineffective for failing to object to these improper instructions. Appellant's Brief at 72. Appellant alleges the penalty phase instructions were unconstitutional because they deprived him of the: (1) presumption of life; (2) jury's consideration of mercy; (3) requirement for the jury to give "meaningful consideration to mitigation evidence"; and (4) proper burden of proof "compelled by the [C]onstitution and state statute during penalty deliberations." *Id*.[17]

To the extent appellant alleges the trial court erred in providing the jury with constitutionally defective instructions, we find this claim waived because he could have raised it on direct appeal but failed to do so. *See* 42 Pa.C.S. §9544(b). Regarding appellant's ineffectiveness allegations, we assess each in turn below. As explained *supra* at Section IV.F, it is well established an appellate court, in reviewing a challenge to jury instructions, must consider the charge in its entirety, rather than specific, discrete portions of the instruction. *See Frein*, 206 A.3d at 1077. In making this assessment we have directed that an appellate court should, in considering the instructions as a whole, evaluate whether it "sufficiently and accurately apprises a lay jury of the law it must consider in rendering its decision." *Prosdocimo*, 578 A.2d at 1276. Upon review of the penalty phase instructions, we conclude appellant has failed to demonstrate this claim has arguable merit and find it was properly dismissed.

---

[17] In this claim, appellant alleges the trial court incorrectly instructed the jury on the possibility and process of commutation of his sentence. However, because appellant includes a nearly identical jury instruction challenge in his thirteenth claim, we address his contentions there. *See infra* Section IV.M.

1.   The Presumption of Life Instruction

Appellant first argues the trial court erred in failing to instruct the jury "on the presumption of life and this failure implicitly created a presumption of death by giving primacy to the consideration of a death sentence." Appellant's Brief at 73. To this end, he notes Pennsylvania's capital jurisprudence mandates a presumption of life in penalty phase proceedings, consideration of mitigating evidence, and proof beyond a reasonable doubt of aggravating circumstances prior to imposing a death sentence. Here, appellant maintains these requirements were not met because "at no point during [his] penalty phase did the court instruct the jury that [he] enjoyed a statutory and constitutional presumption of life, and the preliminary instructions implied just the opposite." *Id*. at 74. Appellant states the trial court, by instructing the jury he was presumed innocent "unless and until" proven guilty, and by explaining the penalty phase would be conducted only after a finding of guilt, led the jury to conclude "there was no penalty-phase equivalent to the guilt-phase presumption of innocence." *Id.*

The Commonwealth offers several rejoinders. First, it notes this Court previously considered the "primacy for death over life" argument in *Eichinger*, found it "plainly unreasonable[,]" and held:

> [A] specific [jury] instruction containing the words "presumption of life" is not required. An explanation of the deliberately disparate treatment of the aggravating and mitigating circumstances under the applicable standards of proof and a clear indication that life in prison is the sentence unless the Commonwealth meets its high burden is sufficient to convey the fact that life is presumed.

Commonwealth's Brief at 128, *quoting Eichinger*, 108 A.3d at 841 (internal quotation omitted). The Commonwealth asserts these requirements were met here, because the trial court instructed the jury in detail on the disparate treatment of aggravating and mitigating circumstances. *See* N.T. 11/16/09 at 142-45.

Second, with respect to appellant's argument that the structure of the trial court's instruction shifted the burden from the Commonwealth to appellant, the Commonwealth asserts the structure here was substantially similar to the language in *Eichinger* and, further, the trial court correctly and repeatedly instructed the jury on how to assess and weigh the aggravating and mitigating factors.

Finally, the Commonwealth contends the court's deadlock instruction was proper, as it accurately informed the jury: "if they did not unanimously agree to sentence [d]efendant to death, 'if all of you agree to do so, you may stop deliberating and sentence the [d]efendant to life imprisonment[,]'"  Commonwealth's Brief at 129, *quoting* N.T. 11/16/09  at 144; and if they could not reach a unanimous verdict the court would determine if they were deadlocked, *see id.* at 144-45.  The Commonwealth argues that, because the court's instructions were accurate, appellant cannot prove his claim has merit or that he suffered prejudice.

The PCRA court agreed with the Commonwealth regarding each of appellant's arguments.  Specifically, it concluded:  per *Eichinger*, the trial court did not need to provide a presumption of life instruction, and the court's instructions met the *Eichinger* requirement of distinguishing between aggravating and mitigating factors, *see* PCRA Court Op. at 77; the structure of the penalty instructions did not shift the burden from the Commonwealth to appellant, as the court's accurate and repeated instructions on how to weigh the factors eliminated any confusion as to the required standard, *see id.* at 78, *citing Commonwealth v. Spotz*, 18 A.3d 244, 296-99 (Pa. 2011); and appellant "misinterpret[ed] what the trial judge stated " regarding deadlock, as the instructions did not require the jury to be unanimous to be deadlocked, *id.*, *citing* N.T. Penalty Phase, 11/16/09 at 144-45.  Thus, the PCRA court concluded counsel "could not have lacked a reasonable basis for failing to object when there was no objection to be made." *Id.*

We find the PCRA court's conclusion amply supported by the record. Although the trial court did not provide a presumption of life instruction, such an instruction was not required. As we explained in *Eichinger*, an instruction is proper and sufficiently conveys life is presumed where it instructs the jury as to the "deliberately disparate treatment of the aggravating and mitigating circumstances under the applicable standards of proof" and "clear[ly] indicat[es] that life in prison is the sentence unless the Commonwealth meets its high burden[.]" *Eichinger*, 108 A.3d at 841.

Here, the trial court did exactly that. It stated: "Aggravating circumstances must be proven by the Commonwealth beyond a reasonable doubt, while the mitigating circumstances must be proven by the [d]efendant by a preponderance of the evidence, . . . [s]o there is a lesser standard or burden of proof on the [d]efendant in regards to mitigating than is on the Commonwealth[,]" which "continue[s] to have the burden, that higher burden, proof beyond a reasonable doubt." N.T. 11/16/09 at 23-24. The court then reinforced this distinction and reiterated the standards of proof, including the definitions of those standards, when it gave its closing instructions to the jury. *See id.* at 134-36. Finally, the court told the jury how to complete the verdict slip and again explained that, to find an aggravating circumstance, the jurors must "all agree that it is present" and that the "Commonwealth has proven it beyond a reasonable doubt[,]" whereas "each [juror] is free to regard any particular mitigating circumstance as present, despite what other [j]urors may believe." *Id.* at 143. The court elaborated this is "different from the general findings to reach your ultimate sentence of either life in prison or death[,]" and "[t]his different treatment of aggravating and mitigating circumstances is one that involves the law's safeguards against unjust death sentences[,]" as it "gives a [d]efendant the full benefit of any mitigating circumstance[s] and evidence." *Id.* Because the trial

court adhered to the requirements articulated in *Eichinger,* we find its instructions were proper and appellant has not demonstrated arguable merit.

We similarly find appellant's subclaims related to shifting the burden of persuasion and deadlock meritless. We agree with the PCRA court that where a court repeatedly and accurately instructs a jury on the proper standards for considering aggravating and mitigating factors, as here, such clear instructions "remove any possible confusion as to the appropriate standard." *Spotz*, 18 A.3d at 296. Moreover, with respect to appellant's subclaim related to the deadlock instruction, we agree with the PCRA court that appellant misinterpreted the court's instruction, as it did not state the jury had to be unanimous to decide it was deadlocked. Because appellant failed to demonstrate arguable merit, he cannot prove his counsel were ineffective, and this claim was properly dismissed. *See*, *e.g.*, *Pursell*, 724 A.2d at 304.

## 2. The Jury's Consideration of Sympathy

Appellant further contends the trial court erred in "affirmatively instruct[ing] jurors that sympathy was an improper consideration[,]" and his trial counsel were ineffective for failing to object to this instruction. Appellant's Brief at 74. In doing so, he challenges the PCRA court's reliance on *Commonwealth v. Bond*, 819 A.2d 33 (Pa. 2002), stating the issue in *Bond* was counsel's failure to request a mercy instruction, whereas here the court instructed the jury not to consider sympathy in assessing the penalty phase evidence. Appellant asserts counsel should have objected, were ineffective for not doing so, and urges this Court to grant relief.

The Commonwealth counters this claim was expressly rejected in *Bond*, where this Court held "an exercise of the jury's mercy or sympathy had to be based on evidence of mitigating circumstances[,]" including those encompassed by the "catchall" provision set forth in 42 Pa.C.S. §9711(e)(8). *Id.* at 51, *quoting Commonwealth v. Rainey*, 656 A.2d

1326, 1334 (Pa. 1995). Accordingly, if the trial court instructed the jury "it could reach its decision outside this framework" of weighing aggravating and mitigating circumstances, it "would have been error." *Id., quoting Rainey*, 656 A.2d at 1334. The Commonwealth further notes we addressed the applicability of appellant's federal claims in *Bond*, and noted our conclusion was "consistent with U.S. Supreme Court jurisprudence in that we held that an exercise of the jury's mercy or sympathy must be grounded in the actual evidence relating to the statutory mitigating circumstances." *Id.* Considering this precedent, the Commonwealth urges us to reject appellant's claim.

The PCRA court found *Bond* directly applicable, and relied on its holding that "instructing a jury on the relevant aggravators and mitigators, to include the 'catchall' mitigator of 42 Pa.C.S. §9711(e)(8) is sufficient." PCRA Court Op.at 79. The court thus concluded appellant's claim lacked merit and counsel were not ineffective for failing to object or to request a mercy instruction.

The record supports the PCRA court's finding. During the penalty phase, the court instructed the jury "[t]he sentence you impose must be in accordance with the law as I have instructed and will continue to instruct you here, and you may not base it on sympathy, prejudice, emotion, public opinion, or other improper considerations." N.T. 11/16/09 at 139. The trial court gave this instruction after providing an overview of the aggravating and mitigating circumstances presented and explaining the standards by which the jury should assess and weigh those circumstances. Viewed in concert, the instructions directed the jury to weigh the aggravating and mitigating evidence and that it could not improperly base its decision on a factor such as sympathy, unless it was grounded in the record. *See id.* at 134-36, 138-39, 142-45. Having considered the court's instructions in full, we conclude they were consistent with our precedent and accurately stated the law. *See Bond*, 819 A.2d at 51; *see also Rainey*, 656 A.2d at 1334 (jury must

reach its decision as to penalty based on the aggravating and mitigating factors framework and must be supported by the evidence). Appellant's claim lacks arguable merit and his trial counsel were not ineffective for failing to raise an objection or request a mercy instruction. No relief is due on this claim and the PCRA court properly dismissed it.

### 3. The Consideration of Mitigating Evidence

Appellant next argues counsel were ineffective for failing to object to the trial court's instruction that the jury "may" consider mitigating evidence, as this consideration is mandatory. He points to language in the instruction wherein the court stated, "Any circumstance that any [j]uror considers to be mitigating, **may** be considered by that [j]uror in determining the proper and appropriate sentence." N.T. 11/16/09 at 143 (emphasis added). In advancing this claim, appellant argues the PCRA court erred in finding that the penalty phase instructions, when read in their entirety, properly instructed the jury to weigh the mitigating evidence along with the aggravating evidence. Instead, appellant alleges the "may" instruction was not sufficiently corrected by the trial court's direction for the jury to weigh "all" the evidence during deliberation.

The Commonwealth contends the trial court's instruction was proper. It notes the portion of the challenged instruction was read verbatim from Pa. SSJI (Crim) §15.2502H, para. 3. In addition, the Commonwealth argues the remainder of the court's instruction stated the jury was permitted to return a verdict of death only if they "unanimously f[oun]d one or more aggravating circumstances are present that outweigh all mitigating evidence and circumstances." Commonwealth Brief at 132, *quoting* N.T. 11/06/09 at 134. Accordingly, the Commonwealth asserts the instruction was proper and appellant's claim lacks merit.

The PCRA court determined appellant failed to establish counsel's ineffectiveness. It explained the "supposed offending instruction is actually a **standard** jury instruction, Pa. SSJI (Crim) §15.2502H" and, when read alone or in conjunction with the rest of the charge, accurately stated the law. PCRA Court Op. at 80 (emphasis in original). The trial court's instruction stated:

> First, however, you must understand that your verdict must be a sentence of death, if and only if you unanimously find, that is, all of you find and agree that at least one aggravating and no mitigating circumstances will be present, and that's actually not here because there is a stipulation as to one mitigating; or, if you, (because there is a stipulated mitigating circumstance), if you unanimously find one or more aggravating circumstances are present that outweigh **all mitigating evidence** and circumstances. If you do not all agree on that finding, then the only verdict that you may return is a sentence of life imprisonment.

*Id.* at 80-81, *quoting* N.T. 11/16/09 at 134 (emphasis supplied by PCRA court). Based on this and other instructions, *see* N.T. 11/16/09 at 137, the PCRA court concluded the trial court clearly informed the jury it had to consider mitigating circumstances in reaching its sentencing decision.

The PCRA court's dismissal of this subclaim is supported by the record. In fact, as the PCRA court and the Commonwealth observe, the portion of the instruction appellant challenges is a verbatim recitation of the standard jury instruction Pa. SSJI (Crim) §15.2502H. Although courts are not required to follow the standard jury instructions and have discretion in using their own expressions of the law (so long as those expressions are accurate), *Frein*, 206 A.3d at 1077, we conclude counsel were not ineffective for failing to object to the standard language used by the trial court here. Notably, appellant does not identify any infirmity with the standard instruction and, in any event, the rest of the court's instruction conveyed and reinforced the jury was required to weigh and evaluate mitigating circumstances. *See*, *e.g.*, N.T. 11/16/09 at 134, 137 ("In deciding whether aggravating or mitigating circumstances exist, and whether the

aggravating circumstances outweigh the mitigating circumstances, you should consider the evidence and arguments offered by both the Commonwealth and the [d]efendant."). Because the court's instructions were proper, appellant's claim lacks merit.

4. The Burden of Proof Instruction

Finally, appellant claims the trial court's reasonable doubt instruction given during the penalty phase was improper. According to appellant, it initially defined reasonable doubt as requiring doubt to the level of "a matter of importance in your own life in which you would act with confidence and without restraint or hesitation," but later stated the jury "must believe in the aggravating circumstances 'to the degree that if this were a matter of importance in your own life, you would still act upon that matter confidently without hesitation or restraint.'" Appellant's Brief at 75, *quoting* N.T. 11/16/09 at 135-36. Appellant challenges the trial court's use of the terms "without" and "restraint[,]" and maintains this instruction equated the definition of reasonable doubt "with the assessment of confidence in aggravating circumstances[.]" *Id.* at 76. Appellant claims the court thus "eliminated the jurors' assessment of reasonable doubt and allowed them to solely focus on the positive evidence in favor of aggravating circumstances." *Id.*

In response, the Commonwealth argues the trial court instruction was proper and appellant's claim is factually inaccurate. As to the latter, the Commonwealth explains appellant "selectively cites to the second and first editions of the instructions" and, in doing so, ignores the more recent third edition which was used by the trial court and endorses the challenged language:

> To find that an aggravating circumstance exists beyond a reasonable doubt, you must be convinced of it to the same degree you would be convinced about a matter of importance in your own life in which you would act with confidence and **without restraint or hesitation**.

Commonwealth's Brief at 133, *quoting* Pa. SSJI (Crim) §15.2502F (emphasis supplied by Commonwealth). In addition, the Commonwealth notes the general reasonable doubt

instruction includes a second alternative, which also employs the "without hesitation or restraint" language. *Id.*, *quoting* Pa. SSJI (Crim) §7.01. The Commonwealth asserts the terms "without" and "hesitation" are therefore not improper in defining reasonable doubt. Finally, the Commonwealth notes we addressed a similar claim in *Commonwealth v. Jones*, 912 A.2d 268 (Pa. 2006), and found it "entirely baseless." *Id.*, *quoting Jones*, 912 A.2d at 287 (emphasis omitted). In *Jones*, the Commonwealth explains, this Court reinforced it "has 'explicitly approved of instructions containing the word "'restraint'"' for nearly five decades[,]'" such that the instruction given here was not in error. *Id.*, *quoting Jones*, 912 A.2d at 287.

The PCRA court similarly rejected appellant's arguments, finding "without" and "restraint" did not diminish the Commonwealth's burden. PCRA Court Op. at 82. To the contrary, it noted this Court, in *Commonwealth v. Cook*, 952 A.2d 594 (Pa. 2008), was confronted with an analogous ineffectiveness claim and determined that, based on five decades of case law, some "permutation of 'without restraint' is a reasonable term to include in the definition of reasonable doubt." *Id.* at 83, *citing Cook*, 952 A.2d at 630-31. The PCRA court concluded appellant's claim lacked arguable merit and counsel's failure to object did not prejudice appellant, as the objection would not have succeeded.

Having reviewed the challenged instruction, we find the PCRA court did not err in dismissing appellant's claim. Contrary to his assertions, and as the Commonwealth aptly notes, this Court has permitted use of the term "restraint" in defining reasonable doubt for more than five decades. Approval of this term is reflected in the sections of the standard jury instructions quoted above, as well as in our decisions in *Cook* and *Jones*, where we held such language does not improperly shift the burden to the defendant. Given this, we conclude the court's use of the challenged terms did not render its instruction improper, appellant's claim lacks merit, and this claim was properly dismissed.

## L. Failure to Present Evidence of an "Age" Mitigating Circumstance

Appellant contends trial counsel were ineffective for failing to investigate, develop, and present evidence related to his age and brain development. *See* Appellant's Brief at 76-78. He notes a defendant's young age and non-chronological age at the time of the offense are constitutionally and statutorily recognized as a mitigating circumstance, and "the background and mental and emotional development of a youthful defendant [should] be duly considered in sentencing." *Id.* at 76-77, *quoting Eddings v. Oklahoma*, 455 U.S. 104, 116 (1982). Appellant asserts his counsel did not investigate the "wealth of existing science" about "how brain maturation and development occurs well into one's twenties and that dysfunction, abuse[,] and neglect like [he] suffered . . . during the developmental years, further impairs that process of maturation." *Id.* at 77.

In support of this claim, appellant points to the testimony of Dr. James, who opined he suffers from brain controlling executive function deficits, which impact his impulse and emotional control and exacerbate both in stressful situations. Appellant maintains trial counsel's decision to forego this mitigator was objectively unreasonable and constitutes ineffective assistance, as a neuropsychologist could have provided the jury with testimony related to how his "physiological and neurological development[,]" lack of maturity, or stunted brain development would have "explain[ed] and lessen[ed] the moral culpability of his perceived actions." *Id.* at 78.

The Commonwealth asserts that because appellant failed to demonstrate trial counsel lacked a reasonable basis for their action, the PCRA court's dismissal of this claim was proper. It explains counsel discussed this issue on the record when the court reviewed potential jury instructions before the penalty phase. Specifically, the following exchange occurred between the trial court and counsel in determining if this mitigating circumstance was appropriate:

Defense Counsel:    I don't think we have a chance on that one.

Trial Court:    Because of the age of the child?

Defense Counsel:    No, because of his age.

Trial Court:    Well, he's middle twenties.

Defense Counsel:    He's twenty-eight now.

Trial Court:    I don't know. I listed it because I thought it was a potential. He's a relatively young man. I mean that can swing either way. Again, I thought because of the age of the child, to argue that you should, you know, give this guy a break because of his young age, that might even offend and affront.

Defense Counsel:    That's quite frankly what my thought process is. I don't even want to go in that direction.

N.T. 11/16/09 at 11-12. The Commonwealth argues it is evident from this exchange that trial counsel did not "fai[l]" to pursue the age mitigator and, instead, made a "conscious strategic decision" not to present it because it would be against their client's best interests to do so, as the victim was just two years old when she was murdered and appellant was twenty-seven at the time of the offense. Commonwealth's Brief at 136. From the Commonwealth's perspective, counsel's rationale for avoiding this mitigating circumstance was objectively reasonable and, consequently, appellant cannot establish the reasonable basis prong.

The PCRA court agreed with the Commonwealth, finding it clear from the record that trial counsel did not pursue an age mitigation "strategy because they wished to avoid offending or affronting the jury[,]" not because they simply neglected to consider it. PCRA Court Op. at 84. The court noted that, while age mitigation strategies are valid and there are "legal decisions and scientific support for the notion that chronological age does not always reveal the full picture as to brain development and issues like impulsivity[,]" just because such strategies can be valid "does not mean that the decision not to pursue one

in this case was 'objectively unreasonable'" — particularly where, as here, counsel's concerns about offending the jury were viewed as reasonable by the trial court. *Id.* The PCRA court concluded that since counsel considered age mitigation but reasonably decided not to pursue it, appellant could not prove they lacked a reasonable basis for the action and this claim fails.

Considering the record before us, the PCRA court did not err in dismissing appellant's claim. While age mitigation is a strategy that can be employed in some cases and conceivably could have been raised here, counsel's on-the-record discussion about why they were not pursuing an age mitigation circumstance under 42 Pa.C.S. §9711(e)(4) demonstrates they considered the efficacy of the mitigation and determined the chance of offending the jury weighed against it. *See* N.T. 11/16/09 at 12. The trial court seemingly agreed, recognizing employing age mitigation could "swing either way" and "might even offend and affront" the jury. *Id.* Based on this, we conclude appellant's claim fails on the reasonable basis prong, as it is clear his counsel made a strategic decision not to introduce age mitigation, a decision grounded in counsel's effort to effectuate his interests. *See Colavita*, 993 A.2d at 88. Accordingly, we find no error in the PCRA court's disposition of this claim.

## M. The Court's Instruction on the Possibility of Release

Appellant next claims trial counsel were ineffective for failing to object when the trial court instructed the jury about the possibility he "could be released from prison if sentenced to life without parole, as well as the process for determining possible release." Appellant's Brief at 78. Appellant asserts the instructions were "inaccurate and materially misleading" and the trial court allegedly deviated from the standard jury instructions. *Id.* at 78-79. In particular, he maintains the trial court failed to convey that: with respect to commutations, the "Governor is free to reject the Pardon[ ] Board['s] unanimous

recommendation[,]" *id.* at 79; "even if one's sentence is commuted by the Governor, whether a defendant is actually released is not the Governor's decision, but rather subject to a decision by the entire Parole Board after a hearing, at which the victim's family has an opportunity to comment[,]" *id.*, *citing* 18 P.S. §11.201.9.i; and Pennsylvania's commutation process "is the most stringent in the country, thus making the likelihood of commutation and/or release even more unlikely[,]" *id.*, *citing* PA. CONST. Art. 4, §9. Appellant submits his claim has arguable merit and he suffered prejudice because, if the jury had "received accurate instruction[s], there is a reasonable probability it would have reached a life sentence rather than death." *Id.* at 80.

The Commonwealth contends appellant's claim lacks arguable merit and he has not demonstrated prejudice, because the trial court's instruction was accurate. With respect to the assertion the jury was improperly instructed "that the Governor and Board of Pardons rarely commute a sentence of life imprisonment[,]" the Commonwealth notes this instruction was "verbatim from Pa. SSJI (Crim) 15.2502F(9)" and correct, in that, since 1997, only two defendants have had commuted sentences. Commonwealth's Brief at 134, *citing Eichinger*, 108 A.3d at 845. As for appellant's claim the trial court inaccurately described the commutation process, the Commonwealth explains the instruction followed the standard instruction verbatim as it relates to the unanimity of the recommendation and, further, there is no requirement the trial court inform the jury of the makeup of the Pardon Board. The Commonwealth also notes the trial court's instruction that the "Governor alone has the power to shorten or commute" a defendant's sentence is correct, *id.*, and it did not err in omitting the standard instruction phrase, "[i]f the Governor follows the pardon board's recommendation," because the Pennsylvania Suggested Standard Criminal Jury Instructions are, "[a]s the title implies . . . merely a suggestion" and are "not binding and do not alter the discretion afforded trial courts in crafting jury instructions[,]"

*id.* at 135, *quoting Eichinger*, 108 A.3d at 845. Because, in its view, the instructions accurately conveyed the law, the Commonwealth urges us to affirm dismissal of this claim.

The PCRA court, finding *Eichinger* dispositive, concluded the trial court's instruction was not improper as it could "only reasonably [be] read as reassurance to the jury [that the defendant] would not pose a threat to safety regardless of its choice." PCRA Court Op. at 85, *quoting Eichinger*, 108 A.3d at 845. Moreover, it determined counsel cannot be "deemed ineffective for failing to object to a jury instruction given by the court where the instruction itself is justifiable or not otherwise improper." *Id.*, *quoting Eichinger*, 108 A.3d at 845.

The PCRA court did not err in this regard. Contrary to appellant's position, the trial court's instruction was accurate and consistent with the Suggested Standard Jury Instructions, notwithstanding that the trial court omitted a phrase. Rather, as the PCRA court explained, the standard instructions are "not binding and do not alter the [trial court's] discretion[.]" *Eichinger*, 108 A.3d at 845. Because the instruction here provided a correct statement of the law and was not improper, we find appellant's claim lacks arguable merit and his counsel were not unreasonable for failing to object to it. *See Commonwealth v. Rainey*, 928 A.2d 215, 243 (Pa. 2007) ("counsel cannot be deemed ineffective for failing to object to a proper charge").

### N. Jury Was Precluded from Considering Mitigation Evidence

Appellant alleges "court error, prosecutorial misconduct, and ineffective counsel precluded the jury from considering relevant mitigation evidence and argument." Appellant's Brief at 80. Appellant asserts five subclaims: (1) trial counsel were ineffective because they failed to "educate the court about relevant, admissible mitigation under the Eighth Amendment" in connection with the testimony of his mother, Cassandra Lloyd, *id.*

at 81; (2) even if this latter claim was previously litigated, his appellate counsel was ineffective for failing to assert the constitutional basis for it on direct appeal; (3) the trial court erred in granting the Commonwealth's objection when his trial counsel attempted to inform the jury "what life in prison would be like for [him] if sentenced to life[,]" *id.*; (4) the prosecutor, despite stipulating appellant lacked a significant criminal history, improperly informed the jury it should not consider mitigating evidence, in violation of Section 9711(e)(1); and (5) the trial court erred in instructing the jury not to base its sentencing determination on sympathy for him, *id.* at 80-82. We examine each subclaim below and, for ease of discussion, we combine the two issues relating to appellant's mother, Cassandra Lloyd.

### 1. Appellant's Mother

Appellant asserts trial counsel called his mother during the penalty phase to testify about her treatment of him and to provide context about his background. During this testimony, counsel asked her how she felt about having two sons convicted of murder. *See* N.T. 11/16/09 at 79-80. The Commonwealth objected and the court sustained the objection. *See id.* at 80. Appellant contends his mother's testimony about her background and experience was directly relevant under the Section 9711(e)(8) catchall mitigator because her own abusive upbringing was relevant to: "contextualize, explain, and demonstrate the magnitude of her abuse and neglect of [a]ppellant; show how abusive, neglectful parenting had become somewhat normalized in their family (and to [a]ppellant); show there was no caring grandparent who stepped in to save [a]ppellant from his mother's abuse and neglect; and show the multi-generational dysfunction embedded" in his life. Appellant's Brief at 82. Appellant asserts counsel were ineffective because, in response to the Commonwealth's objection, they failed to argue this evidence was admissible mitigation under the Eighth Amendment, and Attorney Weitzman

conceded during the evidentiary hearing he had no strategic basis for failing to do so. *Id.* at 81, *citing* N.T. 8/21/18 at 158-60. Appellant further contends that, while this Court previously rejected his claims related to the relevancy of his mother's testimony on direct appeal, his appellate counsel "unreasonably failed to raise the constitutional bases for these claims." *Id.* at 82.

The Commonwealth argues this claim was previously litigated on direct appeal and cannot be raised again on post-conviction review. The Commonwealth highlights the fact this Court found testimony related to appellant's mother's background to be generally outside the scope of Section 9711(e)(8), which allows for mitigating evidence related to "the character and record **of the defendant** and the circumstance of his offense." Commonwealth's Brief at 138, *quoting* PCRA Court Op. at 86 (emphasis supplied by PCRA court). Moreover, the Commonwealth notes the trial court allowed appellant some leeway to introduce testimony about his mother's background: "I'll permit you to develop some brief background on her, as it would affect credibility and determinations on how she parented, but understand and remind, let's move through this, she's not the person on trial." N.T. 11/16/09 at 59. The Commonwealth maintains the court's direction was appropriate and appellant cannot demonstrate his claim has arguable merit. Turning to appellant's second subclaim alleging his appellate counsel was ineffective for failing to assert a constitutional basis for his mother's testimony, the Commonwealth observes appellant did not present any evidence of his appellate counsel's strategy given that he did not call counsel to testify at the post-conviction hearings.[18] The Commonwealth

---

[18] The Commonwealth did not address this subclaim in its briefing before this Court, presumably because the PCRA court did not include the subclaim in its discussion. As a result, we include the Commonwealth's response to this subclaim as set forth in its brief before the PCRA court. *See* Commonwealth's Corrected Brief in Opposition to Amended PCRA Petition at 61.

asserts appellant failed to meet his evidentiary burden of proving his counsel lacked a reasonable basis for their actions.

The PCRA court concluded appellant's claim with respect to his mother's testimony was previously litigated, because appellant raised the question of whether the trial court erred in limiting this testimony in his direct appeal, and this Court found it did not. *See Johnson*, 42 A.3d at 1037-38. The PCRA court relied our holding that, while a capital defendant may introduce a range of mitigation evidence, that evidence must relate to the "character and record of the defendant and the circumstances of his offense[,]" and his mother's testimony was not directly relevant under Pennsylvania's capital sentencing statute. PCRA Court Op. at 86, *citing Johnson*, 42 A.3d at 1038. Agreeing with the Commonwealth, the PCRA court further noted the trial court permitted trial counsel to introduce testimony about appellant's mother's background to the extent it touched on credibility and her parenting. *Id.* Thus, the court concluded appellant's claim lacked merit because it was previously litigated and factually incorrect, as his mother did testify about her background as it related to appellant. It further held he failed to demonstrate the reasonable basis and prejudice prongs for the same reasons.

A capital defendant may offer, as mitigating evidence, "[a]ny other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." 42 Pa.C.S. §9711(e)(8). However, as the language of Section 9711(e)(8) makes clear, the mitigating evidence must be related to the character and/or record of the **defendant**. To the extent appellant continues to challenge the trial court's decision to sustain the Commonwealth's objection when his trial counsel sought to elicit testimony from appellant's mother as to how she felt about her sons being convicted murderers, we find this claim was previously litigated on direct appeal.

Moreover, with respect to appellant's claim his trial counsel were ineffective for failing to argue testimony related to his mother's background was admissible as mitigating evidence under the Eighth Amendment, we disagree. Trial counsel did argue evidence related to appellant's mother's background was admissible at the penalty stage and, in response, the trial court permitted testimony touching on credibility and how that background impacted her parenting. *See* N.T. 11/16/09 at 58-59, 80. Our review of the record demonstrates trial counsel was able to successfully elicit extensive testimony from appellant's mother about her own background and its impact on her parenting, and the trial court allowed it. For example, appellant's mother testified: she was abused by her own mother, who beat her "[a]ll the time[,]" *id.* at 60; she did not have a relationship with her mother's husband because, even though she "just wanted to have a dad," her mother "would never let [her] go near him[,]" *id.*; she lacked parental involvement in any area of her adolescent life, *see id.* at 61; she started drinking and using drugs at ten or eleven years old, and began using heroin, methadone, cocaine, crack cocaine, and alcohol and pills by the time she was in her mid-twenties, *see id.* at 61-62; she routinely used cocaine, alcohol, and marijuana while pregnant with appellant, *see id.* at 63; she was homeless for extended periods of time, *see id.* at 65-66, and engaged in prostitution and stealing to obtain drugs, *see id.* at 70; appellant observed her being physically abused by "all of [her] husbands or boyfriends[,]" including by his father, who "beat [her] senseless" to the point she had "blood [coming] out of [her] face[,]" "couldn't think[,]" and would "just crawl up in a corner" and "not be able to eat[,]" *id.* at 71; and she would "[b]eat the hell out of [appellant]" using "[a]nything [she] c[ould] get [her] hands on[,]" *id.* at 74.

In light of this testimony, we reject appellant's assertion counsel failed to "educate the [trial] court about relevant, admissible evidence under the Eighth Amendment[,]" or effectively elicit testimony from his mother to "contextualize, explain, and demonstrate the

magnitude of her abuse and neglect of [a]ppellant" and the "multi-generational dysfunction" in his family. Appellant's Brief at 81-82. Her testimony was directed to elucidating precisely those points, and appellant does not identify any additional testimony he would have introduced, aside from his mother's response to the question regarding how she felt about having two sons convicted of murder. *Id.* at 81. This testimony, as we found on direct appeal, was properly excluded as third-party impact testimony not encompassed within the catchall mitigator, and trial counsel was not ineffective for failing to successfully argue for its admission. *See Johnson*, 42 A.3d at 1038. Therefore, we conclude appellant has not demonstrated his claim has arguable merit.

We further find appellant has failed to demonstrate his appellate counsel was ineffective for failing to raise the constitutional bases for this mitigation issue on direct appeal. Appellant's argument in support of this subclaim consists of a single sentence and, as the Commonwealth correctly notes, he did not present any evidence regarding his appellate counsel's strategy, as he did not call him to testify during the hearings. Appellant has not met his burden of demonstrating his appellate counsel lacked a reasonable basis for his strategy on direct appeal, and this underdeveloped claim was properly dismissed. *See Wharton*, 811 A.2d at 986-87. Moreover, even assuming appellant had attempted to demonstrate the reasonable basis prong, we find this subclaim lacks merit because his counsel did elicit mitigation testimony from his mother and appellant does not allege any specific, additional evidence he was precluded from introducing.

2. Trial Counsel's Description of Life in Prison

Appellant claims the trial court "unconstitutionally limited [his] mitigation presentation" by sustaining the prosecutor's objection when his trial counsel "attempted

to inform the jury what life in prison would be like" for him. Appellant's Brief at 81, *citing* N.T. 11/16/09 at 128. Aside from this sentence, appellant does not elaborate on or provide supporting argument for this subclaim.

The PCRA court and Commonwealth did not address this subclaim, but in the interest of completeness we resolve it here. We find it waived because it was not raised on direct appeal and, in any event, it is undeveloped. *See* 42 Pa.C.S. §9544(b) ("[A]n issue is waived if the petitioner could have raised it but failed to do so before trial, at trial, during unitary review, on appeal or in a prior state postconviction proceeding."). Appellant offers no argument or support for this subclaim and, instead, simply asserts the court's limitation was unconstitutional. Such bare assertions are insufficient. *See Wharton*, 811 A.2d at 986-87. However, even assuming appellant had developed the claim, a review of the record indicates his trial counsel did inform the jury "what life in prison would be like" for him during the penalty phase closing argument. Attorney Weitzman explained the limitations on appellant's day-to-day life, *see* N.T. 11/16/09 at 127-29, and was only prohibited from answering (after the Commonwealth objected) his own rhetorical question, "You know what people do to child killers" in a men's penitentiary? *Id.* at 128. Considering the description of prison life counsel was permitted to present,[19] appellant

---

[19] In his penalty phase closing argument, appellant's counsel stated:

[L]ife is absolute hell in a state prison. [Appellant] has officially forfeited his right to make any of his own decisions, not just tomorrow, or in a week, but for the rest of his life. [Appellant] has probably never been in any structured environment for any length of significant time, and that's all he's going to have to deal with for the rest of his life, is a corrections officer telling him when to wake up and when to go to bed, when to talk and when to shut up, when to eat, when to sleep, when to go to the bathroom. He's lost the right to make any of his own choices anymore.

So[,] I'm not asking that you guys give him a free pass, and I'm not requesting forgiveness for [appellant]. That is as a severe punishment and penalty as exists. [Appellant] will be in a cell that is probably 8 by 10 for the rest of his life.

N.T. 11/16/09 at 127-28.

has not shown how the court's decision to exclude counsel's response to a speculative, hypothetical question unconstitutionally impeded his mitigation presentation. Because appellant did not raise this claim on direct appeal and the record does not support it, it was properly dismissed.

### 3. Consideration of Mitigation

Appellant asserts the trial court erred in overruling his objection when the prosecutor remarked the jury should not consider his lack of significant criminal history as a mitigator. *See* Appellant's Brief at 81, *citing*, N.T. 11/16/09 at 115. However, appellant again provides no argument to support this subclaim and the Commonwealth and PCRA court did not address it. We find this subclaim waived as undeveloped. In addition, we conclude it is substantively waived, because appellant challenges the trial court's ruling in response to his counsel's objection and this claim could have been raised on direct appeal, but was not. *See* 42 Pa.C.S. §9544(b).

### 4. Consideration of Sympathy for Appellant

Finally, appellant alleges, without discussion, that the trial court erred in instructing the jury it should not consider sympathy for him in reaching its sentencing determination. We examined this same claim above and rely on that analysis here. *See supra*, Section IV.K.2.

### O. Appellant Was Denied a Fair and Impartial Jury

Appellant argues this Court should vacate his death sentence because counsel and the trial court failed to "properly 'life-qualify' two venirepersons, who were seated on [his] jury and indicated they would automatically vote for death in certain circumstances." Appellant's Brief at 84. He asserts Jurors 1 and 7 should have been disqualified because: Juror 1 stated she would vote for the death penalty in cases where a victim dies at the hands of an abuser, *see id.* at 85, *citing* N.T. Jury Selection, 11/2/09 at 84-85, and was

friends with the Manchester Township Police Chief, who spoke with her about this case, but "didn't go into detail[,]" *id.* at 85, *quoting* N.T. 11/2/09 at 78-79, 91; and Juror 7 indicated he would "always vote for death in cases of intentional murder, or where 'the[ defendant] had intentions of harming somebody when they did it,'" *id.* at 84, *quoting* N.T. Jury Selection, 11/5/09 at 468.[20]  Despite recognizing that, per *Commonwealth v. Tedford*, 960 A.2d 1, 47-48 (Pa. 2008), there is no general requirement to life-qualify jurors, appellant argues "where, as here, there is clear evidence of bias in favor of death, counsel is objectively unreasonable in failing to conduct additional *voir dire*, challenge for cause, or exercise a peremptory" strike. *Id.* at 85. Appellant asserts this ineffectiveness led to constitutional, structural error requiring a new trial.

The Commonwealth argues appellant cannot prove his claim because, as this Court made clear in *Tedford* and reaffirmed in *Bond*, 819 A.2d at 50-51, there is no general requirement to life-qualify jurors and, therefore, counsel cannot be deemed ineffective for failing to do so.  Commonwealth's Brief at 139, *citing Tedford*, 960 A.2d at 47.  The only relevant question, the Commonwealth says, is whether counsel and the court "properly ensured that the selection procedures were fair and impartial and that jurors would follow the court's instructions notwithstanding personal beliefs."  *Id.*  The Commonwealth contends these requirements were met, because Juror 1 "repeatedly affirmed that they would not automatically impose the death penalty, would consider the totality of the case, would keep an open mind while hearing evidence, and would follow the court's legal instructions[,]" *id.* at 140, *citing* N.T. 11/2/09 at 81-87, 92-93, and Juror 7 twice indicated that, despite his personal feelings on when the death penalty should be imposed, he would follow the court's instructions, *see id.*, *citing* N.T. 11/5/09 at 471-72. The Commonwealth asserts the challenged jurors were properly seated and, as a result,

---

[20] We note seated Juror 1 is also referenced throughout the briefing as Juror 156, and seated Juror 7 is also referenced as Juror 242.

appellant's claim lacks arguable merit and he cannot demonstrate he was prejudiced by their inclusion in the jury. It further notes appellant failed to ask his trial counsel any questions related to this claim, rendering the reasonable basis prong insufficiently pled and his claim properly dismissed.

The PCRA court rejected appellant's claim, explaining *Tedford* made clear there is "no general requirement to life-qualify jurors, and thus counsel cannot be deemed ineffective for failing to do so." PCRA Court Op. at 87, *quoting Tedford*, 960 A.2d at 48. Moreover, it noted the challenged jurors were questioned extensively on their "initial beliefs and, ultimately, each stated that he/she would follow the court's instructions." *Id.* Because the jurors were rehabilitated with respect to whether their personal views would interfere with their ability to follow the court's instructions and the law, the PCRA court concluded appellant did not demonstrate arguable merit or prejudice. It further determined appellant failed to carry his burden of establishing the reasonable basis prong, because he did not ask counsel questions related to this issue.

The record supports the PCRA court's denial of relief. It is well established there is no general requirement to life-qualify jurors and, accordingly, trial counsel cannot be deemed ineffective for failing to do so. *See, e.g., Tedford*, 960 A.2d 47-48; *Bond*, 819 A.2d 50-51. However, trial counsel must ensure the juror selection procedures are fair and impartial, and that jurors would follow the court's instructions. Indeed, when "a juror's views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath, he is properly excluded from the jury." *Commonwealth v. Rivera*, 199 A.3d 365, 384 (Pa. 2018).

Here, both Juror 1 and Juror 7 ultimately expressed they would follow the court's instructions after initially relaying support for the death penalty in connection with certain crimes. Notably, Juror 1 indicated on her juror questionnaire that "there exists crimes

which are so egregious that society's consequences must mandate th[e death] penalty[.]" N.T. 11/2/09 at 81. But, when asked if the facts of this case fell into that category, she responded:

> It would depend on the circumstances. It depends to me on many of the details and the things that happened and led up to this. It is just not a — I don't look at it just as, well, it is a murder and [the] death penalty should happen. It is what happened within that murder before that and all of the circumstances with it.

*Id.* Juror 1 also reinforced that she would not automatically impose the death penalty, stating, in a lengthy discussion with the court, how she would remain open-minded and follow the court's instructions. *See id.* at 81-87, 92-93. Similarly, Juror 7 noted "there are some cases of intentional murder where [he] would always vote for a death sentence[,]" such as where the perpetrator of a bank robbery committed the crime with the intention of harming someone. N.T. 11/5/09 at 468. However, when asked if he could engage in weighing the aggravators and mitigators and follow the law, Juror 7 explained:

> I would go along — I mean talk about it, find, you know, maybe there is more to it than I really know. I am cut and dry when I say this, but, you know what I mean . . . but maybe there is other circumstances where something could happen to cause this, you know?

*Id.* at 469. The Commonwealth then explained the penalty phase process, including that it has the burden of proving aggravating circumstances and that appellant could present mitigating circumstances, and Juror 7 twice stated he would follow the trial court's instruction in reaching his decision. *Id.* at 471-72.

Having reviewed the *voir dire* record, we agree with the PCRA court that appellant failed to demonstrate the jurors were improperly seated, that their inclusion in the jury constituted unconstitutional error, or that he was prejudiced. To the contrary, the record makes clear both jurors affirmatively indicated they would follow the court's instructions. Because appellant has not established constitutional error, his derivative ineffectiveness

claim also fails, as counsel cannot be deemed ineffective for failing to raise a meritless claim. *See Treiber*, 121 A.3d at 445.

### P. Non-Statutory Aggravation Evidence Presented During Penalty Phase

Appellant next claims the jury was exposed to "irrelevant, improper non-statutory aggravation at the penalty phase" as a result of prosecutorial misconduct, counsel ineffectiveness, and trial court error. Appellant's Brief at 86. He asserts this aggravation evidence included: a juror's exposure to information appellant rejected a plea offer for life imprisonment; evidence incorporated from the guilt phase including "improper and inflammatory commentary by Dr. Ross" about the victim's injuries; improper victim impact evidence and juror notes from the guilt phase; and "improper prosecutorial argument appealing to jurors' emotions." *Id*. Appellant maintains that, while the trial court overruled counsel's objection to the prosecutor's alleged reference to victim impact evidence during the guilt-phase opening statements, counsel was ineffective in failing to object or request limiting instructions with respect to the other evidence, because this non-statutory aggravating evidence was inadmissible and counsel had no reasonable basis for not challenging it. He further asserts that, to the extent the Commonwealth argues he raised similar claims on direct appeal, the instant claim is not waived as it relates to ineffective assistance of counsel. *Id.* at 87.

The Commonwealth refutes each of the issues appellant raises in connection with this claim. First, with respect to appellant's reference to prosecutorial misconduct or improper appeal to the jury's emotions, it notes appellant has not "include[d] authority or analysis[,]" thereby rendering the allegation "unsupported and frivolous." Commonwealth's Brief at 141. Second, the Commonwealth challenges his assertion Juror 187 should have been removed, and his counsel were ineffective for failing to seek removal, after the juror heard an unidentified individual state, "charged with murder, life

sentence was offered, but rejected." *Id.*, *quoting* N.T. 11/16/09 at 4. The Commonwealth explains the standard for removal of a juror is whether that juror is "willing and able to eliminate the influence of any scruples and render a verdict according to the evidence," as determined on the "basis of answers to questions and demeanor." *Id.*, *quoting* *Commonwealth v. Koehler*, 737 A.2d 225, 238 (Pa. 1999).

Here, the Commonwealth notes Juror 187 informed the court immediately before the penalty phase that, while waiting for someone to pick him up, he overheard the comment quoted above. Juror 187 stated no other jurors were in the surrounding area when the comment was made. The court colloquied him as to whether he could follow its instructions and whether the information he heard would impact his ability to assess the evidence presented. Juror 187 agreed he could follow the court's instructions and he would not allow the information to impact his ability to assess the evidence and reach an impartial verdict. As well, the Commonwealth highlights how Juror 187 stated he did not inform the other jurors of this information.[21] In light of the relevant law and Juror 187's responses to the court's questions, the Commonwealth argues appellant's counsel were not ineffective for failing to seek removal of the juror and the trial court did not err in allowing him to continue.

Third, the Commonwealth asks us to reject appellant's assertion trial counsel erred in not objecting to the Commonwealth's request to incorporate the guilt phase record into the penalty phase, because this claim is frivolous. The Commonwealth observes this Court has previously held objections to incorporating the record in this manner is a purely procedural matter carried out pursuant to 42 Pa.C.S. §9711. *See id.* at 143, *citing*

---

[21] In assessing whether Juror 187 could render an impartial verdict, the court asked, "[a]nd did you communicate this information to anybody else[?]" N.T. 11/16/09 at 4. He responded "no" before the court further limited the scope of the question. *Id.*

*Commonwealth v. Wharton*, 607 A.2d 710, 722 (Pa. 1992). Thus, the Commonwealth argues the PCRA court did not err in dismissing this claim.

Fourth, the Commonwealth argues appellant's claim as it relates to the jury's use of notes from the guilt phase during the penalty phase fails because he raised this substantive issue on direct appeal. In fact, appellant's trial counsel objected to the use of such notes, the trial court overruled the objection, and appellant appealed the issue, arguing use of the notes improperly allowed the jury to consider guilt phase evidence irrelevant to the penalty phase. *See Johnson*, 42 A.3d at 1038. We rejected appellant's claim, however, finding trial courts are required to allow juries to take notes for trials expected to last more than two days, jurors are permitted to have their notes during deliberations, the trial court permitted the guilt phase evidence to be incorporated at the penalty phase without objection, and appellant cited no authority for the proposition that guilt phase evidence may not be incorporated at the penalty phase or is inadmissible. *See id.* at 1038-39. For these reasons, we held on direct appeal the jury's use of its guilt phase notes was not improper. *See id*. Because this issue was previously litigated, the Commonwealth argues appellant cannot raise it again now. *See* Commonwealth's Brief at 143; *see also* 42 Pa.C.S. §9544(a)(2).

The PCRA court agreed with the Commonwealth's arguments on each issue. Regarding appellant's assertion Juror 187 should have been removed from the jury because he overheard a comment that appellant rejected a plea offer, the PCRA court quoted the standard from *Koehler* noted above and found removal was not warranted. The court explained appellant failed to demonstrate arguable merit because the juror indicated he had not shared the information with other jurors and agreed he "could set the matter aside and judge the case based upon what occurred in court," such that he did

not harbor any "biases or prejudices" that would disqualify him. PCRA Court Op. at 89, *quoting Koehler*, 737 A.2d at 238.

In addition, the PCRA court found appellant's argument related to the incorporation of the guilt phase record into the penalty phase lacked merit, because it is well established such a claim is frivolous. *See id.* at 90, *citing Wharton*, 607 A.2d at 722. The court similarly rejected appellant's assertion the court erred in allowing the jurors to use their guilt phase notes during the penalty phase, finding the issue was previously litigated on direct appeal. *See id.*, *citing Johnson*, 42 A.3d at 1038. Finally, the PCRA court again recognized appellant did not question counsel about these issues during the evidentiary hearings and, as a result, did not meet his burden of establishing the reasonable basis prong of his claim. *See id.*

Having reviewed the record, we find no error in the PCRA court's determination appellant's claim lacked merit.[22] On the first issue, and as the lower court explained, we held in *Koehler* that

> [t]he test for determining whether a prospective juror should be disqualified is whether he is willing and able to eliminate the influence of any scruples and render a verdict according to the evidence, and this is to be determined on the basis of answers to questions and demeanor. . . . It must be determined whether any biases or prejudices can be put aside on proper instruction of the court. . . . The decision on whether to disqualify is within the discretion of the trial court and will not be reversed in the absence of a palpable abuse of discretion . . . .

*Koehler*, 737 A.2d at 238, *quoting Commonwealth v. Wilson*, 672 A.2d 293, 299 (Pa. 1996) (emphasis omitted). Under this standard, we conclude Juror 187 did not need to be disqualified. The trial court was able to colloquy the juror on this issue and observe

---

[22] As noted, appellant also broadly alleges prosecutorial misconduct and asserts the prosecutor improperly appealed to the jury's emotions. The PCRA court dismissed this claim, however, because appellant offered no support for or discussion of it. We agree with the PCRA court's determination. Bare, unsupported claims do not warrant relief and appellant has not provided us with a basis to review it. *See Wharton*, 811 A.2d at 986-87.

his demeanor. As part of that colloquy, the juror told the court he did not share the information he heard and could adhere to the court's instructions. Accordingly, we find appellant's counsel was not ineffective for failing to seek removal of the juror, as removal was unwarranted, and the trial court did not abuse its discretion in allowing the juror to remain.

We likewise agree with the PCRA court's conclusion appellant's trial counsel were not ineffective for failing to object to the Commonwealth's request to incorporate the guilt phase record into the penalty phase. We have held the incorporation of the guilt phase record into the penalty phase is "purely a procedural matter carried out pursuant to 42 Pa.C.S. §9711." *Wharton*, 607 A.2d at 722, *quoting Commonwealth v. Albrecht*, 511 A.2d 764, 777 (Pa. 1986). Thus, as we held in *Wharton*, a claim challenging a trial court's incorporation of the guilt phase record or a claim alleging counsel's ineffectiveness for failing to object to it, is "frivolous." *Id.*

We further find appellant has not demonstrated the trial court erred or his counsel were ineffective in connection with the jury being permitted to use their guilt phase notes during the penalty phase. Regarding the former, as the PCRA court aptly explained, this issue was previously litigated on direct appeal, at which time this Court concluded the jury's use of their notes was not improper. *See Johnson*, 42 A.3d at 1038-39. Because this issue was previously litigated, appellant cannot raise it again to obtain postconviction relief. Moreover, to the extent appellant raises this issue in the context of ineffective assistance of counsel, we conclude he has not met his burden of pleading and proving this aspect of his claim. To the contrary, appellant's trial counsel did object to the use of guilt phase notes during the penalty phase, that objection was overruled, and we concluded on direct appeal the use of the notes was proper. *See id.* Consequently, we find trial counsel were not ineffective for failing to request a limiting instruction, particularly

where appellant has not identified any inadmissible guilt phase evidence or authority for the proposition that guilt phase evidence cannot be incorporated into the penalty phase. Finally, we agree with the PCRA court that appellant failed to establish counsel lacked a reasonable basis for their action, as he did not ask counsel questions related to this claim at the hearing. Thus, in addition to the foregoing, appellant's claim fails on this prong and the PCRA court did not err in dismissing it.

### Q. Counsel's Failure to Request a Cautionary Instruction When the Trial Court Admitted Inflammatory Photographs

In his principal brief, appellant claimed trial counsel were ineffective for failing to request an available cautionary instruction when the trial court admitted inflammatory photographs. *See* Appellant's Brief at 88-89. The Commonwealth responded in opposition, noting this Court addressed the admissibility question on direct appeal and found in its favor, such that the claim was previously litigated. *See* Commonwealth's Brief at 144-47. Given this, appellant subsequently withdrew his claim in his reply brief, and we do not consider it. *See* Appellant's Reply at 27 ("Counsel withdraws this claim of error.").

### R. Counsel's Failure to Object to Prosecutorial Misconduct During the Penalty Phase

Appellant asserts trial counsel were ineffective for failing to object to three instances of prosecutorial misconduct during the penalty phase, specifically, when the prosecutor: (1) instructed the jury to put themselves in appellant's shoes; (2) made multiple references to the intent to cause pain, which misstated the legal standard for proving torture; and (3) improperly implied appellant's mitigation evidence should be

disregarded or given less weight when compared to the injuries the victim sustained.  *See* Appellant's Brief at 90-94.[23]

### 1. Putting the Jury in Appellant's Shoes

Appellant notes that, during the penalty phase closing argument, the prosecutor stated:  "And what's going through your head when you're thinking about grabbing these other mechanisms, these other devices, these other ways to go ahead and beat [the victim]?  You're hitting her in the arms.  You're hitting her in the legs."  N.T. Penalty Phase, 11/16/09 at 109.  Appellant contends this statement asked the jury to put themselves in his shoes, which is widely recognized as improper argument as parties should not appeal to the sympathy of the jury by asking what they would have done.  *See* Appellant's Brief at 91, *quoting Millen v. Miller*, 308 A.2d 115, 117 (Pa. Super. 1973).  Appellant asserts his counsel should have objected to this statement, asked for a curative instruction, or requested a mistrial, and their failure to do so violated his Sixth, Eighth, and Fourteenth Amendment rights.

The Commonwealth explains the quoted portion of its comment was "made in the context of explaining how the Commonwealth proved beyond a reasonable doubt that [appellant] committed the murder by means of torture."  Commonwealth's Brief at 150.  The Commonwealth notes the comment was preceded by a description of the forty-five minutes appellant "took to use multiple implements to inflict pain[,]" *id.*, and was followed by a description of the evidence and did not reference the jury:

> The trauma to the genital region.  These aren't, in and of themselves, killing blows, but you know what they are?  They're pain.  They're pain.  And that's what she got to undergo in those last minutes of her conscious life, as she's

---

[23] With respect to each subclaim, the Commonwealth asserts that, to the extent appellant is alleging a substantive claim of prosecutorial misconduct, this claim is waived as it could have been raised on direct appeal.  *See* 42 Pa.C.S. §9544(b).  While the Commonwealth is correct in its assertion, appellant's subclaims also include allegations of ineffective assistance of counsel, which we address herein.

going through that forty-five minute to an hour beating. As she's going through that time frame, she got to experience pain.

N.T. Penalty Phase, 11/16/09 at 109. Based on this, the Commonwealth argues the prosecutor simply described evidence relating to the "elements of the charges leveled . . . and the evidence necessary to prove those elements at trial." Commonwealth's Brief at 151, *quoting Commonwealth v. Clancy*, 192 A.3d 44, 60 (Pa. 2018). The Commonwealth asserts this was proper, as it was required to prove appellant intentionally caused pain and suffering above and beyond what it took to kill the victim, the comments were grounded in the evidence, and "[a] prosecutor has more latitude in presenting argument at the penalty phase[.]" *Id.*, *quoting Eichinger*, 108 A.3d at 836-37.

The PCRA court concluded the Commonwealth did not engage in prosecutorial misconduct, noting the prosecution has "more oratorical latitude during the penalty phase of a capital trial than in a non-capital trial[,]" because "the presumption of innocence no longer applies." PCRA Court Op. at 94, *quoting Eichinger*, 108 A.3d at 836-37. The court explained "not every intemperate or improper remark mandates the granting of a new trial[,]" as reversible error occurs only when the unavoidable effect of the challenged comments would prejudice the jurors and form in their minds a fixed bias and hostility toward the defendant to the extent they "could not weigh the evidence and render a true verdict." *Id.* at 95, *quoting Commonwealth v. Koehler*, 36 A.3d 121, 144 (Pa. 2012) (emphasis omitted). The court further noted it must evaluate the comments based on the "context in which they were made." *Id.* (citation omitted).

Here, the PCRA court found the prosecutor's comments allegedly asking the jury to put themselves in appellant's shoes came during an explanation of the assault and its duration. The comment was then immediately followed by reference to the pain she incurred as a result of the injuries to her vaginal area. The PCRA court found this description was directed at establishing the torture aggravator and, "taken in context, the

comments flowed from the evidence and were geared toward[ ] demonstrating an element that the Commonwealth had to prove to prevail during the sentencing phase." *Id*. at 96. Because the comments were made in this context, the court found they did not form a fixed bias or hostility in the jurors' minds, and appellant's ineffectiveness claim fails for lack of arguable merit.

When assessing claims of prosecutorial misconduct, courts must evaluate a two-part test. First, the court must determine "whether the substance of the statement at issue was improper, and (if it was) then proceed[ ] to apply the unavoidable prejudice test." *Clancy*, 192 A.3d at 58. The "substance analysis center[s] upon the elements of the charges leveled against the defendant and the evidence necessary to prove those elements at trial." *Id.* at 60. Courts "evaluate[ ] whether the remarks [are] fairly . . . made in response to defense counsel's arguments[,]" *id.*, and whether they "relate back to the evidence on the record[,]" *Commonwealth v. M. Johnson*, 533 A.2d 994, 996 (Pa. 1987). We have consistently held prosecutorial misconduct "will not be found where comments were based on evidence or proper inferences therefrom or were only oratorical flair." *Clancy*, 192 A.3d at 60, *quoting Commonwealth v. Hall*, 701 A.2d 190, 198 (Pa. 1997). As noted, reversible error occurs only when the "unavoidable effect of the challenged comments would prejudice" the jury against defendant such that it could not "render a true verdict." *Koehler*, 36 A.3d at 144, *quoting Commonwealth v. Cox*, 983 A.2d 666, 687 (Pa. 2009).

Following our review, we agree with the PCRA court that, when the prosecutor's challenged comments are viewed in the context of the surrounding statements, they do not rise to the level of prosecutorial misconduct. The prosecutor's comments were directly preceded by an explanation of the duration of the victim's beating and were followed by a description of the injuries that caused her pain. *See* N.T. Penalty Phase,

11/16/09 at 108-09. The prosecutor continued his closing remarks by highlighting additional evidence demonstrating appellant intended to cause pain above and beyond what was necessary to kill the victim. In light of this context, we conclude the prosecutor's comments clearly related both to the evidence presented at trial and to the specific elements of the torture aggravator the Commonwealth was required to prove. *See id.* at 109-11. As such, the challenged comments were not improper and, accordingly, appellant's trial counsel were not ineffective for failing to object to them.

2. The Prosecution's Burden for Proving the Torture Aggravator

Appellant further alleges the prosecutor repeatedly misstated the legal standard for proving torture by making multiple references to the fact the victim was in pain. Appellant contends that, contrary to the Commonwealth's general references to pain throughout its closing, the "intent to cause pain, even considerable pain" — as opposed to the intent to cause unnecessary pain for its own sake — misstates the legal standard for proving torture and fails to "provide a meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." Appellant's Brief at 92-93, *quoting Godfrey v. Georgia*, 446 U.S. 420, 427 (1980). In appellant's view, aggravating circumstances "must channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance[,]" and the prosecutor's references to pain failed to meet that standard in violation of the Sixth, Eighth, and Fourteenth Amendments. *Id.* at 93, *quoting Godfrey*, 446 U.S. at 428. Appellant further contends his trial counsel were ineffective for failing to object to the prosecutor's statements. *See id.*

The Commonwealth responds that this subclaim is "frivolous[,]" as appellant only references the issue in a subheading and wholly fails to explain how the Commonwealth supposedly misstated the burden. Commonwealth's Brief at 152. Moreover, it notes

appellant does not acknowledge the prosecutor did provide a "verbatim" definition of torture during his closing argument. *Id.* at 152-53, *citing* N.T. Penalty Phase, 11/16/09 at 111. The Commonwealth argues it provided this verbatim definition and then properly proceeded to explain how 150 blows to a two-year-old victim resulted in immeasurable pain beyond what was required to kill.

The PCRA court determined the prosecutor did not mispresent the definition of the torture aggravator. Contrary to appellant's assertion, the court explained the prosecutor referenced the appropriate standard and then made references to the victim's pain throughout his description of the beating to establish the aggravator. Although the prosecutor did not distinguish torture aggravator pain from the "usual pain attendant to all murders" throughout his closing, the PCRA court found the pain references did not affect the fairness of the trial. PCRA Court Op. at 97-98 (emphasis omitted), *citing Commonwealth v. Green*, 581 A.2d 544, 561-62 (Pa. 1990) ("a criminal trial does not unfold like a play with actors following a script" and "a criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone"). Because the jury did "hear[] a correct recitation of the law from the prosecutor[,]" the PCRA court found appellant's claim lacked merit and should be dismissed. *Id*. at 98.

We similarly disagree with appellant's assertion the prosecutor misstated the legal standard for torture and engaged in misconduct by doing so. Notably, the prosecutor did provide the jury with a definition of torture during his closing argument consistent with the model definition:

> Torture, under the law, . . . is about the nature and the quality of what a killer puts his victim through and about what that intent is. He intended to kill. He intended to cause pain and suffering above and beyond what it took to kill. . . . This is about a specific intent to kill and a specific intent to cause pain and suffering that wasn't necessary. It wasn't necessary to kill her. He didn't need to do this. He didn't need to do this to kill her. He did it because he wanted her to feel pain. That's torture.

N.T. Penalty Phase, 11/16/09 at 110-11. Appellant does not explain how the Commonwealth allegedly misstated the definition of torture in its references to the victim's pain, other than to state those references did not provide a "meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not." Appellant's Brief at 93, *quoting Godfrey*, 446 U.S. at 427. While the prosecutor did not define "torture" each time he referenced the victim's pain in his closing, he was not required to, and our review of the record demonstrates he did not misstate or diminish the Commonwealth's burden in his references. Accordingly, appellant's subclaim fails for lack of merit and his counsel was not ineffective.

3. Precluding the Jury's Consideration of Mitigation Evidence

Finally, appellant alleges the Commonwealth engaged in misconduct when the prosecutor stated the jury should disregard or give less weight to the mitigating evidence he presented because that mitigation did not parallel the abuses the victim suffered or explain his actions. In support of this allegation, appellant notes the prosecutor stated: "What may have happened to [appellant] in his childhood may be appalling, but it does not mitigate against what he did to [the victim.] . . . That upbringing does not explain and does not excuse what he did to [the victim.]" N.T. Penalty Phase, 11/16/09 at 113-14. Appellant asserts this statement was improper and inconsistent with *Tennard v. Dretke*, 542 U.S. 274 (2004), which provides Eighth Amendment jurisprudence does not require evidence to establish a nexus between the alleged mitigator and the crime in order to be relevant. *See* Appellant's Brief at 94. Thus, appellant contends the Commonwealth's statements impaired the jury's ability to make a reasoned assessment of his credibility or to consider the mitigating evidence, and that, had the jury been able to do so, it would have reached a different result. Appellant further maintains his counsel were ineffective for failing to request a "corrective instruction" to remedy the impact of this misconduct. *Id.*

The Commonwealth argues it did not err in urging the jury to find the aggravating factors outweighed appellant's offer of mitigation. It notes it is well established a prosecutor "may rebut mitigation evidence in his arguments and may urge the jury to view such evidence with disfavor[,]" which is precisely what the Commonwealth did in this case. Commonwealth's Brief at 154, *quoting Eichinger*, 108 A.3d at 838-39 (emphasis omitted).

The PCRA court found the Commonwealth did not engage in prosecutorial misconduct by arguing that what happened to appellant did not mitigate what he did to the victim, as this Court expressly allowed such argument in *Eichinger*. *See Eichinger*, 108 A.3d at 838-39. Hence, the PCRA court found the Commonwealth's arguments rebutting appellant's mitigating evidence were not improper and appellant's claim lacks merit.

We likewise decline to find the prosecutor engaged in misconduct by allegedly requiring a nexus between the mitigation evidence and the crime. Contrary to appellant's assertion, our review of the record indicates the prosecutor told the jury it would have to "weigh[ ] between the aggravators and the mitigators," N.T. Penalty Phase, 11/16/09 at 114, and encouraged the jury to find the aggravators outweigh the mitigators, *see id.* Although the Commonwealth did inquire with appellant's mother and sister as to whether he was abused in any of the specific ways the victim was abused here, at no point did the prosecutor indicate the jury would have to find a nexus between a mitigating factor and the crime to assign it weight. Rather, the prosecutor expressly encouraged the jury to find the mitigators appellant offered did not outweigh the torture of a two-year-old. *See id.* As we explained in *Eichinger*, this is not improper. Indeed, a prosecutor is "permitted to argue against [mitigation evidence] or produce contrary evidence[,]" as it is "well settled '[a] prosecutor may rebut mitigation evidence in his arguments and may urge the jury to

view such evidence with disfavor.'" *Eichinger*, 108 A.3d at 938-39, *quoting Chmiel*, 30 A.3d at 1185. Here, the prosecutor did exactly that — he advanced an argument the jury should discount mitigating factors or, at the very least, find they are outweighed by the aggravators. Because this was not improper, appellant's claim lacks arguable merit, he has not demonstrated his counsel were ineffective for failing to request a "corrective instruction[,]" and his claim was properly dismissed. Appellant's Brief at 94.

### S. Appellant Was Tried While Incompetent

Appellant claims he was incompetent at the time of trial and that allowing the trial to "proceed against [him] while incompetent violated due process, [his] right to effective assistance of counsel[,] and the protection from an arbitrary and capricious sentence." Appellant's Brief at 95. He notes competence can "ebb and flow . . . requiring the trial court and counsel to consistently monitor a defendant for signs of incompetence." *Id.* In support, appellant asserts his behavior during trial was "irrational and bizarre" as evidenced by the fact he ignored counsel's advice and asked to be removed during critical witness testimony because he "emotionally [couldn't] handle it," *id.*, quoting N.T. Jury Trial, 11/10/09 at 235, and he was taking 150 milligrams of Elavil, an "anti-depressant psychotropic medication[,]" each day to help him sleep at the time of trial, *id.* at 95-96, *citing* N.T. Jury Trial, 11/13/09 at 691 *and* N.T. Hearing, 2/27/17 at 78. He suggests the Elavil "temporarily interrupted [his] ability to participate in his own defense and communicate with counsel," and his counsel were ineffective for not identifying the need for a competency evaluation. *Id.* at 96. Appellant also argues he proved this claim by providing the post-conviction expert testimony of Dr. Richard Dudley, who concluded that, due to appellant's preexisting psychiatric and neuropsychological deficits, combined with the Elavil he was administered during trial, he was incompetent to stand trial. *See id.*, *citing* N.T. Hearing, 2/27/17 at 18-20, 57-60. Appellant states this testimony is

unrebutted. Finally, he asserts the PCRA court erred in dismissing his ineffectiveness claim for lack of merit, as "counsel unreasonably failed to have [him] evaluated for competency when they had an expert at their disposal, and the court failed to order a competency evaluation, all prejudicing [him]." *Id.* at 96-97.

In response, the Commonwealth argues appellant failed to meet his burden of demonstrating he was incompetent and, as a result, his claim lacks arguable merit. As the Commonwealth sees it, despite Dr. Dudley's testimony appellant may have been incompetent at the time of trial, appellant presented inconsistent expert testimony insufficient to establish incompetence and Dr. Dudley's conclusion was not supported by the record. With respect to Dr. Dudley's testimony specifically, the Commonwealth emphasizes his acknowledgement he was not present at the time of trial, did not interview appellant before, during, or immediately after trial, and did not speak with appellant's trial counsel. *See* Commonwealth's Brief at 155. In addition, the Commonwealth explains Dr. Dudley, when questioned about excerpts from the trial transcript where appellant interacted with the court or was colloquied by it, conceded appellant appeared aware of his circumstances, was able to respond to inquiries regarding his case, and informed the court he was taking Elavil to sleep, but was able to understand the proceedings. *See id.*, *citing* N.T. Hearing, 2/27/17 at 72-83. Given all this, the Commonwealth asserts Dr. Dudley's conclusion, when considered in relation to the ample evidence demonstrating appellant's competency, does not establish appellant's claim.

Regarding that other evidence, the Commonwealth identifies and discusses the testimony of Dr. Schneider, Dr. Rotenberg, and appellant's trial counsel. Dr. Schneider, who, as noted, was retained by appellant's counsel in advance of trial, interviewed and examined appellant twice in the months leading up to trial, with the second interview occurring in late October 2009, just weeks before trial began. During the June 6, 2018,

post-conviction hearing, Dr. Schneider testified he did not have any issue communicating with appellant during the two evaluations and did not identify any difficulty with appellant understanding what was going on. *See* N.T. 6/6/18 at 60 (responding "[n]o" when asked "at any point in time did you have any concerns as to whether or not [appellant] was able to understand or appreciate why you were speaking with him"). Based on these in-person interactions, Dr. Schneider concluded it was not necessary to conduct competency-specific testing. *See id*. at 61.

The Commonwealth next highlights the hearing testimony of Dr. Rotenberg, who interviewed appellant at the time of trial and found no indicia of incompetence. It notes Dr. Rotenberg spent a significant portion of the November 2009 interview evaluating appellant's mental status and did not find evidence of incompetence despite extensive questioning. He stated:

> With regard to [appellant's] sensorium, he knew that this was November 11th, 2009, that it was a Wednesday. He knew that he was in York County Prison. He knew that Obama was President, and, [I] quote, he's black just like me. He was able to make simple changes swiftly and accurately. He was able to spell the word "world" forwards and backwards correctly. He was able to make simple abstractions, such as the fact that an apple and an orange are fruit, a dog and a cat are animals, and a nickel and a dime are money. He was even able to interpret proverbs, a more sophisticated form of abstraction. Thus, when asked the meaning of the old saying, you can't judge a book by its cover, he replies, you can't judge me by what you see right now, but what I really am. So that's a very, very good interpretation of a proverb.

N.T. 2/8/19 (afternoon) at 13-14. Dr. Rotenberg further testified he was aware appellant was taking Elavil at the time of trial and his evaluation, and that, even accounting for appellant's use of the medication, appellant was "[t]otally" able to understand and respond to mental status questions and exhibited no competency concerns on November 11, 2009, which was midway through trial. *Id.* at 19.

Finally, the Commonwealth notes both of appellant's trial counsel testified during the evidentiary hearings and neither identified any competency-related concerns. In particular, the Commonwealth highlights Attorney Weitzman's testimony that he: never had any issues communicating with appellant, as appellant was able to "comprehend[] what [he was] saying"; he did not have "any issues understanding [appellant]"; appellant "underst[oo]d and appreciate[d] the testimony in the courtroom"; appellant participated in his own defense; and appellant was able to "explain or articulate his request as to what he wanted [with respect to] the outcome of the case[.]" N.T. 8/21/18 at 168-70. In addition, the Commonwealth notes that during Attorney Robinson's hearing testimony, he recalled appellant had a lengthy conversation with the prosecutor midway through trial, in which appellant personally suggested and attempted to negotiate an alternative plea agreement. *See* N.T. 8/22/18 at 282-84. Attorney Robinson also stated appellant was able to understand and interact with him and Attorney Weitzman throughout trial, and that, while appellant did not want to be in the courtroom when pictures of the victim's injuries were displayed, "that d[id]n't raise any issue of competency" because "[h]e just didn't want to see it." *Id*. at 281. Considering this testimony, the Commonwealth argues Dr. Dudley's conclusion, when viewed in concert with Dr. Schneider, Dr. Rotenberg, and trial counsel's contemporaneous evaluation and/or interactions with appellant, was "self-contradictory at best," and appellant's claim lacks merit. Commonwealth's Brief at 161.

The PCRA court agreed with the Commonwealth, finding Dr. Dudley's testimony was limited to his review of the record, as he did not speak with appellant's trial counsel or the doctors who evaluated appellant around the time of trial. *See* PCRA Court Op. at 93. It also noted the trial court colloquied appellant multiple times, including about his use of Elavil, and did not identify any problem with that usage or with appellant's ability to understand and appreciate the court's questions. Thus, the PCRA court, referencing the

testimony of Drs. Schneider and Rotenberg and appellant's trial counsel, concluded appellant's claim lacked arguable merit and dismissed it.

Having thoroughly reviewed the record, we hold appellant's claim is meritless. A defendant is presumed to be competent and carries the burden of demonstrating, by a preponderance of the evidence, he is incompetent to stand trial. *See Blakeney*, 108 A.3d at 752. To prove he was incompetent, appellant must establish "he was either unable to understand the nature of the proceedings against him or unable to participate in his own defense." *Commonwealth v. Flor*, 998 A.2d 606, 617 (Pa. 2010), *quoting Commonwealth v. Pruitt*, 951 A.2d 307, 316 (Pa. 2008). More specifically, "the relevant question in a competency determination is whether the defendant has sufficient ability at the pertinent time to consult with counsel with a reasonable degree of rational understanding, and to have a rational as well as a factual understanding of the proceedings." *Id.*, *quoting Pruitt*, 951 A.2d at 316.

Here, appellant was evaluated by Dr. Schneider two weeks before his trial as well as by Dr. Rotenberg during trial, and neither expert found any evidence appellant was unable to communicate or understand the circumstances around him, much less that he was incompetent. Appellant's trial counsel reinforced this conclusion, as both testified appellant was able to communicate with them in advance of and throughout trial, actively conveyed his thoughts during the trial itself, and participated in his own defense by personally proposing a plea agreement to the prosecutor. Appellant also engaged in colloquies with the trial court, wherein he acknowledged he understood the charges against him and the nature of the proceedings, and stated he was taking Elavil but it did not impact his ability to understand. In sum, there is no evidence in the record at the time of trial to indicate appellant was incompetent during any part of it.

In the absence of such evidence, we disagree with appellant's assertion Dr. Dudley's conclusion is unrebutted or that it establishes his claim. To the contrary, and as noted above, in rendering his conclusion, Dr. Dudley did not speak with the doctors who evaluated appellant at the time of trial and did not discuss trial counsel's observations of appellant or their communications with him in November of 2009. Additionally, Dr. Dudley did not evaluate appellant until years after his trial concluded, such that he had no contemporaneous impressions of appellant in making his competency finding. Although appellant counters that Dr. Schneider and Dr. Rotenberg did not conduct an actual competency evaluation, this fact does not change our conclusion. Dr. Schneider and Dr. Rotenberg are mental health experts able to assess whether a competency evaluation is warranted, evaluated appellant during the relevant time, and found him to provide coherent answers to mental status questions. There is no indication in the record that appellant exhibited a lack of understanding or behavior that would point to the need for such an evaluation or indicate he was unable to participate in his own defense.[24] We conclude the record supports the PCRA court's determination appellant failed to demonstrate he was incompetent, or that counsel were ineffective for failing to seek such an evaluation. *See Flor*, 998 A.2d at 617.

---

[24] In his principal brief appellant asserts he exhibited "irrational and bizarre behavior, including ignoring the advice of counsel and asking to be removed during critical witness testimony because he 'emotionally [couldn't] handle it.'" Appellant's Brief at 95 (citation omitted). Significantly, appellant does not identify any additional "bizarre" behaviors in connection with this claim; we presume he is referring to the fact that, when the court did not allow him to leave the courtroom during the presentation of the photographs of the victim's injuries, he "laid his head flat on counsel's table, stuffed his ears with cotton, plugged his fingers in his ears, and rocked himself back and forth." *Johnson*, 42 A.3d at 1032-33. However, as we noted on direct appeal, appellant's actions "did not disrupt his trial[,]" *id.* at 1033, and Attorney Robinson testified during the post-conviction hearings that appellant's desire to not view the photographs was because "[h]e just didn't want to see it[,]" not because of any competency issue. N.T. 8/22/18 at 281. Appellant's bare assertions related to this trial behavior, unsupported by citations to the record or argument, are insufficient to meet his burden of demonstrating incompetency.

Finally, to the extent appellant attempts to raise a due process claim and/or argues his sentence was arbitrary and capricious due to his alleged incompetency and counsel's failure to evaluate for it, we find this claim is waived for failure to develop it, as appellant did not provide the PCRA court with any argument to satisfy the demanding standards governing such claims. *See, e.g., Commonwealth v. Hannibal*, 156 A.3d 197, 215 (Pa. 2016) (denying relief where appellant's "undeveloped due process overlay" was "unsupported by meaningful argument"). Even assuming appellant sufficiently raised this claim, the evidence in the record did not support incompetency or the need for such an evaluation for the reasons discussed above. Accordingly, appellant's claim fails.

### T. Counsel Failed to Move for Change of Venue

Appellant next claims trial counsel were ineffective for failing to move for a change of venue. He alleges his counsel had no reasonable basis for this decision, particularly in light of the fact he experienced negative, prejudicial press coverage in advance of and during trial. As appellant explains: there was a "barrage of graphic, inflammatory, and racist publicity about the case and [himself]" following his arrest, in the months leading to trial, and during the trial itself, Appellant's Brief at 97; this publicity included "inflammatory headlines[,]" as well as details about the victim's condition when the police and EMTs responded to the scene, the extent and nature of her injuries, and the duration of the beating, *id*. at 97-98; and blog and social media posts encouraged imposition of the death penalty as justice for the victim, *see id*. at 98-99. Appellant maintains the pervasive and prejudicial nature of this coverage was evidenced by the fact more than a quarter of his prospective jurors had read, watched, or heard about the facts of the case, four of those individuals were impaneled, and two prospective jurors formed opinions as to appellant's guilt based on what they heard before trial.

As further support for this claim, appellant notes he asked trial counsel about his failure to file for a change of venue during the evidentiary hearing, and Attorney Weitzman acknowledged he "underestimated how much press coverage [the case] had gotten during the trial" and that he and co-counsel would have filed a motion for change of venue if they thought it was meritorious. *Id.* at 100, *quoting* N.T. 8/21/18 at 165-66. Appellant also points to Attorney Robinson's hearing testimony that he did not recall having a conversation with Attorney Weitzman about whether they should file for change of venue, but did note he thought there was an "extended cooling off period[,]" so a venue motion was not warranted. *Id.*, *quoting* N.T. 8/22/18 at 249-50.

Appellant also highlights that the Commonwealth and the PCRA court both recognized he experienced "some prejudice[,]" particularly in connection with news articles reporting he admitted to police that he beat the victim, as that coverage is "presumptively prejudicial." Appellant's Reply Brief at 30, *quoting* PCRA Court Op. at 101 *and* Commonwealth's Brief at 165. Finally, appellant argues the Commonwealth's reliance on *Commonwealth v. Briggs*, 12 A.3d 291 (Pa. 2011), and *Tharp*, *supra*, is misguided, as those cases considered whether the trial court abused its discretion in denying a motion to change venue, rather than a claim of ineffective assistance.

In reply, the Commonwealth argues appellant's trial counsel were not ineffective because, even if appellant had been prejudiced by aspects of the coverage, he "fail[ed] to establish that this publicity was so extensive, sustained, and pervasive that the community must be deemed to have been saturated with it, or that the publicity was so fresh in their minds that it removed their ability to be objective." Commonwealth's Brief at 162. In asserting this position, the Commonwealth directs us to our case law holding that, for a defendant to be entitled to a change of venue due to pretrial publicity, he must "show that the publicity caused actual prejudice by preventing the empaneling of an

impartial jury." *Id.*, *quoting Briggs*, 12 A.3d at 313. Importantly, the Commonwealth continues, evidence that a prospective juror heard about a case through media outlets or "formed some impression or opinion as to the merits of the case[,]" *id.* at 163, *quoting Irvin v. Dowd*, 366 U.S. 717, 722 (1961), does not "render them incapable of jury service," as such a standard, in today's "information age," would prove "impossible" to meet, *id.*, *quoting Briggs*, 12 A.3d at 313 *and Irvin*, 366 U.S. at 723.

Moreover, the Commonwealth explains that even in cases where the pretrial publicity referenced a defendant's admission to police, resulting in presumptive prejudice, that prejudice alone is insufficient to warrant a change of venue. *See id.* at 163-64, *citing Tharp*, 830 A.2d at 529. Rather, even where prejudice is presumed, "change of venue will still not be compelled" unless the defendant also demonstrates the pretrial publicity saturated the community and "there was insufficient time between the publicity and the trial for any prejudice to have dissipated." *Id.* at 164, *quoting Commonwealth v. Robinson*, 864 A.2d 460, 484 (Pa. 2004).

The Commonwealth argues appellant has not made this showing. Despite his reference to twenty-three articles and blogs that reported his crime, eight were released after jury selection began and, the Commonwealth therefore submits, are irrelevant in assessing pretrial publicity. Moreover, it notes that of the ninety-five prospective jurors, thirty-eight heard something about the case prior to trial, two followed coverage of the case throughout, and, of the thirty-eight, only three, or 2.1%, indicated they formed an opinion of appellant's guilt, and those prospective jurors were removed for cause. The Commonwealth asserts these figures demonstrate pretrial publicity was not pervasive and/or that there was a sufficient cooling off period, such that change of venue was not required. Indeed, it observes that, in *Briggs*, this Court found 12% of prospective jurors having a fixed opinion was not "an inordinately high percentage" and, similarly, in *Tharp*,

30% did not necessitate a venue change. *Id.* at 166, *quoting Briggs*, 12 A.3d at 316. Thus, the Commonwealth maintains appellant has not proved arguable merit.

The PCRA court agreed appellant failed to demonstrate his trial counsel were ineffective for not filing a motion for change of venue. In assessing whether publicity was pervasive or had saturated the community, the court noted it could only look to information published before trial. Moreover, it explained appellant was required to demonstrate publicity about his case caused actual prejudice or was presumptively prejudicial. On this point, the court described how appellant submitted "pretrial publicity exemplars that indicate[d] the existence of some prejudice[,]" because at least some referenced appellant's attempt to suppress statements he made about previously beating the victim. PCRA Court Op. at 101. The court also acknowledged one seated juror "remembered something about [appellant]'s request to suppress statements being denied," but he did not have "any knowledge of what those statements were" and confirmed he "could put aside this knowledge and judge the case on the facts presented in court." *Id.*, *citing* N.T. Jury Selection, 11/4/09 at 135-37.

Nevertheless, recognizing a finding of prejudice does not automatically warrant a change of venue, the PCRA court continued its analysis to determine if the publicity saturated the community and whether there was a sufficient cooling off period. The court concluded there was a sufficient cooling off period based on the low percentage of prospective jurors with fixed opinions about appellant's case and the fact that, of the four articles mentioning appellant's admission, only one included detail about the statement and it was released over a year before trial began. In light of these facts, and the seated jurors' sworn statements they did not have fixed opinions about the case and would follow the law, the court found appellant's claim lacked merit and dismissed it.

We agree with the PCRA court's analysis. A juror's mere knowledge about the facts of a case does not render that individual incapable of jury service. *See Briggs*, 12 A.3d at 313. As the United States Supreme Court made clear in *Irvin*, "[i]t is not required . . . that the jurors be totally ignorant of the facts and issues involved." *Irvin*, 366 U.S. at 722. "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard." *Id.* at 723. It is therefore "sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Id.* Moreover, a demonstration of presumptive prejudice is not, in and of itself, sufficient to establish a meritorious change of venue claim. Rather, a defendant must also show the case publicity saturated the community and the cooling off period was insufficient. *See Robinson*, 864 A.2d at 484.

Having reviewed the record and the parties' arguments, we conclude counsel were not ineffective for failing to seek a change of venue because appellant has not demonstrated his claim has arguable merit or his counsel lacked a reasonable basis. With regard to the former, we agree with appellant he did establish presumptive prejudice, as at least one of the pretrial articles discussed his filing of a motion to suppress his admission to police. *See Tharp*, 830 A.2d at 529. Yet, as the PCRA court identified, the one article that provided detail as to his statement was published more than a year before trial began, and only one juror recalled any information related to the admission but did not even know the substance of the statement. Moreover, of the fifteen articles published pretrial, several were blog or social media posts, which, as the PCRA court noted, presumably "would have a significantly lesser reach than established papers" or media outlets. PCRA Court Op. at 101-02. While 40% of the prospective jurors heard something about the case prior to trial, such knowledge does not preclude jury service, *see Briggs*,

12 A.3d at 313, and, notably, only 2.1% formed an unalterable opinion about the case — a markedly lower figure than in *Briggs* and *Tharp* — and those individuals were appropriately dismissed for cause.

Ultimately, of the individuals seated on appellant's jury and selected as alternates, eleven of the fifteen had no information about the case prior to *voir dire*, and of the four who had heard about the case, only one knew significant detail. Further, none of the seated jurors had an opinion about appellant's guilt or innocence, and all agreed they would follow the court's instructions. *See Briggs*, 12 A.3d at 314-15 ("[T]he *voir dire* examination is the proper place to determine whether a defendant's public notoriety has resulted in a prospective juror's prejudice."), *quoting Commonwealth v. Casper*, 392 A.2d 287, 297 (Pa. 1978).

Considering the facts above — most notably, the low percentage of prospective jurors with a fixed opinion about appellant's guilt or innocence and the jurors' overall lack of knowledge about the case — we conclude there was a sufficient cooling off period between the presumptively prejudicial publicity and the trial, such that a change of venue was not warranted. We conclude appellant's claim lacks merit, and the PCRA court did not err in dismissing it. Even assuming appellant's claim had arguable merit, we further find appellant has not demonstrated his counsel lacked a reasonable basis for not filing for change of venue. To the extent appellant argues Attorney Weitzman's testimony demonstrated a lack of awareness or expectation of the case's publicity or its impact, this argument is unavailing as counsel's expectations of coverage during trial are not relevant. In addition, Attorney Robinson testified he thought there was an "extended cooling off period[,]" such that a change of venue motion was not warranted. Appellant's Brief at 100, *quoting* N.T. 8/22/18 at 250. Considering this uncontradicted testimony, and our

conclusion regarding the cooling off period, we hold appellant has not demonstrated his counsel lacked a reasonable basis for their inaction.

## U. Bias or the Appearance of Bias During Appellate Review

Next, appellant alleges the PCRA court erred in denying his claim that two former members of this Court who participated in his direct appeal were or appeared biased, which amounted to structural error. Specifically, he states former Justices J. Michael Eakin and Seamus P. McCaffery were included on over 4,000 "religiously, racially, and sexually offensive" email messages, some of which were sent before or during the pendency of his direct appeal. Appellant's Brief at 103-06. Appellant states the former justices reviewed and affirmed dismissal of a domestic violence-related claim on his direct appeal, yet received at least two emails that "expressly sanctioned and made ligh[t] of domestic violence." *Id.* at 103, *citing* Amended PCRA Petition, Ex. 45. One email purported to provide "Marital Advice" that "women should keep their mouths shut so that their spouses do not beat them black and blue[,]" and the second included a video clip in which a "husband blows up his wife at Christmas and wishes her 'Merry Christmas, Bitch.'" *Id.*, *citing* Amended PCRA Petition, Ex. 45.

Appellant further notes Justice Eakin admitted to "racial and misogynistic biases" in a 2015 Judicial Conduct Board deposition, wherein he testified, "so much of humor is funny because it has, if not a grain of truth, at least a stereotypical aspect that people can look to and say, I understand what you're saying, ha, ha, ha." *Id.* at 104, *quoting* Amended PCRA Petition, Ex. 49, *quoting In re: The Honorable J. Michael Eakin*, N.T. 10/20/15 at 35. Appellant contends the former justices' receipt of these messages, as well as Eakin's testimony, demonstrates their bias or, at the very least, the appearance of bias, which "compromised the integrity, fairness, and impartiality of their review" of his direct appeal and warrants relief. *Id.* at 103-04.

Appellant further argues his "federal constitutional rights to due process of law, effective assistance of direct appeal counsel, and meaningful appellate review were violated by the participation of biased jurists in his appellate proceedings." *Id.* at 104-05, *citing Johnson v. United States*, 520 U.S. 461, 468-69 (1997). He posits the former justices should not have reviewed his claim on direct appeal that the trial court erred in restricting the testimony of his mother — "herself a domestic abuse victim" — during the penalty phase. *Id.* at 106-07. Appellant claims Justice Eakin's "dismissive attitude towards domestic abuse victims, and in particular his finding[,]" as author of the majority opinion, that the testimony of appellant's mother "was irrelevant as mitigation, is clearly tainted by the bias demonstrated in his email exchanges." *Id.* Finally, appellant notes this Court has granted relief in instances where judges engaged in inappropriate *ex parte* communications or demonstrated bias towards a litigant, and faults the PCRA court for requiring him to produce "an email or other evidence related specifically to his case" to establish his claim. *Id.* at 106, *citing In Matter of Larsen*, 616 A.2d 529, 579 (Pa. 1992); *In re Adoption of L.J.B.*, 18 A.3d 1098, 1111 (Pa. 2011).

The Commonwealth responds appellant has not produced evidence of any bias against him, and notes this Court's decision in his direct appeal was unanimous, such that "the rest of this Court were in agreement with the legal determinations in former Justice Eakin's opinion." Commonwealth's Brief at 169. The Commonwealth relies on *Aetna Life Insurance Co. v. Lavoie*, 475 U.S. 813 (1986), in which the United States Supreme Court considered whether a due process violation occurred where an Alabama Supreme Court Justice cast the deciding vote in an unsettled area of state law while he was involved in a pending lawsuit in another Alabama court addressing a very similar issue. *See Lavoie*, 475 U.S. at 822. The Commonwealth asserts that, in *Lavoie*, the Court recognized most "matters relating to judicial disqualification [do] not rise to a

constitutional level" and "the law will not suppose a possibility of bias or favour in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea." *Id.* at 820 (citations omitted). Instead, it held due process is violated where a judge, like the judge in *Lavoie*, had a "direct, personal, substantial, [and] pecuniary" interest in the outcome. *Id.* at 824-25, *quoting Ward v. Village of Monroeville*, 409 U.S. 57, 60 (1972). This did not extend, however, to the other jurists on the Alabama Supreme Court, as any potential interest they had in the case could not be characterized as "direct, personal, substantial, [and] pecuniary" where there was "nothing in the record [to] even suggest[ ] that these justices had any knowledge of the class action before the court issued a decision on the merits." *Id.* at 825-26.

The Commonwealth asserts this case is readily distinguishable from *Lavoie* because Justices Eakin and McCaffery did not cast the deciding votes, no uncertainty existed in the law with respect to any of appellant's issues on direct appeal, and the allegations of personal bias here do not allege interests that are direct, personal, substantial, or pecuniary. Moreover, the Commonwealth observes the Judicial Conduct Board did not "produce[ ] any evidence that [Justice Eakin], in his written judicial opinions, ever demonstrated any over[t] bias due to the race, gender, ethnicity, or sexual orientation of a litigant or witness." Commonwealth's Brief at 172, *quoting In re Eakin*, 150 A.3d 1042, 1048 (Pa. Ct. Jud. Discipline 2016). Thus, the Commonwealth maintains appellant has not demonstrated his rights were violated and this claim was properly dismissed.

In his reply brief, appellant contends the Commonwealth's reliance on *Lavoie* is misplaced, because the United States Supreme Court "did not hold that personal bias could **never** establish such a violation" and, here, Justices Eakin and McCaffery had "clearly established personal biases . . . related to racial bias" and appellant is African American. Appellant's Reply Brief at 32 (emphasis in original).

After considering the record, the PCRA court concluded appellant failed to establish his claim because he did "not produce[ ] an[y] e-mail, participated in by either justice, regarding his own case." PCRA Court Op. at 104. Absent such a showing, the court found appellant could not demonstrate entitlement to relief.

We agree appellant has failed to establish this claim, albeit for a different reason than that underlying the PCRA court's determination or advanced by the Commonwealth. The standard for judicial recusal is well established. In *Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868 (2009), the United States Supreme Court held recusal is required "when the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton*, 556 U.S. at 872 (citation and quotation omitted). In assessing that probability, the *Caperton* Court directed the pertinent inquiry is "whether, under a realistic appraisal of psychological tendencies and human weakness, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." *Id.* at 883-84 (citation and quotation omitted). This inquiry, the High Court explained, is an objective one focused on determining whether an average judge is "likely" to be neutral, or whether there is an unconstitutional "potential for bias." *Id.* at 881 (internal quotation marks omitted). Although some circumstances requiring judicial recusal are clear — such as in the "extreme facts" of *Caperton*, where the jurist in question had a personal stake in a particular case — the Court recognized it will be the "rare instance[ ]" and "extraordinary situation where the Constitution requires recusal." *Id.* at 887, 890. In fact, the Court remarked that "most disputes over disqualification will be resolved without resort to the Constitution" because state "codes of judicial conduct provide more protection than due process requires[.]" *Id.* at 890.

When raised in the post-conviction context, a PCRA petitioner raising a judicial bias-based claim must raise the claim in a timely petition and plead and prove by a preponderance of the evidence that: (1) his due process rights were violated by the jurist's failure to recuse because, viewed objectively, the probability of actual bias on the part of the judge is too high to be constitutionally tolerable; and (2) this violation "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. §9543(a)(2)(i). Upon review of the record and having applied these standards, we conclude appellant has not met his burden. As noted, he asserts his due process rights were violated because former Justices Eakin and McCaffery "engaged in email exchanges that were both racially offensive and insensitive to the seriousness of domestic violence[.]" Appellant's Brief at 107. He attempts to connect the bias reflected in these emails with his case by pointing to a statement in this Court's opinion on direct appeal "that the testimony of [his] mother, herself a domestic abuse victim, was irrelevant as [to] mitigation[.]" *Id.* at 106-07. Appellant notes his "[d]irect appeal counsel attempted to argue that the trial court's restriction of the examination of [his] mother at the penalty phase improperly limited the presentation of all relevant mitigating evidence." *Id.* at 106. This mitigating evidence, according to appellant, would have included his mother testifying about the fact she was also abused as a child, such that his family has a history of abuse and she parented appellant the same way.

Significantly, however, appellant's direct appeal claim did not reference or involve the issue of domestic violence, contrary to his current characterization of the claim. Instead, the issue he posed on direct appeal was whether the trial court erred in limiting the testimony of his mother as it related to general mitigation. The following exchange precipitated the objection at issue:

| | |
|---|---|
| Trial Counsel: | What do you think about what [appellant] did in this case? |
| Commonwealth: | Your Honor, I'm going to object. |
| Trial Court: | Sustained. |
| Trial Counsel: | How does it make you feel that two of your children have been convicted of murder? |
| Appellant's Mother: | I'm crazy. I feel like the worst person in the whole world. |
| Trial Counsel: | Why? |
| Commonwealth: | I'm going to object. Again, personal opinion. |
| Trial Court: | Defense? |
| Trial Counsel: | It's the penalty phase. I'm just trying to elicit as much as I can so the Jury has a flavor for what we're looking at here. |
| Trial Court: | Sustain the objection. |

N.T. Penalty Phase, 11/16/09 at 79-80.

On direct appeal, appellant claimed the "trial court erred in sustaining this objection because he, as a capital defendant, was entitled to present all relevant evidence in mitigation, including his mother's testimony." *Johnson*, 42 A.3d at 1037. In response, the Commonwealth argued the evidence was inadmissible "third party impact" testimony, which was irrelevant to appellant's character, record, or circumstances. *Id.* The trial court reached the same conclusion, explaining appellant "sought his mother's personal opinions as to what she thought about his actions and how those actions affected her[,]" which constituted improper personal opinion. *Id*. After reviewing the record on appeal, we agreed. In particular, we found "appellant's mother's testimony as to how she felt regarding her sons being murderers is irrelevant to appellant's character or record or the circumstances of his offense[,]" and, therefore, it was "not relevant to Pennsylvania's

capital sentencing statute." *Id.* at 1038, *citing Montalvo*, 986 A.2d at 98-99; *Commonwealth v. Bomar*, 826 A.2d 831, 852 (Pa. 2003); *Commonwealth v. Harris*, 817 A.2d 1033, 1054 (Pa. 2002). Thus, we held the trial court did not abuse its discretion in "prohibiting appellant's mother from offering irrelevant testimony regarding how appellant's offense affected her." *Id.*

As the foregoing makes clear, appellant's direct appeal before this Court did not specifically reference the issue of domestic violence. In fact, a review of appellant's direct appeal brief demonstrates he did not in any way identify the limitation of his mother's testimony as a domestic violence-related claim. Instead, his argument before this Court on direct appeal consisted of the following:

> The present death penalty statute in Pennsylvania permits a capital defendant to present a wide range of mitigating evidence in order to support a finding of one or more mitigating factors, including the catch-all mitigator. In this case, the [trial court] sustained [the] Commonwealth objection during direct questioning of Cassandra Lloyd, [appellant]'s mother and a mitigation witness. As a capital defendant, [appellant] was entitled to present a broad range of mitigation evidence. Accordingly, the [trial court] erred in restricting this evidence.

Appellant's Direct Appeal Brief at 20; *see also id.* at 58-59. While appellant did challenge the court's limitation of his mother's testimony on mitigation grounds, he did not allege, as he does now, that he sought to introduce domestic violence-related evidence. And, since such an argument was never presented, this Court did not address it in resolving appellant's claim the trial court erred in restricting his mother's testimony. We therefore reject appellant's claim that Justices Eakin and McCaffery's actual or possible bias infected this Court's resolution of his direct appeal. Simply put, appellant cannot prove by a preponderance of the evidence that the "probability of actual bias on the part of the [former justices was] too high to be constitutionally tolerable[,]" where the issue this Court addressed on direct appeal was unrelated to the offensive emails appellant highlights. *Caperton*, 556 U.S. at 872 (citation omitted).

Moreover, to the extent appellant contends the former justices' "clearly established personal biases . . . related to rac[e]" impacted their review of his case and violated his right to due process, this claim likewise fails. Appellant's Reply Brief at 32. Appellant's bare assertion of general racial bias is insufficient to demonstrate that, viewed objectively, the probability of actual bias was too high to be constitutionally tolerable, or that this alleged violation "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. §9543(a)(2)(i). Consequently, we hold appellant's claim was properly dismissed and he is not entitled to relief.

### V. Cumulative Error

Finally, appellant argues we should grant him relief because constitutional claims of error "are to be considered cumulatively as well as individually, and cumulative error or prejudice may provide a basis for relief whether or not the effect of individual errors warrants relief." Appellant's Brief at 107, *citing Williams v. Taylor*, 529 U.S. 362, 397-98 (2000). He maintains this applies to prejudice arising from ineffective assistance of counsel, which is also assessed cumulatively, and "need not be presented or exhausted as a separate due process-based cumulative error claim." *Id.*, *citing Strickland*, 466 U.S. at 687. Appellant asserts that, although he is entitled to relief on each claim individually, the "overwhelming evidence presented at the PCRA hearing[s] demonstrates" the "many prejudicial errors the Court can aggregate[,]" as it is "clear that the cumulative prejudice resulting from the combination of deficient performance by counsel, court error, and prosecutorial misconduct mandates relief." *Id.* at 108-09.

The Commonwealth responds by noting that relief based on cumulative prejudice is warranted where a defendant has failed to prove only the prejudice prong of an ineffectiveness claim and, despite an inability to prove prejudice arising from the individual

errors, the cumulative effect of all errors results in prejudice that warrants relief. *See* Commonwealth's Brief at 173. The Commonwealth asserts cumulative prejudice does not apply in this case because, as is clear from the foregoing, appellant's claims "fail for multiple reasons and not just for want of prejudice[.]" *Id.*

The PCRA court rejected appellant's claim, explaining that, while he is correct that "if multiple instances of deficient performance are found, the assessment of prejudice may be premised upon cumulation[,]" here, even considering all of his "claims *in toto*," it could not "conclude that [he] suffered prejudice." PCRA Court Op. at 102-03, *quoting Commonwealth v. Johnson*, 966 A.2d 523, 532 (Pa. 2009).

This Court has emphasized "no number of failed claims may collectively warrant relief i[f] they fail to do so individually," *Sepulveda*, 55 A.3d at 1150, *quoting Rainey*, 928 A.2d at 245, but we have also recognized "if multiple instances of deficient performance are found, the assessment of prejudice properly may be premised upon cumulation." *Id.*, *quoting Johnson*, 966 A.2d at 532. As is clear from our disposition of appellant's claims set forth at length throughout this opinion, we have determined appellant's individual claims lack merit. However, to the extent we have reached the prejudice prong in our consideration of any of his ineffectiveness claims, we are satisfied that, even if cumulated, appellant is not entitled to relief.

## CONCLUSION

For the foregoing reasons, we hold the PCRA court properly dismissed appellant's petition for PCRA relief, and so we affirm the order denying relief.

Justices Mundy and Brobson join the opinion.

Justice Donohue files a concurring opinion in which Justice Wecht joins.

Chief Justice Todd did not participate in the consideration or decision of this matter.